UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CLAUDE A. REESE, Individually and on Behalf of All Others Similarly Situated | ) ) ) | Civil No. 1:07-cv-01530-CKK |
| | ) | CLASS ACTION |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) ) | |
| | ) | |
| THE MCGRAW-HILL COMPANIES, INC., HAROLD MCGRAW III, and ROBERT J. BAHASH, | ) ) ) | |
| | ) | |
| Defendants. | ) ) | |
| | ) | |

**<u>CONSOLIDATED CLASS ACTION COMPLAINT FOR SECURITIES FRAUD</u>**

## TABLE OF CONTENTS

I.      INTRODUCTION AND NATURE OF THE ACTION ....................................................1

II.     JURISDICTION AND VENUE ..............................................................................................4

III.    THE PARTIES.........................................................................................................................5

IV.     THE INDIVIDUAL DEFENDANTS' ACCESS TO CRITICAL INFORMATION..........6

V.      CLASS ACTION ALLEGATIONS ......................................................................................8

VI.     CONFIDENTIAL WITNESSES ..........................................................................................10

VII.    CONTEXT OF DEFENDANTS' FALSE AND MISLEADING STATEMENTS ..........12

        A.      Background ................................................................................................................12

        B.      The Evolution of Mortgage Lending Practices Leads to Increased Use of
                Mortgage-Backed Securities ................................................................................13

        C.      The Subprime Mortgage Market.........................................................................15

        D.      The Subprime and Alt-A Markets Converge .....................................................18

        E.      Fraud and Risk on the Rise ................................................................................23

        F.      The Tidal Wave Crashes and the Company Downgrades Thousands of
                RMBS and CDO Securitizations .......................................................................32

VIII.   DEFENDANTS' FALSE AND MISLEADING STATEMENTS DURING THE
        CLASS PERIOD.....................................................................................................................39

IX.     THE TRUTH IS PARTIALLY REVEALED....................................................................111

X.      ADDITIONAL SCIENTER ALLEGATIONS...................................................................113

XI.     APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE
        MARKET DOCTRINE ......................................................................................................115

XII.    LOSS CAUSATION.............................................................................................................116

XIII.   NO SAFE HARBOR ...........................................................................................................120

XIV.    COUNT I:  FOR VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE
        ACT AND RULE 10b-5 PROMULGATED THEREUNDER AGAINST ALL
        DEFENDANTS .....................................................................................................................121

XV.     COUNT II:  FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE
        ACT AGAINST THE INDIVIDUAL DEFENDANTS .....................................................124

XVI.    JURY TRIAL DEMANDED ........................................................................................126

CERTIFICATE OF SERVICE ................................................................................................128

1.      Lead Plaintiff Boca Raton Firefighters and Police Pension Fund (the "Plaintiff"), individually and on behalf of a proposed class (the "Class") of all purchasers of the publicly traded common stock of The McGraw-Hill Companies, Inc. ("McGraw-Hill" or the "Company") between July 25, 2006 and March 11, 2008, inclusive (the "Class Period"), by and through its undersigned counsel, brings suit against McGraw-Hill, Harold McGraw III ("McGraw III"), and Robert J. Bahash ("Bahash") (McGraw-Hill, McGraw III, and Bahash are sometimes collectively referred to as "Defendants").

2.      Plaintiff seeks remedies under the Securities Exchange Act of 1934 (the "Exchange Act") as a result of the fraudulent scheme undertaken by the Defendants and the economic loss suffered when the true facts were partially revealed to the public through a series of disclosure events.  The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

## I.    INTRODUCTION AND NATURE OF THE ACTION

> Ratings are designed to be stable.  Unlike market prices, they do not fluctuate on the basis of market sentiment.  But they can and do change – either as a result of fundamental adjustments to the risk profile of a bond or the emergence of new information.  Ratings are not recommendations to buy, sell or hold a particular security.  They simply provide a tool for investors to assess risk and differentiate credit quality [. . . .] we base our opinions on documented facts.  We are continually reviewing and refining our processes, and we make adjustments to our ratings when the facts demonstrate the need to make adjustments, and not a moment sooner.
>
> -- Vickie Tillman, Executive Vice President of Credit Market Services for Standard & Poor's, August 31, 2007 (printed in *The Wall Street Journal*).

3.      McGraw-Hill's Financial Services Segment, operating under the Standard & Poor's ("S&P") brand, assigns credit ratings to structured finance transactions and deals.  Despite Vickie Tillman's ("Tillman") statement that "ratings are designed to be stable" and change on the "emergence of new information" and "documented facts," the Company's ratings of residential

mortgage backed securities ("RMBS") and collateralized debt obligations ("CDOs") during the Class Period suffered from many problems – they were neither stable, reflective of an understood risk profile, nor indicative of current information – and Defendants knew it. To the contrary, the Company's ratings failed on a grand scale to incorporate the actual credit risk underlying RMBS and CDOs. Because of those facts, Defendants' Class Period statements set forth herein were materially false and misleading.

4.      At the start of the Class Period, the Company was riding high. Rating RMBS and CDO transactions was big business for McGraw-Hill, and the Company reported eye-popping growth in its Financial Services Segment, which drove the Company's stock price. Indeed, as the Company rode the RMBS and CDO – or "structured finance" – tidal wave, its stock price reached an intra-day, Class Period high price of $72.50 per share on June 5, 2007, up from $54.32 at the start of the Class Period. Cashing in on the Company's artificially inflated stock price, the Company's Executive Vice President and Chief Financial Officer ("CFO"), Bahash, sold more than $13,500,000 million worth of Company stock – all at prices above $68.00 per share – within just a few dollars of the stock's Class Period peak.

5.      As the Class Period progressed, however, fundamental problems in the structured finance market began to rear their head, especially in the subprime lending area. Despite the fact that Defendants knew of these problems and failed to adequately warn McGraw-Hill shareholders of the negative impact they would have on the Company's financial performance and stock price, Defendants issued falsely optimistic and misleading statements designed to quell investor unrest and maintain the artificial inflation of the Company's stock price.

6.      For example, although the Company's S&P brand alerted the market to some of the problems underlying the RMBS and CDO securitization markets as those markets deteriorated (and eventually imploded during late 2006 and throughout 2007), McGraw-Hill described itself as a

company both positioned and capable of addressing such problems with its ratings, ratings staff, and ratings models through active surveillance of the transactions S&P rated. As quoted above, Tillman assured investors the Company's ratings were stable, based on facts, reflected an understanding of the risk profile, and would change on the emergence of new information. The truth, however, was that the Company omitted critical, then-known material facts concerning its ongoing failure to monitor RMBS and CDO securitizations that it rated – thus making its ratings uninformed and outdated. The result of these material omissions was that Defendants' Class Period statements concerning the Company's financial performance and outlook lacked a reasonable basis, and McGraw-Hill investors were misled.

7.      The partial truth behind Defendants' false and misleading statements leaked out to the market in fits and spurts during the Class Period – Company investors learned of bits of truth here and there. For example, as the Class Period progressed, the Company's Financial Services division slashed its assessments of ***thousands*** of subprime RMBS and CDOs – representing ***billions of dollars*** worth of securitized transactions. Since that time, the Company's S&P brand has been maligned by critics for grossly underestimating the danger of bonds backed by subprime RMBS and CDOs tied to subprime mortgages. By November 2007, the Company's S&P division had lowered its credit ratings on more than $70 billion worth of structured finance transactions, and found itself under investigation by the New York Attorney General, the Connecticut Attorney General, the Ohio Attorney General, and the Securities Exchange Commission ("SEC"). At the same time, the Company's stock price fell below $50 per share. It was not until the end of the Class Period, however, that investors learned the truth with respect to the Company's true financial condition and saw the bigger picture behind Defendants' fraudulent scheme and material omissions – when on March 11, 2008, the Company withdrew its recently issued financial guidance for 2008 and refused to offer any revised guidance for its shareholders. At that point, investors learned that the Company

had no handle on its ratings of RMBS and CDOs, or its financial outlook, and that the Company's stock price had been artificially inflated throughout the Class Period.

8.    Indeed, on March 11, 2008, the last day of the Class Period, McGraw-Hill withdrew its recently issued forecast for 2% to 4% full-year revenue growth in its Financial Services Division – citing deterioration in the U.S. housing market and the economy.  Speaking at a Bear Stearns & Co. media conference in Palm Beach, Florida, McGraw-Hill's Chief Executive Officer ("CEO"), McGraw III, stated that "softness" in demand for new credit ratings would "clearly have an effect" on the Company's first-quarter financial results.  Moreover, the Company declined to give a new forecast for full-year revenue growth.  In response to the revelation that the Company was abruptly withdrawing revenue guidance (and revealing its true financial condition), the Company's stock price dropped , on a day of broad market gains, to as low as $36.32 on enormous trading volume – *a 49% decline* from its Class Period high – removing the remaining artificial inflation from the Company's stock price.

9.    Although the abrupt removal of the guidance marks the end of the Class Period, since that time, more evidence regarding Defendants' fraud has reached the market.  As recently as May 1, 2008, the Company's S&P brand, in a stunning and unprecedented move, announced it would stop rating new bonds composed of U.S. second mortgages, admitting that it could not conduct a "meaningful analysis" of that market segment and could not understand the risk profile of the debt. In other words, the Company admitted its rankings had failed on a fundamental level and were, in essence, meaningless.  The Company had never previously refused to rank broad classes of securities linked to U.S. home loans.

## II.    JURISDICTION AND VENUE

10.    This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1331.

11.     Venue is proper in the Judicial District pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1391(b).  In addition, the causes of action asserted herein occurred and/or accrued, among other places, in this District.  At all times relevant to this action, McGraw-Hill was headquartered in this District, and many of the acts and transactions alleged herein, occurred in substantial part in this District.

12.     In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities markets.

## III.    THE PARTIES

13.     Plaintiff Boca Raton Firefighters and Police Pension Fund purchased McGraw-Hill securities on the open market during the Class Period as set forth in its certifications previously filed with the Court.  On February 11, 2008, the Court appointed Plaintiff as Lead Plaintiff in this action.

14.     Defendant McGraw-Hill is a New York corporation with its principal place of business located at 1221 Avenue of the Americas, New York, New York 10020.

15.     Defendant McGraw III has been Chairman of the Board since 2000 and President and CEO of the Company since 1998.  Prior to that, McGraw III had been President and Chief Operating Officer of the Company since 1993.  McGraw III was Executive Vice President, Operations, of the Company from 1989 to 1993.  Prior to that, he was President of McGraw-Hill Financial Services Company, among other things.  In addition, McGraw III has served as a Director of the Company since 1987 and is the Chair of the Executive Committee.

16.     Defendant Bahash is the Company's Executive Vice President and CFO.  During the Class Period, he was also responsible for managing the Company's use of information technology, including the strategic direction of the Company's electronic commerce strategy, investor relations

and the Company's centralized manufacturing operations. Before his appointment to executive vice president and CFO in 1988, Bahash was Senior Vice President, Finance and Manufacturing. He joined McGraw-Hill in 1974 as manager of financial auditing, and has held a number of finance-related positions.

## IV.    THE INDIVIDUAL DEFENDANTS' ACCESS TO CRITICAL INFORMATION

17.    McGraw III and Bahash (collectively the "Individual Defendants") were privy to confidential and proprietary information concerning McGraw-Hill, its operations, finances, financial condition, and present and future business prospects. The Individual Defendants also had access to material adverse non-public information concerning McGraw-Hill, as discussed in detail below. Because of their positions with McGraw-Hill, the Individual Defendants had access to non-public information about its business, finances, products, markets and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and board of directors meetings and committees thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or were severely reckless in disregarding the fact that adverse facts specified herein had not been disclosed to, and were being concealed from (in order to mislead), the investing public.

18.    Throughout the Class Period, the Individual Defendants were able to, and did, control the contents of the Company's SEC filings, reports, press releases, and other public statements. The Individual Defendants were provided with copies of, reviewed and approved, and/or signed such filings, reports, releases, and other statements prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. The Individual Defendants were also able to, and did, directly or indirectly, control the conduct of McGraw-Hill's business, the information contained in its filings with the SEC, and its public statements. Moreover,

the Individual Defendants made or directed the making of affirmative statements to the investing public, and participated in meetings, conference calls, and discussions concerning such statements. Each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations that were being made were then false and misleading.  As a result, each of the Individual Defendants is responsible for the accuracy of McGraw-Hill's corporate releases detailed herein and is therefore responsible and liable for the representations contained therein.

19.     The Individual Defendants are liable as direct participants and co-conspirators with respect to the wrongs complained of herein.  In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20 of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of McGraw-Hill's business.

20.     The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to the investing public.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

21.     As senior executive officers and/or directors and controlling persons of a publicly traded company whose common stock and other securities were, and are, registered with the SEC pursuant to the Exchange Act, and whose shares traded on the New York Stock Exchange ("NYSE") and governed by the federal securities laws, the Individual Defendants had a duty to disseminate

promptly accurate and truthful information with respect to McGraw-Hill's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, to correct any previously issued statements that had become materially misleading or untrue, so that the market price of McGraw-Hill's common stock would be based upon truthful and accurate information.  The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

22.     The Individual Defendants are liable as primary participants in a fraudulent scheme and wrongful course of business which operated as a fraud or deceit on purchasers of McGraw-Hill common stock by disseminating materially false and misleading statements and/or concealing material adverse facts.  The fraudulent scheme employed by the Individual Defendants was a success, as it:  (i) deceived the investing public regarding McGraw-Hill's prospects and business; (ii) artificially inflated the price of McGraw-Hill common stock; and (iii) caused Plaintiff and other members of the Class to purchase McGraw-Hill common stock at inflated prices (which artificial inflation came out of the stock when the relevant truth regarding the true financial condition of McGraw-Hill was revealed).

## V.     CLASS ACTION ALLEGATIONS

23.     Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased the securities of McGraw-Hill during the Class Period.  Excluded from the Class are Defendants, the officers and directors of the Company, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

24.     Because McGraw-Hill has millions of shares outstanding, and because the Company's shares were actively traded on the NYSE, members of the Class are so numerous that

joinder of all members is impracticable.  According to McGraw-Hill's SEC filings, as of February 1, 2007 (shortly before the close of the Class Period), McGraw-Hill had more than 354 million shares of common stock outstanding.  While the exact number of Class members can only be determined by appropriate discovery, Plaintiff believes that Class members number at least in the thousands and that they are geographically dispersed.

25.     Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff and all of the Class members sustained damages arising out of Defendants' wrongful conduct complained herein.

26.     Plaintiff will fairly and adequately protect the interests of the Class members and has retained counsel experienced and competent in class actions and securities fraud litigation.  Plaintiff has no interests that are contrary to or in conflict with the members of the Class it seeks to represent.

27.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impossible for the members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

28.     Questions of law and fact common to the members of the Class predominate over any questions that may affect only individual members, in that Defendants have acted on grounds generally applicable to the entire Class.  Among the questions of law and fact common to the Class are:

(a)     Whether Defendants violated federal securities laws as alleged herein;

(b)     Whether Defendants' publicly disseminated press releases and statements during the Class Period omitted and/or misrepresented material facts;

(c)     Whether Defendants breached any duty to convey material facts or to correct material acts previously disseminated;

(d)     Whether Defendants participated in and pursued the fraudulent scheme or course of business complained of;

(e)     Whether Defendants acted willfully, with knowledge or severe recklessness, in omitting and/or misrepresenting material facts;

(f)     Whether the market prices of McGraw-Hill common stock during the Class Period were artificially inflated due to the material nondisclosures and/or misrepresentations complained of herein; and

(g)     Whether the members of the Class have sustained damages as a result of the decline in value of McGraw-Hill's stock when the truth was revealed and the artificial inflation came out and, if so, what is the appropriate measure of damages.

## VI.     CONFIDENTIAL WITNESSES

29.     Plaintiff's allegations herein, concerning the falsity of Defendants' statements and the scienter of the Individual Defendants, are based, in part, on interviews with dozens of former McGraw-Hill employees and others with knowledge of the facts underlying Defendants' fraud. Throughout the course of the investigation of Defendants' fraud, many confidential former insiders provided information regarding the various methods employed by Defendants in furtherance of their scheme to defraud shareholders. Indeed, among those confidential former employees interviewed in the course of the investigation of the fraudulent scheme and wrongful business practices complained of herein were a former S&P Research Associate in CDO Surveillance, a former Ratings Analyst Assistant, a former IT Manager, a former Senior Contract Coordinator, and a former RMBS Deals Research Assistant.

30.     These confidential witnesses included a former Company employee who worked for S&P from the Fall of 2004 until the Summer of 2006 as a Research Associate. As part of her/his responsibilities, this former employee accounted for RMBS and CDO deals by "backing-up" S&P's databases. In that regard, this former employee reviewed CDO income statements for discrepancies. This former employee has information concerning, among other things, the Company's bias in rating CDOs and RMBS

31.     Another confidential witness worked for McGraw-Hill from December 2004 until November 2007, and worked as an IT Manager in the S&P Structured Finance Division from December 2004 until June 2006. This former employee reported initially to Senior IT Director of the Structured Finance Group Juan Vega ("Vega"), who was replaced by Elaina Pressner ("Pressner"). Vega and Pressner, in turn, reported to Company Vice President Rom Ranagoff ("Ranagoff"). As part of her/his responsibilities, this former employee maintained portfolio management software products for the Company, such as "CDO Evaluator" and "Levels." This former employee has knowledge, among other things, concerning the information used in the Company's structured finance models and the Company's surveillance on structured finance deals.

32.     One confidential witness worked for the Company as a Ratings Analyst Assistant from January 2007 through July 2007. This former employee reported to CDO Department Associate Director Jimmy Koyliski ("Koyliski"), who, in turn, reported to Steve Vandeberg ("Vandeberg"). This former employee was responsible for providing supportive work for the Company's "CORE" database and has information concerning the S&P's CDO Department.

33.     One confidential witness worked for the Company as a Senior Contract Coordinator in the S&P Global Licensing and Contracts Department from 2000 until April 2007. This former employee reported to Manager of Contract Operations Patrick Allen ("Allen"), who reported to Vice President of Global Licensing and Contracts Evonne Inglesh ("Inglesh"). As part of her/his

responsibilities, this former employee supervised and reviewed Company contracts, including those for the Company's Structured Finance ratings transactions, and prepared weekly, monthly, quarterly, and year-end reports from the Contract Management Information System database.

34.     One confidential witness worked for the Company from October 2006 until January 2007 as a temporary consultant at S&P.  This former employee worked in the Company's Structured Finance Department as part of a team of consultants tasked with building ratings on structured finance transactions.  This former employee has knowledge regarding the Company's backlog of structured finance transactions that needed to be updated during the Class Period.

## VII.     CONTEXT OF DEFENDANTS' FALSE AND MISLEADING STATEMENTS

### A.     Background

35.     McGraw-Hill was incorporated in December 1925, and touts itself as a leading global information services provider serving the financial services, education and business information markets.  The Company has three reportable segments: McGraw-Hill Education, Financial Services, and Information & Media.  The Financial Services segment operates under the S&P brand as one reporting unit and, according to the Company, provides credit ratings, evaluation services, and analysis globally on corporations, financial institutions, securitized and project financings, and local, state and sovereign governments.  McGraw-Hill states that its Financial Services segment provides a wide range of analytical and data services for investment managers and investment advisors globally.

36.     Prior to and throughout the Class Period, the Company's Financial Services segment, operating under the S&P brand, was heavily involved in rating structured finance transactions made up of RMBS and CDOs – including large amounts of transactions in the subprime market.  The revenue associated with the Company's structured finance ratings was a tremendous driver of the

Company's growth during the Class Period, and was also a primary driver of the Company's stock price.

### B. The Evolution of Mortgage Lending Practices Leads to Increased Use of Mortgage-Backed Securities

37.    Prior to 1980, the mortgage market was dominated by savings and loan associations that originated conventional mortgage loans, mortgage bankers that originated government mortgage loans, and mortgage brokers that handled everything else.  Changes enacted by the Depository Institutions Deregulation and Monetary Act of 1980 reduced the lending advantage that savings and loans had enjoyed, and allowed the mortgage market to shift toward federal banks and federal government sponsored enterprises ("GSEs").  GSEs played a key role in the development of mortgage-backed securities.

38.    The Alternative Mortgage Transaction Parity Act of 1982 authorized state-chartered lending institutions to offer alternative mortgage products, including those with variable interest rates and balloon payments, and has been credited with increasing parity among state-and federally-chartered mortgage banks.  The Tax Reform Act of 1986 stimulated mortgage demand by retaining the federal income tax deduction for mortgage interest and eliminating similar deductions for consumer debt like car loans and educational loans.  These legislative changes, together with the increased popularity of mortgage-backed securities, encouraged and facilitated product innovation and expanded credit availability during the 1980s.

39.    Prior to the mid-1990s, most lenders required potential homeowners to put 20% down on their new home loans.  People with damaged credit, employees with non-wage income, and young people with few savings for down payments were largely shut out of the housing market.  As the millennium approached, however, the mortgage lending market changed dramatically, and credit became much more widely available.

40.     The increasing popularity of the Internet and advances in computing technology made it easier and cheaper to process and package new loans.  Electronic databases made it easier for lenders to rapidly attempt to assess the risk of lending to borrowers with damaged credit, and the secondary market for mortgage-backed securities helped lenders package riskier loans with less risky ones to theoretically mitigate an investor's risk exposure.  Strong interest in mortgage-backed securities from investors in the United States and abroad gave lenders a great incentive to lend – they were able to rapidly resell their loans on the secondary market, making a profit, and unload the risk of payment default to others.

41.     These changes had dramatic consequences for home ownership.  According to a recent study by the Federal Reserve Bank of Chicago, subprime lending put as many as two million families into homes over the past decade; helping push the United States homeownership rate to 69% in 2005, up from 65% in 1995.  Although subprime lending alone did not cause this change, it accounted for close to half of the four-percentage point rise in home ownership and is believed to have had almost as much of an impact on rising home ownership as demographic changes, low interest rates, and government programs combined.  Former Federal Reserve Chairman Alan Greenspan has referred to subprime lending as "the democratization of credit."

42.     Changes over the past decade not only helped subprime homebuyers enter the market, but also first-time homebuyers.  In 2006, 45% of first-time homebuyers purchased their homes with no money down, up from 43% a year earlier, and up from nearly zero percent ten years before.

43.     At about the same time that credit became more readily available, housing prices were increasing, and doing so dramatically in certain areas, such as California and Florida.  Homebuyers seeking to purchase increasingly expensive homes were gravitating toward mortgages with low introductory interest rates and other features that put previously unaffordable homes within their grasp.  Nontraditional mortgages became the norm.  Nationwide, nontraditional loans

comprised over one-third of all loans made during the first nine months of 2006, up from about 2% in 2000.

### C.    The Subprime Mortgage Market

44.    The residential mortgage industry provides financing to consumers to purchase homes, refinance the rate and term of a previous loan or loans, and to refinance mortgage loans for the purpose of extracting cash from the value of the subject property.  There are numerous types and permutations of mortgage loan products in the market place today.  Mortgage loans primarily differ based on if a loan rate is fixed, payment options, maturity date, amortization of principal, and maturity date.  In addition, lending is divided up into 1st lien and 2nd lien loans.  A key driver for the industry is based upon how borrowers are categorized with respect to a financing transaction. This breaks down into primarily three major categories: prime borrowers, Alt-A borrowers, and subprime borrowers.

45.    Subprime mortgage loans are issued to borrowers who do not qualify under conventional credit criteria.  Typically, this means borrowers with low credit scores or deficient credit scores.  The credit scores, FICO being a popular score used in the market, are based on the borrowers' past payment patterns and the amount of credit available to the borrower.  A subprime borrower will pay a higher interest rate commensurate with higher credit risk.

46.    Prior to the mid-1990s, subprime borrowers typically could not borrow more than 65% of the value of their home.  This maximum loan to value ratio, however, began to be increased as house price appreciation began to increase.

47.    The securitization market for residential mortgages can be divided up into transactions based on prime credit borrowers, Alt-A borrowers and subprime borrowers.  Mortgage loans are pooled together and securitized in order to gain off-balance sheet treatment for loan originators.  There is little or no regulation for the securitization transaction itself.  The criterion for

the credit exposure for any bond made up of pools of mortgage loans is primarily based upon rating agencies such as McGraw-Hill's S&P brand.

48.     Over two-thirds of all mortgages are securitized – bundled together and sold in groups on the secondary market.  The loan bundles, commonly known as RMBS, CDOs, or collateralized loan obligations ("CLOs"), are widely seen as a way to spread credit risk to investors.  Monthly payments on the mortgages are used to pay the interest on the underlying mortgage-backed bonds.

49.     U.S. CDOs were extremely vulnerable to ratings volatility and represented a pooling of the lowest rated subprime securities or swaps tied to subprime securities.  The CDOs represented extremely leveraged securities that were used to support the funding of subprime and Alt-A securitizations.  Without the CDO structure, there were no buyers for the lower rated subprime securitization securities.  CDO securities were sold by underwriters based on a high yielding asset in a low yield environment and were derived from residential mortgage securities.  It was not disclosed that a majority of the securities underlying CDOs rated during the Class Period were subprime securities or reference portfolios related to subprime securities.

50.     CDOs give issuers the ability to sell off all credit risk or purchase protection for/hedge a portfolio of subprime securities that could not otherwise be sold.

51.     CDO structures represented transactions that investors typically did not understand or have the correct detail available to make correct decisions regarding the probability of default.  McGraw-Hill and the issuers had access to complete data to determine the probability of default and the volatility of such ratings.

52.     Some CDOs are purchased by private firms, while others are purchased by Fannie Mae and Freddie Mac, the two GSEs.  The importance of CDOs within the US economy is unquestioned.  As of June 30, 2006, mortgage-backed securities accounted for the largest segment of

the US bond market (23% of all outstanding bond market debt, compared to corporate bonds at 20% and Treasury debt at 16%).

53.     According to the Mortgage Bankers Association, $1.2 trillion of privately-issued, RMBS were issued in 2006. An additional $966 million worth of RMBS were issued by the GSEs. Nonprime loans comprised two-thirds of private CDOs in 2005, up from 46% in 2003.[1]

54.     The growth of nontraditional mortgages has changed the market for securities. As the nonprime market has grown, so has the popularity of private-label mortgage backed securities (*i.e.*, those securitized by entities other than the GSEs). Total outstanding private-label CDOs represented 29% of all CDOs in 2005, more than double its share in 2003. At the same time, the share of CDOs held by the GSEs fell by 10 percentage points, from 53% to 43%. The shift is a dramatic reflection of investor choice. Investors left the guaranteed, GSE-backed mortgage market for higher interest rates in the potentially riskier, privately-backed mortgage securities market. As they did so, the amount of capital available to fund nontraditional mortgages grew, making more of these mortgages available to more borrowers.

55.     Most asset-backed securities are priced in relation to the London Interbank offered rate, or Libor. High-quality debt issues are priced to yield Libor or a few hundredths of a percentage point above it. Traditionally, lower-quality debt has been priced one or two percentage points higher than Libor. Demand has been high for lower-quality debt securities, which typically offer higher yields than many other bonds. Demand for these securities has also encouraged several Wall Street investment firms, including Morgan Stanley, Merrill Lynch, and Bear Stearns, to purchase subprime

---

[1] Somewhat ironically, the worldwide nature of mortgage securitizations has meant that homeownership, the cornerstone of the American Dream, has been made possible in significant part by foreign investors. As much as one third of the $2 trillion in CDOs issued since 2002 has been purchased by foreign investors.

lenders. Using sophisticated methods, these Wall Street firms figured out how to profit on the difference between Libor and the price of high-yielding CDOs.

56.     The downside to the lucrative profit potential offered by mortgage-backed securities occurs when loans fail to perform (*i.e.*, become delinquent). When a lender sells a bundle of mortgages on the secondary market, the lender commonly agrees to buy back loans that fail to perform. If a large enough percentage of a lender's loans become non-performing, as has increasingly been the case, the lender will lack sufficient cash with which to buy back the loans, and will be forced to shut its doors. For example, Ownit Mortgage Solutions of Agoura Hills, California, which had billed itself as one of the top 15 lenders to homebuyers with weak or no credit histories, shut its doors in December 2006, when it ran out of cash needed to buy back its nonperforming loans from investment banks and others who purchased the loans on the secondary market. Sebring Capital Partners out of Carrollton, Texas, another subprime lender that ran out of cash to buy back nonperforming loans, folded the same week.

57.     Data on "Alt-A" mortgages, which are discussed in more detail below, that have been packaged up and sold as mortgage-backed securities show the growing popularity of low-documentation and stated-income loans. More than 80% of Alt-A mortgages that were securitized in 2006 were low-documentation, stated-income loans, according to Inside Mortgage Finance. That number was up from 68% in 2005. At its peak, 30% to 40% of all residential mortgage securitization transactions were either Alt-A or subprime related.

**D.    The Subprime and Alt-A Markets Converge**

58.     In an effort to meet the needs of borrowers who could not fully document their income, employment, or assets, a new mortgage lending segment was started in the 1990s called Alt-A. Typically, these borrowers were self employed and had good cash flow, but could not

document their income via tax returns, W-2's and pay stubs.  The typical Alt-A borrower had a higher FICO and a good credit history.

59.     After 2003, however, Alt-A lending rapidly evolved into loans that had very little borrower information or had stated income and stated assets.  In other words, information in the mortgage loan application (such as income and assets) was not verified by the lender, next to nothing was actually known about the borrower, and lenders were reliant only upon the borrowers' credit scores and the adequacy of the underlying collateral, not the primary source of repayment – the borrower's income.  Stated loans were ones where borrowers simply stated their assets and income: "You're a schoolteacher and you make a half million a year? OK. Your assets are $5 million? Fine." Other terms for these loans are no-documentation loans, or simply "liar loans."

60.     This type of aggressive lending and poor underwriting fostered the rise of mortgage brokers and lenders steering borrowers to stated, low, or "no doc" loans for convenience and fraud purposes.

61.     Prior to and during the Class Period, more and more borrowers and lenders took advantage of the ability to qualify borrowers for a loan while providing little or no documentation. The more housing prices rose, the more popular Alt-A loans became.  Put simply, "[t] he most creative mortgage products came out of the Alt-A business," said Manuel Ramirez, an analyst with Keefe Bruyette & Woods in San Francisco.

62.     When buyers realized they could not afford the home they wanted, they took out alternative mortgages that helped them pay the higher price.  Subprime and Alt-A mortgages requiring few documents – the stated income or "NINJA" loans (meaning No Income, No Job, No Assets) – allowed buyers to inflate their earnings and get bigger loans that they should never have qualified for.  Moreover, most mortgage originators routinely offered Alt-A as well as prime and subprime loans, according to a survey by Campbell Communications, a research firm in Washington,

D.C.  The Campbell study points to a significant convergence of the Alt-A, prime and subprime broker communities: nearly three-quarters of the brokers surveyed reported that they regularly originated all three types of mortgages, and very few appeared to concentrate on just one major type of product.

63.    For example, during 2006, *20%* of home purchase loans were Alt-A, *up from 5% in 2002*, according to a March 12, 2007 report by Credit Suisse.  The report stated that lenders took too many risks with Alt-A loans during 2006. For example:

- On average they loaned *88 percent* of the value of a home, with 55 percent of homebuyers taking out a simultaneous second mortgage, suggesting such borrowers didn't pay mortgage insurance and borrowed the full value of the home.

- Low or no documentation loans represented *81 percent* of all Alt-A purchase loans in 2006, up from 64 percent in 2004.

- Loans with a one-year fixed "teaser" rate accounted for 28 percent of Alt-A purchase loans last year, "setting the stage for considerable reset risk" when the teaser period ends.

64.    Put simply, the popularity of subprime and Alt-A mortgages exploded.  A record $400 billion of Alt-A loans were originated in 2006 – they accounted for 13.4% of all mortgages offered in 2006, according to industry publisher Inside Mortgage Finance.

65.    But, as the Alt-A business grew, more of these loans were offered to less creditworthy borrowers, creating what mortgage industry insiders called "Alt-B" products.  The result was that the difference between Alt-A and subprime loans was virtually eliminated because Alt-A products were weighted with subprime deficiencies.

66.    For example, in 2004 Fitch Ratings announced it had determined that material differences existed among Alt-A residential mortgage-backed securities due to a lack of uniform standards.  This vacuum led to real differences in Alt-A originations, leaving many Alt-A securitizations to bear "unprotected credit risks because of the implications from borrower credit, risk layering and intangibles."  Fitch Ratings further explained that the booming Alt-A market,

which was created to offer alternative processes for borrowers who could not comply with conforming or nonconforming program guidelines, evolved as new entrants and existing lenders expanded their product bases. "As lenders have embraced a wider credit spectrum under the Alt-A banner, there is such a blurring of the original definition of Alt-A, that the term should hold little meaning to investors," the report's co-author Cheryl Glory said in the announcement.

67.     By 2005, there was also an emphasis on processing and reduction of costs through technology for the mortgage loan origination process. The use of technology dramatically reduced the time needed to originate a new mortgage loans. In addition, the use of technology for automated underwriting ended up taking out significant verification steps in lieu of speeding up the approval process. High levels of automated underwriting allowed for loans to be processed without a "common sense" factor being applied or fraud prevention. Therefore, borrowers and brokers came to understand the automated underwriting model for lenders and work around it to provide either: (a) false information that could not be detected; or (b) move borrowers into programs that would require fewer details for the approval process (*i.e.*, NINJA loans). This trend was well known to rating agencies such as the Company's S&P brand.

68.     The result was that Alt-A and Alt-B pools had riskier loan characteristics than the Alt-A of the not-so-distant past, and combined with expanded origination guidelines and weaker underwriting practices, there was substantial credit risk.

69.     Data from Loan Performance tells a similar story: 58% of all mortgages originated in the fourth quarter of 2006 were low-documentation loans. That was up from 21% at the start of 2000. In California, which saw some of the biggest gains in home prices this decade, 86% of all mortgages offered in the fourth quarter of 2006 were low-documentation loans. That was up from 29% in early 2000, Loan Performance data shows. In other words, precious little was actually known about loan borrowers.

70.     During the Class Period, stated income loans at high loan-to-value ratios were a major source of abuse by lenders and brokers.  A key trend was for the broker-dealers securitizing mortgage loans to only underwrite a sample of the loans being purchased.  As an example, Nomura, a leading financial services group, did not typically underwrite 100% of the mortgage loans it purchased.  Nomura relied upon the representations and warranties of the seller/originator regarding the quality of the loans, but with little to no borrower data.  Such representations were of little to no value.

71.     Put simply, because of the increasing use of NINJA loans and similar products, the information underlying the mortgages that made up subprime and Alt-A RMBS and CDO transactions was simply unreliable.  Because there was little to no proof of a borrower's income, assets, or ability to pay back the mortgage, the market was "running on faith."  The importance of this fact cannot be understated, because the Company's models for rating RMBS and CDO loans were only as reliable as the information underlying them.  For that reason, it was of paramount importance for the Company's S&P brand to remain fully informed as to the performance of mortgages making up the loan pools *after* the initial rating through detailed surveillance.  For example, on April 17, 2007, as loan delinquencies and defaults were skyrocketing, S&P's Managing Director of Rating Services Susan Barnes ("Barnes") testified before the Senate Banking, Housing and Urban Affairs Committee's Securities, Insurance and Investment Subcommittee that:

> "S&P *actively monitors* trends in the housing market, the mortgage finance market, consumer credit and the economy to ensure that our models, methodologies, criteria and analysis…*are fully informed*," said Ms. Barnes. She also explained Standard & Poor's rigorous process for rating RMBS transactions which includes: an analysis of every loan, a simulation of the cash flow generated by each deal, a review of originator and servicer operational procedures, review of the transactional documents for legal and structural provisions, and *a surveillance process that allows S&P to monitor the ongoing performance of subprime mortgages included in subprime RMBS.*

72.    The truth, however, as detailed below, was that the Company did not analyze "every loan" and did not timely monitor "the ongoing performance of subprime mortgages included in subprime RMBS."

E.    **Fraud and Risk on the Rise**

73.    Although they have only recently grown to comprise a significant portion of the mortgage market, nontraditional mortgage loans have been available for many years.  In the past, nontraditional mortgage loans were offered only to higher-income borrowers, those with promising long-term earnings potential, such as young lawyers and doctors just finishing law and medical school, and to borrowers with uneven income streams, such as stock brokers or salespeople who receive large commission checks one or more times a year.  As set forth above, in the past several years, nontraditional loans have increasingly been used to help home buyers, especially those considered subprime borrowers, obtain credit.

74.    In an effort to qualify new borrowers for homes they would otherwise be unable to afford and to allow existing homeowners to refinance, even as interest rates were rising, lenders began lending to ever-riskier borrowers on ever more favorable terms.  These findings are not simply anecdotal; they are supported by several federal studies and examinations.  For example:

- In mid-2005, all five federal banking regulators (the Office of the Comptroller of the Currency ("OCC"), Federal Reserve Board ("FRB"), Federal Deposit Insurance Corporation ("FDIC"), Office of Thrift Supervision ("OTS"), and National Credit Union Administration ("NCUA")) reviewed data from six of the most sophisticated residential mortgage lenders in the country, looking for trends and current practices. The six lenders chosen represented half of the projected 2005 nontraditional mortgage product originations, as well as half of all mortgage originations. The agencies' review found indications of loosening in underwriting standards, instances of borrowers not being qualified based on fully amortizing payments, an increase in piggyback loans, and an increase in the use of credit scores in lieu of income and asset verification. The layering of these activities on top of subprime nontraditional mortgages added additional layers of credit risk. The survey also found concentrations of nontraditional products in areas experiencing the most rapid home price appreciation.

- In January 2006, the FRB issued a report in which it found that a sizeable number of borrowers with ARMs did not fully understand the terms of their loans, particularly the percent by which their interest rates could change, whether there was a cap on interest rate increases, and the index to which their rates are tied.  These findings were particularly true for lower-income borrowers and those with less education.

- In an annual survey of credit underwriting practices at nationally chartered banks, released in October 2006, the OCC found that 26% of lenders had eased their lending standards in the prior year, most often by increasing the use of nontraditional mortgage products.  The 2006 survey was the first in the survey's 11-year history in which a net easing in credit underwriting was found.

75.     Thus, by early to mid-2006 – the start of the Class Period – it had been clearly established that mortgage brokers and lenders were lending to borrowers who, in the past, would have never qualified for loans.

76.     On top of lending to buyers who only a few years prior would have never qualified for loans, fraud was rampant as a result of stated income and NINJA lending practices.  In 2005, a white paper issued by the Federal Financial Institutions Examination Council ("FFIEC"), Washington, D.C., reported that as many as 10 percent of all mortgage loan applications annually in the U.S. residential real estate market involved a "material misrepresentation."

77.     In October 2005, USA Today reported, "As the U.S. housing market hits record highs, mortgage fraud appears to be rising from California to Florida." The story quotes the author of a report on mortgage fraud, who noted that "fraud is costing the industry tens of millions of dollars."

78.     As an additional example, at the May 2005 Mortgage Bankers Association's Secondary Marketing Conference, there was a panel discussion regarding mortgage fraud.  On the mortgage fraud panel was George Kimmel ("Kimmel"), associate director of S&P's Structured Finance Group.  Kimmel's comments at the conference included that "[S&P's] Structured Finance Group estimated the annual cost of mortgage fraud in 2003 at 3 basis points, or $1.2 billion . . . ."

79.     Various studies were completed during the 2005 to 2007 time frame that indicated a sharp rise in mortgage loan fraud.  A 2007 study by Basis Analytics of 16,000 defaulted residential

mortgage loans found that *over 70% contained significant misrepresentations* in their respective

mortgage loan files.  A 2006 study by the Mortgage Asset Research Institute showed that almost

*60% of the stated income loans had misrepresented stated income by at least 50%*.  Also, mortgage

fraud complaints more than doubled in the U.S. from 2003 to 2006 according to the Financial

Crimes Enforcement Network, a division of the U.S. Treasury Department.    Suspicious activity

reports pertaining to mortgage fraud increased 14-fold from 1997 to 2005.

80.    On April 6, 2005, S&P issued comments at an industry event held at Amelia Island,

Florida, concerning fraud and risks related to newer mortgage products.  In its commentary, S&P

stated:

> [T]here is growing concern around the increased usage of these mortgages in new RMBS securitization, which may pose significant credit risk.  According to [S&P's] credit analyst Ernestine Warner, a director in RMBS Surveillance, some of the inherent risks that may arise include payment shock due to interest rate increases, coupled with the addition of principal repayment, undercollaterlization with regard to negative amortization, and home price depreciation.
>
> Despite these risks, there isn't any performance information available on any of these products just yet because they are still very new to the subprime market.  Due to the time lag associated with delinquencies and losses in RMBS pools, and the nature of these risks, it will be several years before the product performance is tested.  It is anticipated that all risks associated with these loans have been adequately covered.  However, monthly performance data will be closely scrutinized as the products mature," Ms. Warner noted.

81.    One confidential witness worked for the Company's S&P brand as a Research

Associate who was responsible for "accounting for RMBS and CDOs."  This former employee

received a print-out of "every CDO S&P rated."

82.    This former Research Assistant stated that it was her/his responsibility to input the

data from the print-outs into S&P's database and to "balance out the discrepancies" from the CDO

income statements.

83.    This former employee also stated that "S&P was definitely biased" in rating CDOs

and RMBS, stating that the way S&P rated such securities was very beneficial to the people selling

the securities – the issuers.  This former employee stated that there was no clear way to see the risk behind the transactions because the products were "all bundled together."  The former employee stated that the CDOs, for example, were "so volatile with so many parts that it didn't even make sense to rate them in the first place."  This confidential witness stated that S&P knowingly used its reputation in the marketplace to convince investors to believe in the Company's ratings on RMBS and CDOs.

84.    Despite these troubling facts, the Company did not alert its investors during the Class Period that it was unable and/or unwilling to provide adequate surveillance to the structured finance transactions it rated – transactions where fraud had become rampant.

85.    In that regard, one former Company employee who worked as a consultant from October 2006 through January 2007 stated that she/he was retained to work in S&P's Structured Finance department on the 42nd floor of the S&P headquarters as "part of a team of consultants retained to build ratings for RMBS deals."  This former consultant was one of eight consultants retained in October 2006.

86.    The former consultant stated that S&P needed the eight consultants because there was *a backlog of RMBS deals that needed to be updated*.  Information regarding the deals was supposed to be provided to S&P by one of S&P's vendors named Intex.  Intex was tasked with tracking the Company's deals and providing information and data to S&P so that S&P could update its ratings. The former employee stated that Intex tracked information regarding securitized structured finance deals, including how different tranches of the deals are being paid down and the balances outstanding.

87.    The former consultant stated that the Company used a "CORE Ratings System" database that "was supposed to be linked" to Intex.  But, the former employee stated that the information from Intex was not always transferred.  In that regard, the former consultant's

responsibilities including reviewing the CORE Ratings System to determine which RMBS deals had not been updated properly.  She/he stated that "[i]f a deal had not been updated for *at least a year*," she/he would attempt to gather the monthly statements, or "deal sheets," from Intex, which provided specific details of a given mortgage backed security, including the balance outstanding and the amount being paid down for each different tranche.

88.    Once the former consultant gathered the deal sheets from Intex, she/he packaged the deal sheets for the previous year – or longer – for use by the S&P ratings analysts.   The ratings analysts were supposed to go over the deal sheet packages on a regular basis, *but there was always a lag of analysts' review of the packages that the former consultant put together.*  For example, the former consultant estimates that during her/his tenure with the Company, she/he put together *at least 50 or 60 deal sheet packages*.  The former consultant believed that the other eight consultants in the same role did a similar amount of work, meaning that during a period of just a few months, the Company's S&P brand was more than one year delinquent on updating its ratings of at least hundreds of structured finance deals – at a time when the structured finance market was literally imploding.  This was not disclosed to the market.

89.    Moreover, the former consultant stated that her/his work meant that *S&P maintained ratings on RMBS deals without up to date information*.  *In other words, the ratings on the RMBS deals were maintained despite the fact that S&P did not have any information regarding the deal from Intex for a period of <u>at least</u> twelve months*.

90.    *The former consultant stated that large numbers of mortgages providing the foundation for a RMBS deal could be in default or foreclosure during the prior year, and S&P would retain its rating because it did not have accurate or updated information*.  The Company's S&P brand simply did not know what was happening to the securities it rated – despite telling the market that it was active in surveillance and that staying active was critical to its success.

- 27 -

91.     The accounts of the former consultant detailed above make it clear that the Company lacked a reasonable basis for maintaining ratings on *at least* hundreds of transactions throughout the Class Period.  By failing or refusing to commit the resources necessary to maintain up-to-date information on such transactions – many of which were backed by risky subprime and Alt-A loans – the Company was playing fast and loose with its reputation and Defendants were making false and misleading statements to the market.

92.     In addition, it was not until October 2007 that S&P published a report admitting that fraud was a factor in faulty RMBS performance, despite the fact that it was well known to Defendants – since 2005 – that fraud was prevalent in the risky subprime and Alt-A transactions it rated.  In its report, S&P attempted to state that it was not responsible for detecting mortgage fraud in the RMBS transactions it rated.  Yet, at the same time, the Company touted S&P's models as capable of accurately rating RMBS transactions.

93.     The Company's modeling data was limited by recent favorable trends from 2003 to 2005 (*e.g.*, low interest rates, strong house price appreciation and a good economic environment). The Company, however, was aware of the risks associated with the new mortgage loan products, but failed to make substantive inquiries or rating reviews focused on fraud and poor underwriting.  It took until January 23, 2008 for the Company's S&P brand to issue a report discussing mortgage fraud and resulting changes to its models to capture additional fields of information that would relate to fraud.

94.     As the subprime RMBS and CDO markets further deteriorated during 2006 and 2007, the Company's S&P brand continuously misled the market that its modeling and surveillance were adequate to monitor the performance of structured finance transactions, and touted the Company's ability to quickly move in a "fast-changing" environment though surveillance.

95.     But, the Company had conflicting incentives when it came to rating and surveillance of securitization transactions.  The Company's S&P brand was paid by issuers and the revenue from issuers far surpassed revenue from investor subscriptions.  Structured finance contributed over 40% of revenues to S&P – or 4 times that of traditional debt ratings for corporations.  At the same time, there was very little revenue associated with surveillance, which was not be completed on a timely basis, as set forth above.  Moreover, it was to the benefit of the Company to allow RMBS and CDO issuance to continue as long as possible and forestall the collapse in revenues associated therewith.  In other words, the Company knew that if it downgraded its previously issued ratings, it would lose business and its earnings would evaporate.

96.     Because the Company was seriously delinquent in its surveillance, ratings were being maintained on billions of dollars worth of subprime and Alt-A RMBS and CDOs without any review.  This allowed securitization transactions to deteriorate horribly without the Company being aware of the level of defaulted loans and subsequent losses, while its ratings remained stagnant.

97.     Another important factor that the Company failed to disclose to Company investors was that while its S&P brand had the ability to access data regarding the mortgage loans securing RMBS and the performance of the securities related to CDOs, it chose to perform surveillance (what little surveillance it did do) on a "pool level" basis.  Put simply, instead of looking at the performance of individual mortgages underlying structured finance transactions, the Company looked at entire pools as a whole, which further prevented the Company from conducting meaningful surveillance.

98.     It was not until October of 2007 that the Company first attempted to get loan level data from loan servicers, as set forth in the Company's request for comment, below:

> Standard & Poor's Ratings Services is requesting comments from U.S. residential mortgage securitization market participants, including investors, issuers, and servicers, ***on its proposal for responsible parties to provide us monthly loan-level origination variables, data, and performance information.***  Analogous to our

existing new rating requirements, *this proposal reflects our effort to conduct surveillance and other analytical activity based on detailed collateral data and information beyond the pool level.* We expect this data to further our ongoing efforts to enhance our analytics and processes, and help us provide additional insightful research to the mortgage and securitization markets.

*Standard & Poor's will request an updated loan-level file complete with updated origination variables, including loan performance information on all outstanding loans (loans not paid in full or liquidated), for all U.S. residential mortgage-backed securities (RMBS) transactions closing on or after Jan. 1, 2008.* Responsible parties should deliver loan-level data in a bulk file for all Standard & Poor's rated transactions on the first business day following the distribution day. At this time, we are requesting feedback on the servicer's ability to deliver monthly the proposed fields in the referenced format below starting Jan. 1, 2008 (see Ratings Impact). *We will also request loan performance information on all outstanding loans for U.S. RMBS transactions rated before Jan. 1, 2008 (existing transactions).* We recognize the large volume of existing transactions and are interested in market feedback regarding the servicer's or trustee's ability to meet this request.

Beginning in 2008, the governing documents of Standard & Poor's rated U.S. RMBS transactions should incorporate a covenant of the responsible parties to submit monthly loan-level performance information. If there is a master servicer on a transaction, we would expect the master servicer to be the responsible party, or absent a master servicer, the primary servicer. We expect the master servicers and/or primary servicers will be responsible for coordinating the submission of a single file of loan-level data representing all outstanding loans from the combined sub-servicers on the transaction where applicable. If the transaction contains multiple primary servicers and no master servicer, we would like feedback on the ability of one of the primary servicers to be designated the responsible party to send a single submission or, alternatively, on the trustee's ability to aggregate the separate files and submit one file to us. We will not accept multiple loan¬ level data files from multiple servicers. The governing documents should incorporate the provision that this responsibility be transferable to all successor servicers. *Availability of loan-level information will be a positive consideration in determining a transaction's rating. The unavailability of loan-level data may adversely affect our rating determination.*

99.     After requesting comments in October 2007, *the Company did not require loan level data until May 1, 2008*, after the close of the Class Period, as set forth in the Company's April 9, 2008 release:

> *Beginning with transactions that close on or after May 1, 2008, Standard & Poor's Ratings Services requests that issuers of U.S. residential mortgage backed securities (RMBS) send us monthly performance data customarily sent to trustees and other third parties and include a representations and warranty that all loan variables and performance data fields sent to us at the time we assign our rating and monthly for the transaction's life are true and correct.*

Loan-Level Performance Data Will Enhance Surveillance And Strengthen Our Ratings Process

***By receiving ongoing collateral attributes and performance data, we plan to develop a loan-level approach to surveilling outstanding U.S. RMBS ratings and move forward with efforts to conduct more granular analysis of the factors influencing borrower behavior in the residential mortgage market.*** The additional data may also help identify patterns and trends in the market, enhance our surveillance of outstanding transactions, and help us provide additional insightful research to the mortgage and securitization markets. The provision of regular loan-level performance data transmitted to Standard & Poor's for rated U.S. RMBS transactions expands on its existing practice in Europe and Australia.

On Feb. 7, 2008, Standard & Poor's announced a series of broad measures intended to enhance its governance, analytics, information dissemination, and investor education to strengthen its ratings process (see Related Research).  In this article, ***Standard & Poor's stated that it will take actions to improve its surveillance process through strengthened surveillance functions, improve timeliness and effectiveness of its surveillance process through the addition of improved surveillance tools, and work with market participants to improve disclosure of collateral underlying structured securities.***  The collection and dissemination of loan-level data is also consistent with extensive market feedback, which indicates a desire for more transparency on outstanding transactions and more insight into developing markets.  We're also actively engaged with market participants to potentially develop an industry standard reporting package of loan-level data and have offered the Standard & Poor's glossary of terms for residential mortgage data transmittal as the starting point for industry efforts to develop standard definitions and terms (see Related Research).  Market feedback confirms this effort to be an important step in improving data quality in the U.S. RMBS sector.

100.    Because of the Company's failure to conduct surveillance on a timely basis, its inability to account for fraud in its models, and its Class Period failure to seek loan-level data when conducting its limited surveillance, its ratings changes for structured finance transactions during the Class Period ended up being delayed and extreme.  Indeed, some of the RMBS and CDO securities rated by the Company dropped by 2 to 3 ratings levels, which demonstrates that the Company's models ***had no predictive capability***.  From a statistical perspective, a decline by 3 ratings levels would be outside a 95% confidence interval, making the predictive capability of the Company's models useless.  To be clear, however, this case is not based upon S&P's failure to monitor its rated RMBS and CDOs, nor is it based upon the Company's failed ratings models.  Instead, it is based

upon Defendants' misrepresentations regarding how the Company conducts business, as well as misrepresentations regarding the Company's true financial condition and prospects.

### F.    The Tidal Wave Crashes and the Company Downgrades Thousands of RMBS and CDO Securitizations

101.    Delinquencies related to subprime and Alt-A mortgage loans began to spike in August of 2006 and reached historical highs by the end of November 2006. Subprime loans 60 days or more delinquent represented more than 30% of the pool balance for 2006 securitizations.[2] Loans underlying RMBS and CDO transactions were defaulting immediately after origination and staying delinquent. This same pattern emerged for Alt-A mortgage loans, but with smaller percentages than subprime mortgage loans.

102.    By March 2007, the market was clearly concerned with a meltdown of the subprime and Alt-A credit markets. On that day, the *Wall Street Journal* reported:

> The meltdown in mortgages for risky, "subprime" borrowers is claiming its latest casualties: credit-ratings companies.
>
> ***Trading in many bonds backed by subprime mortgages reveals a widening gap between investors' perception of their risk and the opinions of large ratings providers like*** Moody's Investors Service, ***Standard & Poor's*** and Fitch Ratings. ***Some subprime-mortgage bonds that were assigned investment-grade ratings as recently as 2006 are even trading at prices that imply they could be as risky as junk bonds. Yet most of their ratings haven't changed.***
>
> At the same time, the stock prices of Moody's Corp. and S&P's parent, McGraw-Hill Cos., have taken a hit over concerns that turmoil in the subprime-mortgage market may spread to the broader credit markets and damp issuance of other types of debt products like collateralized debt obligations.
>
> Moody's and McGraw Hill's shares are down 11% and 6%, respectively, since early February, versus a 1% fall in the S&P 500-stock index over the same period.
>
> For years, the ratings companies reaped profits by charging issuers for rating bonds backed by home loans to borrowers with weak credit, known as subprime mortgages.

---

[2] Any loan over 60 days delinquent has a high probability of moving to 90 days delinquent and into foreclosure.

Many Wall Street firms also followed guidelines from the ratings companies when they bundled loans together and sold billions of dollars in highly rated securities backed by them.

The ratings providers "were at least as interested as the investment banks in getting the deals done because they would get paid for rating them," notes Edward Grebeck, chief executive of Tempus Advisors, a debt-markets strategist in Stamford, Conn.

Executives at ratings companies deny a conflict exists. "Issuers pay us because investors believe our opinions about the risk of the assets have value," says Glenn Costello, a managing director at Fitch. He adds that "it is still too early to determine which bonds are going to be most at risk."

Stock analysts who track Moody's and McGraw Hill say subprime-related ratings revenue make up a small part of their businesses and they don't expect the subprime issues to affect their forecasts of double-digit earnings growth at the companies this year.

To come up with ratings on mortgage bonds, ratings companies use financial models that consider historical default rates among pools of mortgage loans and try to predict how newer loan pools will hold up under various economic scenarios. Assumptions about movements in interest rates and home prices also are factored in.

The models help determine how many bonds backed by a pool of loans may be so insulated from losses that they can be rated AAA, and how many are less protected and thus bear weaker ratings like A or BBB. The bonds usually are backed by loans whose value exceeds the bonds' principal so as to provide a cushion for expected losses among the mortgage pool.

"What's driving the market now is that defaults are coming significantly faster than historical simulations," says Brian Carlin, head of fixed-income trading at J.P. Morgan Private Bank.

If ratings companies end up having to downgrade a large number of subprime bonds issued in 2006, "it would mean they completely misjudged the risk," says Thomas Lawler, a housing economist in Vienna, Va.

Ratings-company officials say their ratings still accurately reflect the probability of actual losses on mortgage bonds. "Subprime mortgages by their nature usually perform poorly, and we took that into account when we assigned our ratings," says Brian Clarkson, co-chief operating officer of Moody's.

Susan Barnes, a managing director at S&P, says the firm expected that subprime loans originated last year would be weaker than previous years and modified its rating criteria. "We expect very infrequent defaults in the investment-grade bonds over their life cycle," she says.

103.     Similarly, by April 23, 2007, the *Wall Street Journal* was reporting that the market's concern had placed McGraw-Hill's S&P brand under a large cloud of uncertainty:

These should be sunny days for Standard & Poor's and Moody's Investors Service, Wall Street's two big credit-rating companies, which profit when debt issuance booms. But a cloud hangs over them.

S&P and Moody's -- which charge debt issuers fees to rate different flavors of bonds and loans -- report first-quarter results today and tomorrow, respectively. Thanks in part to the corporate-debt boom, analysts expect 29% growth in earnings per share, excluding one-time items, for S&P's parent, McGraw-Hill Cos., and 18% expansion for Moody's parent, Moody's Corp., according to Thomson Financial.

***Yet the shares of both companies are down during the past three months, because of the housing slowdown. Both companies built up big franchises rating mortgage-backed bonds in recent years.***

***Now they have a double-barreled problem. First, the housing slowdown means fewer bonds to rate. Second, they have a reputation dilemma, the kind that often crops up for the raters after debt disasters strike.***

When Enron collapsed, critics wondered why Moody's and S&P didn't spot it sooner. Now, some critics are asking why they didn't spot the mess in subprime mortgages -- which cater to especially risky homeowners.

The market value of many subprime-mortgage-backed bonds has been falling, in anticipation of severe increases in defaults on the loans that back them. S&P and Moody's say most of these bonds are well-cushioned from losses. But Friday, Moody's said losses among 2006 subprime-loan pools "will be somewhat higher than our initial expectations." It also said it expects more volatility in ratings on weaker subprime-mortgage bonds.

Moody's says it has been adapting to the environment as it changes. But the latest acknowledgment "throws up a red flag," says Christian Stracke, an analyst at independent debt-research firm CreditSights. The company is "implicitly admitting that its initial assumptions ... did not adequately predict the damage that was to come."

104.    Although the subprime RMBS and CDO market was under intense pressure and collapsing, the Company's S&P brand did not begin significantly downgrading structured finance transactions until July 2007 – in part because of the Company's inability and failure to conduct surveillance. As set forth below, over the span of several months, the Company's S&P brand downgraded ***billions*** worth of RMBS and CDO transactions:

- July 10, 2007 – ***S&P downgrades 498 U.S. RMBS worth more than $5 billion*** backed by U.S. First Lien Subprime Mortgages and securities rated from the fourth quarter of 2005 through the fourth quarter of 2006 and ***places 74 securities on credit watch***.

- July 16, 2007 – S&P puts additional CDO transactions put on credit watch.

- July 19, 2007 – **S&P downgrades 418 U.S. RMBS worth more than $3.8 billion** backed by U.S. Second Lien Mortgages and securities rated from the beginning of 2005 through the fourth quarter of 2006 and **places 74 securities on credit watch**.

- August 7, 2007 – **S&P downgrades 207 classes of RMBS** backed by first-lien Alt-A mortgage loans securities rated from the beginning of 2005 through the fourth quarter of 2006.   In addition, CDO transactions are now starting to be reviewed by S&P.

- August 17, 2007 – **S&P downgrades 158 Alt-A RMBS classes worth more than $660 million** and cites "revised surveillance assumptions."

- August 28, 2007 – **S&P places 34 tranches of CDOs on credit watch negative**, but does not officially downgrade them.

- October 17, 2007 – **S&P downgrades 1713 classes of U.S. RMBS worth more than $23 billion** backed by first-lien subprime mortgage loans, first-lien Alt-A mortgage loans, and closed-end second-lien mortgage loans **issued from January 1, 2007 through June 30, 2007**.  In addition, **S&P places 646 other classes, representing $3.3 billion**, on credit watch negative.

- October 19, 2007 – **S&P downgrades 1,413 classes of 1st lien subprime RMBS** for securities issued during 2005 and 2006.

- November 16, 2007 – **S&P downgrades 536 1st Lien Subprime, 1st lien Alt-A, closed-end 2nd lien 2007 vintage RMBS classes**.

- December 19, 2007 – **S&P places an additional 74 tranches of CDOs** on credit watch negative.

- December 19, 2007 – **S&P downgrades 1,292 classes of Alt-A loans** relating to securities issued in 2005 to 2006.

- January 30, 2008 – **S&P takes action on 6,389 U.S. subprime RMBS ratings.  S&P also takes negative action on 1,953 CDO ratings estimated to be worth more than $200 billion.**

- February 26, 2008 – **S&P lowers ratings on 374 classes** insured by FGIC and XLCA.

105.    In the midst of the Company's extraordinary volume of ratings downgrades, the

Company's S&P brand fired its President on August 30, 2007.  In a press release issued that day, the

Company stated, in part:

> The McGraw-Hill Companies (NYSE: MHP) today announced the appointment of Deven Sharma as president of Standard & Poor's, the Corporation's financial

services division, effective immediately. Mr. Sharma has served as executive vice president of Investment Services and Global Sales for Standard & Poor's since November 1, 2006. *He succeeds Kathleen Corbet, who is stepping down from her position to pursue other opportunities*. Mr. Sharma will report to Harold McGraw III, chairman, president and chief executive officer of The McGraw-Hill Companies.

106.    Also during the Company's intense ratings downgrades outlined above, on November

9, 2007, the *Wall Street Journal* reported on the astonishing wave of debt downgrades:

> Get Set for Wave of Debt Downgrades --- With Investors Frazzled, Real-Estate Softening, Three Rating Firms Have Their Markers Out

> The credit-rating downgrade deluge that's been rocking financial markets isn't over.

> In the next few weeks, debt-rating services like Moody's Investors Service, *Standard & Poor's* and Fitch Ratings *look poised to downgrade hundreds of mortgage-related investments worth tens of billions of dollars*, creating the potential for more market unrest.

> The three major rating firms -- owned respectively by Moody's Corp., *McGraw-Hill* Cos. and Fimalac SA of Paris -- *have been maligned by critics for originally underestimating the danger of bonds backed by subprime mortgages and other investments tied to mortgages*.

> Now they're moving in the other direction, aggressively reassessing where they stand on a wide assortment of debt. Behind the about-face: a worsening real-estate backdrop and frazzled investors.

> Credit-rating firms have lowered their credit ratings on *more than $70 billion* in mortgage-related bonds in the past few months, setting off waves of distress in the stock and bond markets. They've also expressed concerns about the outlook for a range of related industries from banking to bond insurance. Banks and Wall Street firms including Citigroup Inc. and Merrill Lynch & Co. took large charges when they were forced to reassess the value of even their highest-rated mortgage debt.

> The latest turmoil to hit markets has been a reminder that the raters -- despite all of the criticism about their approach -- still have great sway. Many pensions and other institutional investors are bound to hold only investment-grade debt. A downgrade into junk territory can have an impact on demand for securities.

> Moreover, because many mortgage instruments are so hard to value, some banks and hedge funds rely on credit ratings even when they know the ratings could be flawed.

> "We are going to be seeing ratings actions coming for awhile" on mortgage-related debt, says Yuri Yoshizawa, a group managing director overseeing U.S. derivatives at Moody's.

> *Collateralized debt obligations, or CDOs, look primed for more distress. These are investments often backed by portfolios of mortgage-backed securities. They're sold*

*in pieces, or tranches, with varying levels of risk and return.  The CDO tranches -- widely held by banks and investors -- haven't been downgraded as quickly as the underlying mortgage securities they hold.*

As of Nov. 1, S&P had lowered ratings on 381 tranches of residential mortgage-related CDOs.  It still had a "Credit Watch negative" on 709 CDO tranches, meaning the bonds face a good chance of a downgrade.

\*       \*       \*

While the rating downgrades of mortgage-backed securities were expected by many analysts, the speed and magnitude of the corresponding CDO downgrades caught many banks, brokerage firms and investors off guard.  *This past spring, even as mortgage delinquencies kept rising, some rating executives told investors that they didn't foresee CDO downgrades until 2008.*

That's all changed as the rating companies have slashed their assessments of thousands of subprime mortgage-backed securities.  That's had an especially severe impact on a class of CDOs backed by low-investment-grade securities.  According to J.P. Morgan research, several CDOs had over 80% of their underlying collateral affected by the downgrades or reviews.  The Aaa tranches on some of these CDOs were subsequently cut by multiple notches -- some to junk -- days after the mortgage-backed securities downgrades.

"There will be a lot of chain reactions," says David Yan, director and head of CDO research at Credit Suisse Group.

107.    As of April 21, 2008, S&P had reviewed 31,926 U.S. RMBS & CDO structured finance transactions spanning from the first quarter of 2005 through the third quarter of 2007.  Of the 31,926 securities reviewed, *38.5% were downgraded*.  Of the 31,926 securities reviewed, 11,226 or 35% of the securities were related to subprime RMBS.  *Of the 11,226 subprime securities reviewed, 52% were downgraded*.  The charts below demonstrate the tremendous volume of downgrades by the Company's S&P brand:

Original-to-Current Rating Transitions
SECTOR = U.S. RMBS & CDO of ABS and SIV-Lite    For Vintages: Q1 2005 - Q3 2007    Date Updated = April 21, 2008

| Original | AAA | AA+ | AA | AA- | A+ | A | A- | BBB+ | BBB | BBB- | BB+ | BB | BB- | B+ | B | B- | CCC+ | CCC | CCC- | CC | C | D | # of Ratings | # of Down | Down % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| AAA | 3397 | 30 | 56 | 17 | 27 | 25 | 27 | 21 | 42 | 35 | 20 | 67 | 13 | 9 | 44 | 19 | 38 | 45 | 78 | 53 | 0 | 16 | 4079 | 682 | 16.72% |
| AA+ | 0 | 1930 | 49 | 16 | 21 | 35 | 7 | 10 | 43 | 3 | 9 | 59 | 0 | 1 | 62 | 2 | 2 | 30 | 1 | 4 | 0 | 1 | 2285 | 355 | 15.54% |
| AA | 3 | 9 | 3132 | 58 | 47 | 84 | 46 | 30 | 89 | 26 | 28 | 122 | 10 | 12 | 120 | 14 | 27 | 193 | 54 | 108 | 0 | 19 | 4231 | 1087 | 25.69% |
| AA- | 0 | 1 | 8 | 1108 | 32 | 16 | 18 | 37 | 14 | 10 | 54 | 6 | 4 | 136 | 4 | 6 | 0 | 232 | 16 | 34 | 0 | 19 | 1787 | 670 | 37.49% |
| A+ | 0 | 0 | 0 | 0 | 1039 | 26 | 28 | 29 | 42 | 17 | 17 | 65 | 7 | 6 | 60 | 8 | 3 | 430 | 12 | 31 | 0 | 16 | 1836 | 797 | 43.41% |
| A | 0 | 0 | 2 | 1 | 4 | 2116 | 59 | 48 | 91 | 40 | 41 | 119 | 18 | 29 | 79 | 17 | 12 | 477 | 48 | 212 | 0 | 48 | 3461 | 1338 | 38.66% |
| A- | 0 | 0 | 0 | 0 | 1 | 0 | 1030 | 63 | 72 | 28 | 16 | 86 | 22 | 13 | 81 | 21 | 5 | 490 | 19 | 162 | 0 | 52 | 2161 | 1130 | 52.29% |
| BBB+ | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 841 | 46 | 43 | 35 | 94 | 24 | 18 | 89 | 18 | 3 | 491 | 7 | 172 | 0 | 71 | 1952 | 1111 | 56.92% |
| BBB | 0 | 0 | 0 | 0 | 0 | 1 | 2 | 1 | 1799 | 81 | 90 | 146 | 29 | 31 | 159 | 25 | 12 | 491 | 57 | 403 | 0 | 90 | 3417 | 1614 | 47.23% |
| BBB- | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 1 | 941 | 56 | 117 | 35 | 21 | 153 | 34 | 4 | 569 | 7 | 405 | 0 | 115 | 2460 | 1516 | 61.63% |
| BB+ | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 256 | 26 | 14 | 11 | 56 | 13 | 0 | 241 | 5 | 275 | 0 | 136 | 1033 | 777 | 75.22% |
| BB | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 1027 | 40 | 15 | 236 | 20 | 1 | 237 | 5 | 167 | 0 | 88 | 1838 | 809 | 44.02% |
| BB- | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 96 | 7 | 14 | 3 | 0 | 15 | 0 | 6 | 0 | 8 | 149 | 53 | 35.57% |
| B+ | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 47 | 0 | 0 | 0 | 5 | 0 | 0 | 0 | 2 | 55 | 7 | 12.73% |
| B | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 787 | 60 | 0 | 266 | 1 | 10 | 0 | 9 | 1134 | 346 | 30.51% |
| B- | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 40 | 1 | 6 | 0 | 1 | 0 | 0 | 48 | 8 | 16.67% |

1. AAA ratings from the same transaction are treated as a single rating in the calculation of this table.
2. Multiple rating actions are aggregated to calculate a security's cumulative rating performance
3. Last rating before withdrawal due to redemption is used in the transition rate calculation.

| | | # of Ratings | # of Down | Down % |
|---|---|---|---|---|
| Investment Grade | 447 | 27669 | 10300 | 37.23% |
| Speculative Grade | 243 | 4257 | 2000 | 46.98% |
| ALL | 690 | 31926 | 12300 | 38.53% |

Original-to-Current Rating Transitions
SECTOR = U.S. RMBS    For Vintages: Q1 2005 - Q3 2007    Date Updated = April 21, 2008

| Original | AAA | AA+ | AA | AA- | A+ | A | A- | BBB+ | BBB | BBB- | BB+ | BB | BB- | B+ | B | B- | CCC+ | CCC | CCC- | CC | C | D | # of Ratings | # of Down | Down % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| AAA | 3110 | 10 | 30 | 8 | 10 | 18 | 14 | 6 | 24 | 19 | 4 | 59 | 0 | 0 | 22 | 0 | 0 | 7 | 0 | 0 | 0 | 0 | 3341 | 231 | 6.91% |
| AA+ | 0 | 1906 | 14 | 15 | 18 | 35 | 7 | 9 | 42 | 3 | 9 | 58 | 0 | 1 | 62 | 1 | 0 | 30 | 1 | 1 | 0 | 0 | 2241 | 335 | 14.95% |
| AA | 2 | 8 | 2892 | 52 | 52 | 27 | 73 | 37 | 11 | 76 | 10 | 6 | 109 | 3 | 5 | 111 | 0 | 167 | 0 | 3 | 0 | 5 | 3597 | 695 | 19.32% |
| AA- | 0 | 1 | 2 | 1072 | 29 | 29 | 15 | 15 | 34 | 11 | 9 | 46 | 3 | 2 | 135 | 1 | 0 | 225 | 0 | 4 | 0 | 13 | 1646 | 571 | 34.69% |
| A+ | 0 | 0 | 0 | 0 | 1015 | 25 | 26 | 28 | 41 | 15 | 17 | 65 | 7 | 6 | 60 | 8 | 0 | 427 | 0 | 25 | 0 | 16 | 1781 | 766 | 43.01% |
| A | 0 | 0 | 2 | 1 | 4 | 1972 | 50 | 41 | 74 | 24 | 25 | 108 | 11 | 14 | 70 | 8 | 0 | 462 | 0 | 57 | 0 | 34 | 2957 | 978 | 33.07% |
| A- | 0 | 0 | 0 | 0 | 1 | 0 | 989 | 58 | 68 | 21 | 12 | 82 | 22 | 10 | 79 | 19 | 0 | 485 | 0 | 135 | 0 | 50 | 2031 | 1041 | 51.26% |
| BBB+ | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 818 | 46 | 42 | 35 | 93 | 23 | 18 | 89 | 18 | 0 | 488 | 0 | 148 | 0 | 67 | 1885 | 1067 | 56.60% |
| BBB | 0 | 0 | 0 | 0 | 0 | 1 | 2 | 1 | 1650 | 69 | 71 | 129 | 20 | 155 | 17 | 467 | 0 | 185 | 0 | 75 | 0 | 67 | 2856 | 1202 | 42.09% |
| BBB- | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 890 | 55 | 116 | 35 | 19 | 153 | 33 | 0 | 568 | 0 | 319 | 0 | 103 | 2294 | 1401 | 61.07% |
| BB+ | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 227 | 25 | 10 | 9 | 56 | 12 | 0 | 240 | 0 | 188 | 0 | 131 | 898 | 671 | 74.72% |
| BB | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 952 | 39 | 13 | 232 | 17 | 0 | 236 | 0 | 133 | 0 | 85 | 1709 | 755 | 44.18% |
| BB- | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 77 | 7 | 14 | 2 | 0 | 15 | 0 | 3 | 0 | 8 | 126 | 49 | 38.89% |
| B+ | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 34 | 0 | 0 | 0 | 5 | 0 | 0 | 0 | 2 | 42 | 7 | 16.67% |
| B | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 769 | 60 | 0 | 266 | 0 | 8 | 0 | 9 | 1112 | 343 | 30.85% |
| B- | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 32 | 0 | 6 | 0 | 1 | 0 | 0 | 39 | 7 | 17.95% |

1. AAA ratings from the same transaction are treated as a single rating in the calculation of this table.
2. Multiple rating actions are aggregated to calculate a security's cumulative rating performance
3. Last rating before withdrawal due to redemption is used in the transition rate calculation.

| | | # of Ratings | # of Down | Down % |
|---|---|---|---|---|
| Investment Grade | 363 | 24629 | 8287 | 33.65% |
| Speculative Grade | 235 | 3926 | 1832 | 46.66% |
| ALL | 598 | 28555 | 10119 | 35.44% |

Original-to-Current Rating Transitions
SECTOR = U.S. RMBS Subprime    For Vintages: Q1 2005 - Q3 2007    Date Updated = April 21, 2008

| Original | AAA | AA+ | AA | AA- | A+ | A | A- | BBB+ | BBB | BBB- | BB+ | BB | BB- | B+ | B | B- | CCC+ | CCC | CCC- | CC | C | D | # of Ratings | # of Down | Down % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| AAA | 927 | 5 | 27 | 1 | 0 | 13 | 0 | 0 | 15 | 2 | 0 | 35 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1027 | 100 | 9.74% |
| AA+ | 0 | 973 | 28 | 9 | 14 | 30 | 1 | 2 | 40 | 0 | 4 | 53 | 0 | 1 | 48 | 0 | 0 | 15 | 0 | 1 | 0 | 0 | 1219 | 246 | 20.18% |
| AA | 0 | 0 | 940 | 28 | 3 | 32 | 2 | 3 | 61 | 1 | 1 | 94 | 3 | 3 | 93 | 0 | 0 | 127 | 0 | 2 | 0 | 0 | 1393 | 453 | 32.52% |
| AA- | 0 | 0 | 0 | 459 | 5 | 19 | 1 | 5 | 24 | 2 | 3 | 35 | 1 | 1 | 126 | 0 | 0 | 190 | 0 | 3 | 0 | 0 | 874 | 415 | 47.48% |
| A+ | 0 | 0 | 0 | 0 | 430 | 6 | 6 | 9 | 26 | 4 | 1 | 46 | 3 | 2 | 45 | 3 | 0 | 391 | 0 | 20 | 0 | 0 | 992 | 562 | 56.65% |
| A | 0 | 0 | 0 | 0 | 0 | 425 | 7 | 7 | 31 | 3 | 6 | 47 | 3 | 4 | 48 | 3 | 0 | 399 | 0 | 53 | 0 | 0 | 1036 | 611 | 58.98% |
| A- | 0 | 0 | 0 | 0 | 0 | 0 | 348 | 10 | 31 | 6 | 2 | 38 | 8 | 3 | 49 | 2 | 0 | 372 | 0 | 78 | 0 | 0 | 947 | 599 | 63.25% |
| BBB+ | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 328 | 15 | 5 | 12 | 59 | 4 | 5 | 55 | 8 | 0 | 418 | 0 | 135 | 0 | 0 | 1044 | 716 | 68.58% |
| BBB | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 277 | 9 | 14 | 38 | 7 | 8 | 65 | 5 | 0 | 372 | 0 | 164 | 0 | 1 | 960 | 683 | 71.15% |
| BBB- | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 205 | 12 | 39 | 6 | 5 | 79 | 9 | 0 | 371 | 0 | 206 | 0 | 6 | 938 | 733 | 78.14% |
| BB+ | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 82 | 16 | 3 | 5 | 40 | 4 | 0 | 196 | 0 | 150 | 0 | 19 | 515 | 433 | 84.08% |
| BB | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 43 | 0 | 0 | 11 | 1 | 0 | 101 | 0 | 68 | 0 | 26 | 250 | 207 | 82.80% |
| BB- | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 7 | 0 | 4 | 0 | 0 | 7 | 0 | 0 | 0 | 4 | 23 | 16 | 69.57% |
| B+ | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 4 | 0 | 1 | 0 | 0 | 7 | 5 | 71.43% |
| B | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 | 1 | 100.00% |
| B- | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | | |

1. AAA ratings from the same transaction are treated as a single rating in the calculation of this table.
2. Multiple rating actions are aggregated to calculate a security's cumulative rating performance
3. Last rating before withdrawal due to redemption is used in the transition rate calculation.

| | | # of Ratings | # of Down | Down % |
|---|---|---|---|---|
| Investment Grade | 7 | 10430 | 5118 | 49.07% |
| Speculative Grade | 50 | 796 | 662 | 83.17% |
| ALL | 57 | 11226 | 5780 | 51.49% |

**How-To-Read**
These tables document the transitions of the original rating-to-the current rating for U.S. CDO of ABS as well as U.S. RMBS transactions. They show the original issuance rating and the current rating for each security, as well as the percentage of ratings that were lowered. For example, the U.S. RMBS table indicates that about 93% of all original 'AAA' ratings have stayed at the same rating level, and only about 7% experienced any downgrade transitions. The original and the current ratings are shown in the first column and the first row below the title, respectively.

108.    The number of downgrades represented a historical event for the Company that had never been seen before – but the majority of the downgrades did not take place until December 2007 through January 2008, towards the end of the Class Period when Defendants were still misleading investors by touting growth prospects for 2008.

## VIII.   DEFENDANTS' FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD

109.    The Class Period begins on July 25, 2006.  On that date, McGraw-Hill issued a press release entitled "The McGraw-Hill Companies Reports Second Quarter EPS of $0.60, a 17.6% Increase," which stated, in relevant part:

"***Record results at Financial Services***, a solid performance in the U.S. college and university market, and effective cost containment were key to our second quarter," said Harold McGraw III, chairman, president and chief executive officer of The McGraw-Hill Companies.  "As a result, our operating margin improved to 25.8%, up from 23.6% for the same period last year.

*        *        *

***Financial Services: "Revenue for this segment increased 13.4% in the second quarter to $677.3 million compared to the same period last year***.  Excluding the prior year's revenue of $34.8 million from Corporate Value Consulting, which was sold at the end of September 2005, and April and May revenue of $8.1 million from CRISIL, Ltd. (majority interest acquired on June 1, 2005), revenue for the second quarter grew by $106.6 million on a non-GAAP basis.  ***Of the non-GAAP revenue growth, 38.6% was produced by structured finance*** and 34.8% came from corporate and government ratings.

"Including the incremental expenses of $6.3 million for stock-based compensation in the second quarter, ***the segment's operating profit increased 21.5% to $313.9 million***.  Corporate Value Consulting contributed approximately $7.5 million to operating results in the second quarter of 2005.

***"Strong double-digit growth for ratings in the U.S. and international markets helped Financial Services set new records for revenue and operating profit in the second quarter. International ratings accounted for 37.4% of ratings revenue in the second quarter versus 36.7% for the same period a year ago***.

***"Strength in global structured finance was again a key factor*** as all asset classes contributed to the year-over-year improvement.  ***Particularly noteworthy was the activity in U.S. Collateralized Debt Obligations, which was driven by leveraged loans for mergers and acquisitions, new hybrid structures and arbitrage opportunities. And, while dollar volume issuance in U.S. Residential Mortgage-***

- 39 -

*Backed Securities market declined by 1.2% in the second quarter, we benefited from an 8.6% pick up in the number of deals coming to market and solid gains in more active overseas markets.*

\*        \*        \*

"In the U.S., total new issue dollar volume was up 16.7%. Corporate new issuance was up 54.7%. Public finance declined by 6.8%. Mortgage-backed securities were off 0.7%. Asset-backed securities were down 12.5%, *while collateralized debt obligations were up 162.0%*. In Europe, new issue dollar volume was up 1.7%.

\*        \*        \*

*The Outlook: "Based on the strength of our first half performance, we are raising our guidance for the year*.

"Our previous guidance called for earnings per share of $2.36 to $2.41, excluding the incremental impact of all stock-based compensation.

"Our new guidance for 2006 improves the full-year forecast by $0.08. Therefore, we now expect EPS for 2006 of $2.44 to $2.49 excluding the incremental impact of all stock-based compensation ($0.13 for incremental stock-based compensation and $0.04 for the one-time charge for the elimination of the restoration stock option program in the first quarter).

*"With more robust opportunities taking shape next year, we expect to return to double-digit earnings growth in 2007."*

110.    Also on July 25, 2006, McGraw-Hill hosted a conference call to discuss its second quarter 2006 earnings and outlook. The Individual Defendants participated in the call on behalf of the Company. During the call, numerous false and misleading statements were made that were designed to artificially inflate the Company's stock price. For example, McGraw III stated:

In the U.S. residential mortgage-backed securities market, we saw the first signs in the second quarter that new issue volume was softening a little bit. Now these are the comparisons, year-over-year comparisons softening a little. New issue dollar volume for the U.S. residential mortgage-backed securities slipped by 1.2% in the second quarter. But these figures, like the estimates for the gross domestic product, are regularly updated. Frequently the estimates grow, *so I don't take today's figures as the last word on market activity here*. Rating smaller deals is a plus for Standard & Poor's, *so we benefited in the second quarter from an 8.6% increase in the number of U.S. residential mortgage-backed security issues. We also benefited from a 20% increase in residential mortgage-backed securities dollar volume issuance in Europe in the second quarter*. We also enjoyed solid growth in the U.S. commercial mortgage-backed securities market, *but the major factors in structured finance in the second quarter were U.S. collateralized debt obligations, CDOs*.

*New issue dollar volume for U.S. collateralized debt obligations grew by 162%. Collateralized debt obligations are an excellent example of the financial market's ability to innovate by pooling bonds and loans and derivatives that are then split into tranches with varying risk profiles for various investor audiences.*

What emerges are collateralized debt obligations that are based on cash flow, which are backed by the actual bonds, loans or asset-backed securities, synthetics backed by derivatives, or some combination of both called hybrids. *Strong growth in collateralized debt obligations throughout 2006 has been driven by a number of positive factors, including robust debt origination in areas like leveraged loans, residential mortgage-backed securities, commercial mortgage-backed securities which are used to create pools of available loans to be put into these large baskets, these collateralized debt obligation structures.* Strong investor demand as CDOs provide opportunities for higher yields in a low interest rate environment and diversification across credit. And attractive arbitrage opportunities for issuers and investors to transfer specific risks or to take advantage of spreads between asset income and liability funding costs. The asset-backed securities market softened because of a sharp decline in auto loan issuance, but we did see strong pickup in activity in the credit card receivable end and student loan sectors.

111.     As the call continued, McGraw III warned of softening in the U.S. RMBS market, but

omitted material facts when he also stated:

Our optimism is based on continued strength in international ratings, as well as products and services that are not tied to new issuance. There are tougher comparisons ahead in the U.S. residential mortgage-backed securities markets, which enjoyed a spectacular second half as we all know in 2005. Residential mortgage-backed securities growth continued into the second quarter this year, and the U.S. residential mortgage-backed securities dollar volume issuance is up 13.5% for the first half of 2006.

We still have a very good pipeline of business heading into the third quarter, but probably not enough to expect year-over-year growth in the face of the challenging comparisons. We now expect U.S. residential mortgage-backed security issuance to decline by about 5% in 2006. But in Europe we expect the residential mortgage-backed securities and the commercial mortgage-backed securities markets to show year-over-year growth in the second half. Prospects for the U.S. commercial mortgage-backed securities, asset-backed securities and public finance look a little soft to us right now. *But the pipeline for U.S. collateralized debt obligation issuance, CDOs, remains very strong, very strong indeed.*

112.     McGraw III also discussed the invaluable nature of S&P's reputation:

*Standard & Poor's has been rating bonds since 1916, so the market knows our capability and our reputation very well. The integrity, reliability and credibility of S&P has enabled us to compete successfully in an increasingly global and complex market, and that is true today and we are confident it will be so in the future.*

113.    Later in the call, McGraw III stated that the CDO market was "red hot" and "doing extremely well," and stated:

> On CDOs, it is really right across the board. The whole structured finance market or the securitized market is the desired choice of most investors, most financial institutions, because it gives them more options in terms of being able to specifically tailor their investment portfolios to components that they need. So, with the collateralized debt obligation market, you are able to have a lot of flexibility in the multitude of tranches that you can take advantage of, and these are very large, very complex instruments. And, therefore, I would expect those to continue.

114.    On July 28, 2006, the Company filed its interim quarterly financial report on Form 10-Q for the quarter ending June 30, 2006. The financial results reported in the 10-Q were substantially similar to those reported in the Company's July 25, 2006 press release. The Form 10-Q was signed by Bahash, and contained required Sarbanes-Oxley certifications signed by McGraw III and Bahash stating that the Form 10-Q did not include any material misrepresentations. In discussing what drove McGraw-Hill's improved financial performance, the July 28, 2006 10-Q stated, in relevant part:

> *In the second quarter of 2006, the Company achieved growth in revenue and operating profit of 4.9% and 14.9%, respectively. The increase in revenue is primarily attributable to growth in the Financial Services segment*. Foreign exchange rates had minimal impact on revenue or operating profit during the second quarter.
>
> *        *        *
>
> *Service revenue increased 11.0% in the second quarter of 2006, due primarily to a 13.4% increase in Financial Services revenue* and the acquisition of JDPA. *Financial Services revenue increased primarily due to the performance of structured finance ratings* and corporate (corporate finance and financial services) and government finance ratings; somewhat offset by the divestiture of the Corporate Value Consulting (CVC) business which contributed $34.8 million to 2005 second quarter revenue. Issuance in structured finance was mixed in the second quarter, *U.S. collateralized debt obligations (CDOs) issuance was up*, while issuance of U.S. residential mortgage-backed securities (RMBS) and commercial mortgage-backed securities (CMBS) were down. . . .
>
> *        *        *
>
> Financial Services revenue and operating profit increased substantially over the second quarter of 2005.

\*       \*       \*

The Financial Services segment's increase in revenue and operating profit was due to the performance of structured finance and corporate (industrial and financial services) and government ratings, which represented approximately 51.5% and 46.4%, respectively, of the growth in revenue [ . . . . ] Issuance in structured finance was mixed in the second quarter, as issuance of U.S. collateralized debt obligations (CDOs) and commercial mortgage-backed securities (CMBS) was up, while issuance of U.S. residential mortgage-backed securities (RMBS) was down.  CDO issuance was driven by growth in leveraged loans related to merger and acquisition (M&A) activity, new structures (hybrids) and arbitrage opportunities within the cash flow and synthetic sectors. . . .

\*       \*       \*

Total U.S. structured finance new issue dollar volume increased 10.0%. U.S. ***CDO issuance increased 162.0%, according to Harrison Scott Publications and S&P's internal estimates (Harrison Scott Publications/S&P)***.  Driven by investor demand and origination levels, U.S. CMBS issuance increased 2.8%.  ***Despite a decline in RMBS issuance dollar volume the number of issues was up.  RMBS issuance was driven by home equity products***.  The Mortgage Bankers Association currently forecasts mortgage originations to decline 18% in 2006 as mortgage rates continue to increase. . . .

\*       \*       \*

In the U.S., growth in issuance was experienced across most asset classes in structured finance.  ***The issuance of U.S. residential mortgage-backed securities (RMBS), commercial mortgage-backed securities (CMBS) and collateralized debt obligations (CDOs) remained strong due to favorable market conditions. Mortgage rates were within historical norms and at levels that kept refinancing and debt consolidation robust.***  Commercial real estate fundamentals and investor demand for these securities also remained strong. The growth in corporate issuance was attributable to increases in industrial issuance, driven primarily by the market's favorable financing conditions and healthy merger and acquisition (M&A) activity.

Total U.S. structured finance new issue dollar volume increased 20.0%. U.S. CDO issuance increased 107.5%, according to Harrison Scott Publications and S&P's internal estimates (Harrison Scott Publications/S&P). The U.S. CDO market was driven by growth of leveraged loans related to M&A activity, new structures (hybrids) and arbitrage opportunities within the cash flow and synthetic sectors. U.S. CMBS issuance increased 26.7% over the prior year driven by strong investor demand, strong commercial origination trends, and issuers coming to market in anticipation of higher interest rates. U.S. RMBS issuance increased 13.5%, driven by the home equity sector as these products are less sensitive to increases in interest rates. Mortgage rates, albeit rising, remained within historical norms and were low enough to keep home purchase and improvement activity and the debt consolidation market healthy. However, as mortgage rates continue to increase, the rate of home

price appreciation levels off, and as sub-prime lenders tighten lending standards for affordability products, RMBS issuance is anticipated to decline. . . .

\*        \*        \*

The Company maintains disclosure controls and procedures that are designed to ensure that information required to be disclosed in the Company's reports filed with the Securities and Exchange Commission (SEC) is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to the Company's management, including its Chief Executive Officer (CEO) and Chief Financial Officer (CFO), as appropriate, to allow timely decisions regarding required disclosure.

As of June 30, 2006, an evaluation was performed under the supervision and with the participation of the Company's management, including the CEO and CFO, of the effectiveness of the design and operation of the Company's disclosure controls and procedures (as defined in Rules 13a-15(e) under the U.S. Securities Exchange Act of 1934). Based on that evaluation, the Company's management, including the CEO and CFO, concluded that the Company's disclosure controls and procedures were effective as of June 30, 2006.

115.    In response to the July 25, 2006 press release and the July 28, 2006 Form 10-Q, the Company's stock price increased dramatically – by more than 12% from a close of $50.40 on July 24, 2006 to closing prices of $54.32 on July 25, 2006 and $56.30 on July 31, 2006, as reflected in the chart below:



116. The statements referenced in ¶¶109-14 were each materially false and misleading when made as the misrepresented and/or omitted adverse facts which then existed and disclosure of which was necessary to make the statements not false and/or misleading. The true facts, which were then known to each of the Defendants, were:

- Because of the lack of regulation regarding securitization transactions and associated derivatives, Defendants knew that ratings agencies, such as S&P, were the only authorities on assets that were securitized. Although S&P claimed it was only providing an opinion of default probability, Defendants were aware that the marketplace, including governmental agencies, used S&P's ratings as a standard.

- The Company's revenue stream for Structured Finance transactions, especially subprime and Alt-A RMBS and CDOs was materially threatened by fraud.

- The Company was perpetually late in conducting its surveillance of RMBS and CDO transactions, and because of the abject failure to conduct timely surveillance, Defendants' assessments of the performance of the Company's Structured Finance division, including its financial outlook, lacked a reasonable basis.

- Without CDO issuance, the U.S. subprime and Alt-A RMBS market would have collapsed. As of July 25, 2006, Defendants were aware of material problems with

the performance of the subprime mortgage loans securitized in late 2005 and the first half of 2006.

- The rapid increase in CDO issuance to meet investor yield demand and the extreme leverage associated with CDOs should have been a significant red flag for McGraw-Hill. In addition, because CDOs used subprime RMBS from completed transactions, Defendants had the opportunity to see the performance of those securities and knew there would be poor performance.

- Defendants' ongoing surveillance failures had the cause and effect of forestalling massive revenue decreases for the Company. If the Company had downgraded its ratings of RMBS and CDOs sooner, its ratings revenue would have substantially declined, it would have seen a decrease in transaction volume as customers would have fled, and the Company's financial condition would have been materially and negatively impacted.

- The Company's credibility and integrity in the marketplace were hanging by a thread, and would be devastated once the Company's poor surveillance led them to downgrade thousands of RMBS and CDOs worth billions of dollars.

- For all the reasons previously stated, Defendants' statements regarding rapid earnings growth lacked a reasonable basis.

117.     On September 20, 2006, McGraw-Hill participated in the Goldman Sachs Communacopia XV Conference. Bahash participated in the conference on behalf of the Company. During the conference, Bahash made several false and misleading statements designed to artificially inflate the Company's stock price. For example, Bahash stated:

> In assessing the current outlook, ***Financial Services continues to show strength and may actually do a little bit better than we had originally anticipated***. We are seeing ***substantial strength*** in the global issuance of commercial mortgage-backed securities and ***collateralized debt obligations***. Corporates in both the U.S. and Europe are doing very well too.

> We also are seeing the expected slowdown in the rate of growth in U.S. residential mortgage-backed securities issuance that we hadn't mentioned earlier.

*       *       *

> ***We continue to see very significant growth in the CDO market,*** CMBS, the securitization in terms of derivative side of the equation, credit default swaps, clearly outside the U.S. are very, very significant to us. ***So those are particular areas that are growing rather dramatically***.

> I think also we're seeing significant growth in bank loan ratings, the nontraditional side, counterparty risks ratings, rating evaluation services. So I think the one area

that gets the most attention with regard to perhaps fluctuations would be the residential mortgage-backed securities market. *And clearly as I mentioned we are seeing a slowdown there. But we right now are thinking that roughly 10% to 12% decline is what we expect for 2006, and early on -- and this is really on -- but we are expecting a decline in that same range for 2007, so not a significant impact.*

118.    The statements referenced in ¶117 were each materially false and misleading when made for the reasons stated in ¶116.  In addition, the statements were each materially false and misleading when made as they misrepresented and/or omitted adverse facts which then existed and disclosure of which was necessary to make the statements not false and/or misleading.  The true facts, which were then known to each of the Defendants, were:

- The strength of the Company's Financial Services segment was illusory.  In fact, the strength was attributable to the Company's inability to account for fraud in its models (meaning it could not understand the bonds' risk profile), its failure to analyze loan pools on a loan-level basis, and its ongoing surveillance lag and shortfall.

119.    On October 19, 2006, the Company issued a press release entitled "The McGraw-Hill Companies Reports Third Quarter EPS of $1.06, a 6% Increase; Raises Earnings Guidance for 2006," which stated, in relevant part:

"Net income for the third quarter was $382.3 million. Revenue was up 0.8% to $2.0 billion versus the same period last year.

"*Record results at Financial Services* and stringent cost management in the face of a softer education market this year *were key factors in our third quarter*," said Harold McGraw III, chairman, president and chief executive officer of The McGraw-Hill Companies.

*            *            *

*Financial Services: "Revenue for this segment increased 11.4% to $675.1 million compared to the same period last year* [ . . . .] Of the non-GAAP revenue growth, 48.3% was produced by structured finance and 21.6% came from corporate and government ratings.

"Including the incremental expenses of $8.0 million for stock-based compensation in the third quarter, *the segment's operating profit increased 17.3% to $295.7 million*.

*            *            *

- 47 -

*"The global pacesetter again was structured finance.* Growth in cash flow and synthetic Collateralized Debt Obligations increases in Commercial Mortgage-Backed Securities due to favorable interest rates, strength in commercial mortgage originations and strong leveraged loan activity were key factors in the structured finance market.

*"Dollar volume issuance in the U.S. Residential Mortgage-Backed Securities market fell again, declining 11.2% in the third quarter after slipping by 1.2% in the second quarter. But we continued to benefit from an increase in the number of deals, up 1.7% in the third quarter, and from more active Residential Mortgage-Backed Securities issuance in international markets.*

*     *     *

"In the U.S., total new issue dollar volume was up 9.0% in the third quarter as corporate new issuance climbed by 25.9%. Public finance declined by 12.9%. Mortgage-Backed Securities were off 8.0%. Asset-Backed Securities were up 4.2%. Collateralized Debt Obligations were up 118.7%. In Europe, new issue dollar volume was up 51.8%.

*     *     *

**The Outlook:** *"Based on our record of achievement for the first nine months, we are raising our guidance for the full year*.

"Our previous guidance called for diluted earnings per share of $2.44 to $2.49 excluding the incremental impact of all stock-based compensation. That excluded $0.13 for stock-based compensation and $0.04 for the one-time charge for the elimination of the restoration stock option program in the first quarter.

"The new guidance calls for diluted earnings per share of $2.53 to $2.55 excluding the incremental impact of all stock-based compensation and restructuring charges. The incremental impact of stock-based compensation has been revised to $0.11, down from $0.13 estimated at the start of the year. For 2007, we fully expect to achieve double-digit earnings growth."

120.    Also on October 19, 2006, McGraw-Hill hosted a conference call to discuss its third quarter 2006 earnings and outlook. The Individual Defendants participated in the call on behalf of the Company. During the call, numerous false and misleading statements were made that were designed to artificially inflate the Company's stock price. For example, McGraw III stated:

In looking at the fourth quarter, *the structured finance pipeline still looks very healthy*. We expect strength in the collateralized debt obligation, *a very large market and getting better*, and the commercial mortgage-backed securities markets, which we have seen for the last couple of years now gaining strength. U.S. residential mortgage-backed security issuance in the fourth quarter is expected to

- 48 -

decline, the year-over-year comparisons.  The absolute volume is still quite high. Corporates still looks very solid, and again, both here and outside of the United States.  And the leveraged loan market will continue to be strong and international issuance looks very good.

121.    Later in the call, in response to a question from a JP Morgan analyst, McGraw III stated:

> Yes, thanks, Fred.  ***In the structured finance market, obviously, it has been strong for the last several years and it's going to continue to be strong***.  ***And the good part is that it continues to gain strength outside the United States***.  As we were saying in just some of the issuance numbers, the issuance for collateralized debt obligations, which is very large and in a big area, was up almost 120%, and it was up -- new issue dollar volume in Europe was up roughly 52%.  ***So it's very, very strong.  We continue to benefit***, obviously, from the shift there.
>
> ***Now remember, on the residential mortgage-backed securities market, even though we're seeing year-over-year declines a little bit in the third and fourth quarter, it is still very large.  Overall, in 2006 in the residential mortgage-backed market, we sold $1.2 trillion of new issuance, and that's in the U.S. alone.  So it is very large and it continues to grow very strong***, and the residential mortgage-backed market in Europe is also doing -- is growing very nicely and is doing really well.  So that, overall, ***the structured finance market is strong and it's going to continue to stay strong***.  We'll see the year-over-year comparisons in residential start to decline a little bit, actually for the full year. I expect it to be flat to probably even positive, given where we see the pipeline.
>
> On the commercial mortgage-backed market, you're going to see the continued strong increases that we have been seeing since last year. On the asset-backed, a little bit softer on the asset-backed, but again, the CDO market and the collateralized loan obligation market are going to continue strong.

122.    On October 27, 2006, the Company filed its interim quarterly financial report on Form 10-Q for the quarter ending September 30, 2006.  The financial results reported in the 10-Q were substantially similar to those reported in the Company's October 19, 2006 press release.  The Form 10-Q was signed by Bahash, and contained required Sarbanes-Oxley certifications signed by McGraw III and Bahash stating that the Form 10-Q did not include any material misrepresentations. In discussing what drove McGraw-Hill's improved financial performance, the October 27, 2006 10-Q stated, in relevant part:

- 49 -

*In the third quarter of 2006, the Company achieved growth in revenue and operating profit of 0.8% and 2.8%, respectively.  The increase in revenue is primarily attributable to growth in the Financial Services segment*.

\*       \*       \*

*Service revenue increased 10.7% in the third quarter of 2006, due primarily to an 11.4% increase in Financial Services revenue*.  *Financial Services revenue increased primarily due to the performance of structured finance ratings* and corporate (corporate finance and financial services) and government finance ratings; somewhat offset by the divestiture of the Corporate Value Consulting (CVC) business which contributed $33.0 million to 2005 third quarter revenue.  *Issuance in structured finance was mixed in the third quarter, U.S. collateralized debt obligations (CDOs) and commercial mortgage-backed securities (CMBS) issuance was up, while issuance of U.S. residential mortgage-backed securities (RMBS) were down*. . . .

\*       \*       \*

*The Financial Services segment's increase in revenue and operating profit was due to the performance of structured finance* and corporate (industrial and financial services) and government ratings, which represented approximately 71.3% and 31.9%, respectively, of the growth in revenue.  Growth in third quarter revenue was reduced by 47.6% due to the divestiture of CVC.  *Issuance in U.S. structured finance was mixed in the third quarter, as issuance of collateralized debt obligations (CDOs) and commercial mortgage-backed securities (CMBS) were up, while the issuance of U.S. residential mortgage-backed securities (RMBS) was down.  CDO issuance was driven by strong investor demand for both the cash flow and synthetic sectors, fueled by more innovative structures, arbitraging opportunities* and growth of the Collateralized Loan Obligations (CLO) sector, which benefited from increases in leveraged loans related to merger and acquisition (M&A) activity.  U.S. CMBS issuance increased on strong commercial real estate fundamentals, growth in origination levels and strong investor demand.  *Residential housing market fundamentals have begun to weaken with home price appreciation slowing, inventories of unsold homes increasing and new housing starts declining, however issuance was favorably impacted by non-traditional mortgage loans being sold into the non-Agency markets and refinancing of Adjustable Rate Mortgages (ARMs) into fixed-rate product.*  The growth in U.S. corporate issuance was attributable to increases in industrial and financial services issuance, driven primarily by the market's favorable financing conditions and healthy M&A activity.  *The third quarter saw strong issuance in Europe for corporates and across all structured finance asset classes.  Recurring surveillance activities and customers on annual arrangements had a positive impact on results in the third quarter of 2006*.  Bank loan ratings showed strong growth in the quarter.

T*otal U.S. structured finance new issue dollar volume increased 8.2%* according to Harrison Scott Publications and S&P's internal estimates (Harrison Scott Publications/S&P).  *U.S. CDO issuance increased 118.7%*, and U.S. CMBS issuance increased 13.9%.  *Despite an 11.2% decline in RMBS issuance dollar*

*volume, the number of issues was up slightly*. The Mortgage Bankers Association currently forecasts mortgage originations to decline 20% in 2006. According to Thomson Financial Securities Data, U.S. corporate dollar volume issuance for the third quarter of 2006 increased 25.9%, while high yield issuance decreased 13.6%. The high yield market was off as many issuers opted to finance in the leveraged loan market. Following a trend that began in December 2005, U.S. public finance issuance decreased in the third quarter of 2006.

*The third quarter saw continued growth in the European structured finance market. RMBS was the largest sector in terms of issuance, representing 50.6% of total European structured finance issuance*. The European securitization market remains strong, with the CMBS dollar volume issuance increasing 159.3% in the third quarter of 2006, after declining in the second quarter. *CDO issuance increased 122.9% due to strong growth within the cash flow sector*. European corporate issuance increased in the third quarter driven primarily by strong M&A activity.

\*       \*       \*

*In the first nine months of 2006, the Company achieved growth in revenue and operating profit of 4.4% and 6.8%, respectively. The increase in revenue is primarily attributable to growth in the Financial Services segment* and the 2005 acquisition of J.D. Power and Associates, which contributed $202.0 million and $61.1 million to the growth in revenue, respectively. Foreign exchange rates had no material impact on revenue or operating profit for the nine months ended September 30, 2006.

\*       \*       \*

*Service revenue increased 11.5% in the first nine months of 2006, due primarily to an 11.5% increase in Financial Services* and the acquisition of JDPA. *Financial Services increased primarily due to the performance of structured finance ratings* and corporate (corporate finance and financial services) and government finance ratings; somewhat offset by the divestiture of the Corporate Value Consulting (CVC) business which contributed $101.3 million to 2005 nine month revenue. *Strong growth in structured finance reflects continued favorable global market conditions*.

\*       \*       \*

The Company maintains disclosure controls and procedures that are designed to ensure that information required to be disclosed in the Company's reports filed with the Securities and Exchange Commission (SEC) is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to the Company's management, including its Chief Executive Officer (CEO) and Chief Financial Officer (CFO), as appropriate, to allow timely decisions regarding required disclosure.

As of September 30, 2006, an evaluation was performed under the supervision and with the participation of the Company's management, including the CEO and CFO, of the effectiveness of the design and operation of the Company's disclosure controls

and procedures (as defined in Rules 13a-15(e) under the U.S. Securities Exchange Act of 1934). Based on that evaluation, the Company's management, including the CEO and CFO, concluded that the Company's disclosure controls and procedures were effective as of September 30, 2006.

123.    In response to the October 19, 2006 press release and October 27, 2006 Form 10-Q,

the Company's stock price posted a healthy 7% increase – from a closing price of $59.03 on October

19, 2006 to closing prices of $62.80 on October 19, 2006 and $63.26 on October 27, 2006, as

demonstrated in the chart below:



124.    The statements referenced in ¶¶119-22 were each materially false and misleading

when made for the reasons stated in ¶116.  In addition, the statements were each materially false and

misleading when made as they misrepresented and/or omitted adverse facts which then existed and

disclosure of which was necessary to make the statements not false and/or misleading.  The true

facts, which were then known to each of the Defendants, were:

- The growth in the Company's Structured Finance division was not sustainable.  By
  this time, there were numerous indicators to the Company that the subprime and Alt-

A RMBS and CDO markets were "running on faith" and that fraud was rampant in loan originations. Thus, although the number of transactions had increased, the market was anything but "strong," as McGraw III stated.

- The Company's disclosure controls were wholly inadequate. Indeed, the Company's rating systems were teetering on the brink of abject failure, the Company's models would turn out to be useless at predicting credit risk for RMBS and CDO transactions, and the Company failed to conduct surveillance of the transactions it rated.

125. On December 5, 2006, McGraw III spoke on behalf of the Company at the UBS 34th Annual Global Media Conference. During the conference, McGraw III made additional false and misleading statements, and stated:

> *Let's go over to the Financial Services segment prospects here. There are important and fundamental reasons why Standard & Poor's will continue its double-digit growth. Clearly, we are taking advantage of powerful, endurable trends that have stimulated growth and financial markets for some time, and will continue to do so for many more years*. The globalization of financial markets clearly leads the list, as issuers continue to enhance their ability to assess capital around the world at lower costs.
>
> The increasing complexity of capital markets also is creating new opportunities for Standard & Poor's. The continued global growth of securitization is unmistakable, and as *investors* seek superior returns in the face of relatively low interest rates and narrow bond spreads, they *need our ratings and more sophisticated tools and models S&P provides to measure the risks of these complex new instruments*.

126. At the Citigroup 17th Annual Entertainment, Media and Telecommunications Conference on January 10, 2007, McGraw III made additional false and misleading statements:

> The *outlook for the ratings business is excellent*. The market is both robust and innovative. Although the new issuance mix has changed significantly over the last 20 years there has been one constant, a growing demand for fixed income securities as global investors have sought bonds for yield and risk diversification. Structured finance has been a key driver with global new issuance growing at a compound annual rate of 35% since 2000.
>
> *            *            *
>
> Risk arbitrage is the key to making all investors happy with a spread that they are earning at a risk they are assuming. As *investors* seek superior returns in the face of relatively low interest rates and narrow bond spreads, they *need our ratings and the sophisticated tools and models that S&P provides to measure the risk of more complex instruments that create more opportunity to generate revenue*.

\*    \*    \*

127.    The statements referenced in ¶¶125-26 were each materially false and misleading when made for the reasons stated in ¶116.  In addition, the statements were each materially false and misleading when made as they misrepresented and/or omitted adverse facts which then existed and disclosure of which was necessary to make the statements not false and/or misleading.  The true facts, which were then known to each of the Defendants, were:

- The Company was not experiencing "endurable trends" in Financial Services.  To the contrary, the market was experiencing an implosion caused by fraud, poor underwriting, and the convergence of the subprime and Alt-A markets.  The only reason Defendants were able to describe the market as endurable was because the Company completely failed to undertake any meaningful surveillance of the transactions it rated.

- The Company's models were incapable of understanding or capturing the credit risk associated with subprime and Alt-A RMBS and CDOs.

128.    On January 25, 2007, the Company issued a press release announcing its financial results for the fourth quarter and full year 2006 entitled "The McGraw-Hill Companies Reports 8.6% Increase in Earnings Per Share for 2006[,] EPS Grows By 12.0% In Fourth Quarter," which stated in relevant part:

> *Net income for 2006 increased 4.5% to $882.2 million.  Revenue for 2006 grew by 4.2% to $6.3 billion.*

\*    \*    \*

> *Net income for the fourth quarter increased 8.2% to $204.8 million.  Revenue grew by 3.4% to $1.6 billion.*

> *"A strong finish to an outstanding year in Financial Services and effective cost controls in a softening education market were key to our performance in 2006,"* said Harold McGraw III, chairman, president and chief executive officer of The McGraw-Hill Companies.

\*    \*    \*

> *Financial Services:  "Revenue for this segment in 2006 increased 14.4% to $2.7 billion.*  Excluding the prior year's revenue of $101.3 million from Corporate Value Consulting, which was sold at the end of September 2005, *revenue in 2006 grew by 19.4% on a non-GAAP basis.  Of the non-GAAP revenue growth, 42.9% was*

*produced by structured finance* and 26.1% came from corporate and government ratings. Foreign exchange rates benefited revenue by $5.6 million and did not materially impact operating results.

"Including incremental expenses of $30.0 million for stock-based compensation and a one-time charge for the elimination of the restoration stock option program in 2006, *the segment's operating profit increased 18.0% to $1.2 billion compared to 2005. The operating margin for 2006 was 43.8%, up from 42.5% in 2005.* The sale of Corporate Value Consulting produced a pre-tax gain of $6.8 million in 2005.

*"In the fourth quarter, revenue grew by 22.1% to $794.1 million. Structured finance produced 44.7% of the revenue increase;* 30.5% came from corporate and government ratings. *Operating profit increased 19.1% to $341.1 million in the fourth quarter compared to the same period in 2005.*

\*     \*     \*

*Continued worldwide strength in structured finance and a surging corporate finance market for both investment-grade and high-yield bonds were key factors in the fourth quarter for ratings.*

"*Rapid growth in the U.S. market for collateralized debt obligations and solid increases in commercial mortgage-backed securities kept the structured market moving ahead. The collateralized debt obligation market in the U.S. is being driven by cash flow CDOs of high-yield collateralized loan obligations and asset-backed securities transactions. Hybrid transactions, a combination of cash flow and synthetics, also continue to gain broader acceptance among investors.*

\*     \*     \*

*"The anticipated slowdown in the U.S. residential mortgage-backed securities market was evident in the fourth quarter. Increases in mortgage rates, a slowing in the rate of home price appreciation and tightening by sub-prime lenders all contributed to the softening market. In Europe, however, the residential mortgage-backed securities market again produced substantial gains. The asset-backed securities market softened as auto manufacturers curtailed securitization while they reorganized their businesses.*

\*     \*     \*

The Outlook: "*With continued strength in Financial Services and a rebounding education market, we are poised for double-digit earnings growth in 2007.*"

129.    Also on January 25, 2007, McGraw-Hill hosted a conference call to discuss its fourth quarter and full year 2006 earnings and outlook. The Individual Defendants participated in the call on behalf of the Company. During the call, numerous false and misleading statements were made

that were designed to artificially inflate the Company's stock price.  For example, McGraw III stated:

> *The structured finance market continues to be a strong driver. In the fourth quarter, structured finance's performance was primarily attributable to growth in the collateralized debt obligations and the commercial mortgage-backed securities market.  In the CDO market there was strong investor demand in cash flow in synthetic sectors as well as increases in collateralized loan obligations which benefited from the growth in leveraged loans stimulated by merger and acquisition activity . . . .*

130.    On January 31, 2007, the Company issued a press release entitled "The McGraw-Hill Companies Increases Dividend by 12.9% and Approves New Stock Buyback Plan for up to 45 Million Shares."  The press release stated in relevant part that the Company "approved a 12.9% increase in the regular quarterly cash dividend on the Corporation's common stock and also authorized a new stock repurchase program for up to 45 million shares, or *approximately 12.7% of the Corporation's outstanding shares*."

131.    In response to the January 31, 2007 press release, the Company's stock price reacted favorably.  The day before the press release (January 30, 2007), the stock closed at $66.19.  On January 31, 2007, it climbed to $66.08 on volume of more than 3.6 million shares traded, and continued climbing the next day, closing at $67.89 on February 1, 2007.

132.    On February 28, 2007, the Company filed its annual financial report on Form 10-K for the year ending December 31, 2006.  The financial results reported in the 10-K were substantially similar to those reported in the Company's January 25, 2007 press release.  The Form 10-K was signed by McGraw III and Bahash, and contained required Sarbanes-Oxley certifications signed by McGraw III and Bahash stating that the Form 10-K did not include any material misrepresentations. In discussing what drove McGraw-Hill's improved financial performance, the February 28, 2007 10-K stated, in relevant part:

*        *        *

The Financial Services segment continues to be favorably impacted by the current trend of the disintermediation of banks and the increased use of securitization as a source of funding.  In 2006, the Financial Services segment was favorably impacted by the continued low interest rate environment and an improved merger and acquisition market.  The mortgage-backed securities market for commercial and residential mortgages remained strong for 2006, as mortgage rates were within historical norms and at levels that kept refinancing and debt consolidation robust in the early part of the year.  Corporate issuance in 2006 also was robust, especially high yield issuance.

*          *          *

• Revenue and income from operations increased 4.2% and 4.5%, respectively, in 2006.  ***Results from operations improved on the strength of the Financial Services segment, primarily due to the performance of structured finance*** and corporate (corporate finance and financial services) and government ratings, and the impact of the April 1, 2005 acquisition of J.D. Power and Associates..

*          *          *

Outlook

***Comparisons in 2007 will be less challenging as Standard & Poor's continues to grow***, McGraw-Hill Education enters a stronger state new adoption market and Information & Media receives the benefits of the Sweets transformation.

*          *          *

In Financial Services, continued global expansion and product diversification as well as a favorable interest rate environment, increased capital spending, and robust merger and acquisition activity by companies will mitigate the anticipated decline in U.S. residential mortgage-backed securities.  ***The U.S. residential mortgage-backed securities market is projected to decline 10–15% in 2007***.

*          *          *

***In 2006, the Company achieved growth in revenue and income from operations. The results are primarily attributable to growth in the Financial Services segment*** and the impact of the April 1, 2005 acquisition of J.D. Power and Associates which contributed $43.8 million in revenue in the first quarter of 2006 and had no material impact on operating profit.

*          *          *

***Service revenue increased 10.0% primarily due to increased revenue in the Financial Services segment, which increased 14.4% or $345.6 million.  Financial Services revenue increased due to the strong performance of structured finance*** and corporate (industrial and financial services) and government ratings.

*          *          *

*The 2006 operating profit increased as a result of the Financial Services segment* . . . .

\* \* \*

*The Financial Services (FS) segment's 2006 operating profit and margin grew by 18.0%* and a 1.3 percentage point change, respectively, from 2005. These results were primarily due to the following items:

• *Growth in structured finance related to the continued strength in issuance of U.S. commercial mortgage-backed securities and collateralized debt obligations (CDOs)* in 2006, *primarily driven by strong investor demand for both asset classes, strong commercial real estate origination trends and new CDO structures and arbitraging opportunities*.

\* \* \*

*The Financial Services segment continued to experience double-digit growth in revenue and operating profit in 2006, increasing 14.4% and 18.0%, respectively, over 2005 results. The increases in revenue and operating profit were due to the performance of structured finance* and corporate (industrial and financial services) and government ratings, which represented approximately 55.4% and 33.7%, respectively, of the growth in revenue.

\* \* \*

*In the U.S., in 2006, strong growth was experienced in the issuance of commercial mortgage-backed securities (CMBS) and collateralized debt obligations (CDOs)*. CDO issuance was driven by strong investor demand in both the cash flow and synthetic sectors, fueled by more innovative structures, arbitraging opportunities and growth of the collateralized loan obligations (CLOs) sector, which benefited from increases in leveraged loans related to merger and acquisition (M&A) activity. CMBS issuance was driven by strong investor demand and strong commercial real estate origination trends. The residential mortgage backed securities (RMBS) market was up slightly year-over-year, as increases in mortgage rates, a slowing of the rate of home price appreciation, and the tightening of lending standards by sub-prime lenders for affordability products adversely impacted RMBS issuance. The growth in U.S. corporate issuance was attributable to increases in industrial and financial services issuance, driven primarily by the market's favorable financing conditions and healthy M&A activity. Bank loan ratings showed strong growth in 2006.

*Total U.S. structured finance new issue dollar volume increased 12.1% in 2006* according to Harrison Scott Publications and S&P's internal estimates. *U.S. CDO issuance increased 85.4%, and U.S. CMBS issuance increased 27.6% over the prior year. RMBS issuance increased 1.4%, but the number of issues, while smaller in size, increased by 12.6%.*

\* \* \*

*Growth rates in 2007 in the Financial Services segment are expected to remain double-digit despite the declining growth rates primarily due to the anticipated fall-off in the U.S. RMBS market*. The Mortgage Bankers Association is forecasting approximately a 5% decline in mortgage originations, as mortgage rates continue to rise and the housing market continues to soften resulting in reduced refinancing. *The Company anticipates that RMBS issuance will decline approximately 10-15% in 2007. Strong international growth and product diversification will help mitigate the anticipated decline in the U.S. RMBS issuance volumes*.

The U.S. CMBS market in 2007 will be driven by continued strength in commercial real estate fundamentals, investor demand for relative yield and refinancing of maturing deals. *U.S. CDO issuance in 2007 will continue to be driven by the robust performance of the asset class resulting in fewer downgrades, more new structures and arbitrage opportunities as well as an increasing investor base*. Issuance in U.S. asset-backed securities market is anticipated to grow moderately in 2007 as auto manufacturers continue to rely on securitization as a source of funding. The resiliency of the consumer should also lead to growth in the credit card and student loan sectors.

*        *        *

The Company maintains disclosure controls and procedures that are designed to ensure that information required to be disclosed in the Company's reports filed with the Securities and Exchange Commission (SEC) is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to the Company's management, including its Chief Executive Officer (CEO) and Chief Financial Officer (CFO), as appropriate, to allow timely decisions regarding required disclosure.

As of December 31, 2006, an evaluation was performed under the supervision and with the participation of the Company's management, including the CEO and CFO, of the effectiveness of the design and operation of the Company's disclosure controls and procedures (as defined in Rules 13a-15(e) under the U.S. Securities Exchange Act of 1934). Based on that evaluation, the Company's management, including the CEO and CFO, concluded that the Company's disclosure controls and procedures were effective as of December 31, 2006.

133.    In response to the January 25, 2007 press release and the February 28, 2007 Form 10-K, the Company's stock price declined slightly, falling from a close of $68.40 on January 24, 2007 to closing prices of $66.36 on January 25, 2007 and $64.56 on February 28, 2007. If not for Defendants' false and misleading statements and omissions, however, the Company's stock price would have declined much further.

134.   The statements referenced in ¶¶128-30 and ¶132 were each materially false and misleading when made for the reasons stated in ¶116.  In addition, the statements were each materially false and misleading when made as they misrepresented and/or omitted adverse facts which then existed and disclosure of which was necessary to make the statements not false and/or misleading.  The true facts, which were then known to each of the Defendants, were:

- Although Defendants told investors they were anticipating the U.S. RMBS market to decline somewhat, they omitted material information concerning the Company's material lack of surveillance of transactions its S&P brand rated.

- In addition, although Defendants acknowledged the slowdown of the RMBS market, the Company did not take action to adjust its ratings of such transactions to reveal then-known information, such as the prevalence of mortgage fraud at origination, the convergence of the subprime and Alt-A markets, or the actual performance of the loans underlying such transactions.

- McGraw-Hill was teetering on the brink of a financial meltdown, and the share buyback was an attempt to maintain the artificial inflation in the Company's stock price.

- The Company's disclosure controls were wholly inadequate.  Indeed, the Company's rating systems were teetering on the brink of failure, the Company's models would turn out to be useless at predicting credit risk for RMBS and CDO transactions, and the Company failed to conduct surveillance of the transactions it rated.

135.   On March 5, 2007, McGraw III participated in the Bear Stearns 20th Annual Media Conference on behalf of the Company.  During the conference, McGraw III made additional false and misleading statements, which included the following:

> We realize that there has been concern about the sub-prime mortgage market, so I appreciate the opportunity to share perspective on the credit quality of residential mortgage-backed securities and collateralized debt obligations rated by Standard & Poor's and the prospects for our structured finance business as well. Let's start with the sub-prime market.

> Sub-prime market, which represents 20% of rated U.S. residential mortgage-backed securities issuance in 2006.  *It is true that delinquencies in this segment of the market have increased, but the impact of overall credit ratings has not been significant. In 2006 we lowered about 1.5% of roughly 10,000 outstanding sub-prime ratings.  To date, in 2007, there were no downgrades and only 10 credit watch actions relating to almost 5000 vintage 2006 sub-prime ratings.  That is only 0.2% of the outstanding ratings, so you can see that these actions really represent only a small percentage of total rating.*

*Despite probably near-term increases in losses and downgrades, S&P expects the residential mortgage-backed securities market to perform well over the long term, and obviously it certainly has*.  Most of those residential mortgage-backed security transactions now on credit watch were issued during the first half of 2006, before S&P raised loss coverage levels for certain sub-prime mortgages.  *It is also worth nothing that the residential mortgage-backed security instrument placed on credit watch have had no current impact on any outstanding collateralized debt obligation rating.*

S&P saw early signs of poor performance of the collateral backing for these residential mortgage-backed securities transactions that are now on credit watch.  By placing these instruments on credit watch when the transactions had not yet experienced a loss, *S&P was signaling the market that it was adopting a new, more stringent standard for the surveillance of these types of transactions.  It notified the market in April that it was going to be strengthening loss coverage and implemented three months later*.

*S&P was able to take this early action because it regularly monitors credit markets, and the credit performance of these rated transactions, and systematically report on them at the same time*.  S&P regularly communicates its opinions on not only what is happening, but what may happen through credit watch and its rating actions.  That's why professionals closely watch our credit watch actions.

*I think S&P has [been] very on top of the situation in the sub-prime market.  When lending standards started to deteriorate last year in the sub-prime market, S&P raised the level of credit support for riskier sub-prime deals and tightened some surveillance standards for residential mortgage-backed securities.  Moreover, S&P has fully integrated surveillance process for residential mortgage-backed securities and CDOs.  That means that S&P will determine what effect, if any, the increase in delinquencies on certain sub-prime mortgages has on both its rated residential mortgage-backed security transactions, and those collateralized debt obligation transactions which hold residential backed securities.*

We do not expect the problems in the sub-prime market to impact the growth prospects that we anticipate in 2007 for structured finance.  We do not expect the problems in sub-prime market.  Generally, residential mortgage-backed security transactions issued during the second half of 2006 are supported by higher loss coverage and are still performing as expected, but as a cautionary note I would point out that it is very early in the life of these transactions, and I've already pointed out that last July, S&P increased its loss coverage for sub-prime deals.

So what's the current outlook?  S&P believes that the 2006 vintage residential mortgage-backed securities transactions will underperform relative to 2005 transactions, but based on our current economic scenarios, *S&P does not believe that 2006 transactions will perform as badly as some have suggested*.  S&P is anticipating losses in the 5.25 to 7.75% range, which is slightly above vintage year 2000, the previous worst-performing year with average cumulative losses of about 5%.

*Overall we expect the residential mortgage-backed securities to maintain strong credit quality and returns that continue to attract investors* at a time when high grade corporate issuance is in short supply.  Today the credit quality of a U.S. corporate bond is average BBB-.

Between 1978 and 2006, S&P has issued roughly 47,000 residential mortgage-backed securities ratings. 85% were initially investment grade, AAA to BBB.  Last year, 2006 vintage residential mortgage-backed securities, 88 were rated investment grade.  Of the 3.6 trillion in par value of S&P ratings outstanding as of January 1, 2007, 88.1% are rated AAA.  In general, then, the vast majority of residential mortgage-backed securities ratings have been investment grade and are very stable. *S&P believes its models have captured the deterioration in credit quality of the 2006 sub-prime mortgages and the sub-prime mortgage obligations may decline this year, but the sub-prime market will not evaporate.  These mortgages are profitable for lenders and represent, for many people, an opportunity to own a home who would otherwise never qualify for a prime mortgage*.

In a detailed report at the end of January, the Mortgage Bankers Association pointed that, and I quote, "Even with the expansion of credit availability with the growth of the sub-prime market, foreclosures are well below their historic high and will not have a macroeconomic impact."  Some other key points from the Mortgage Banker report, *the residential financial market is fundamentally sound and working efficiently*.  Mortgage obligations will fall in 2007 relative to 2006, given the decline of home sales and the diminished refinancing activity.  Baring any unexpected downturn in the economy, the recent increase in mortgage delinquency rates will likely peak by the end of 2007, but at levels low below those of past peaks.  The lower peak will come despite the change in the composition of the outstanding loans, namely the larger portion of the sub-prime loans in recent years.  All of which points me back to the starting point.

We began by predicting a 10 to 15% year over year decline in the U.S. residential mortgage-backed securities market in 2007.  That is a continuation of the slowdown experienced in 2006 when the U.S. residential mortgage-backed securities issuance rose by only 1%.  It was also a year in which our financial services segment had double-digit top and double-digit bottom-line growth and margin expansion.

We started 2007 expecting another year of double-digit increases even though loan originations and issuance would decline.  Except for the U.S. residential mortgage-backed securities issuance we continue to expect increases in all other asset classes, and that includes collateralized debt obligations where the financial community's innovation is clearly evident in its ability to meet investor demand for returns and obvious, specific risk reward attributes.

*       *       *

*Collateralized debt obligations will show continued strength in the United States and abroad driven by new structures and increasing investor base.  U.S. collateralized debt obligations grew a little over 140% in January, and even faster globally; this is a very high quality market.  For currently outstanding*

*collateralized debt obligations, the overwhelming majority are investment grade. Of the $828 billion of outstanding U.S. collateralized transactions, 98% are investment grade, 82% are rated AAA.*

136.    As the call continued, McGraw III stated:

We've been saying on the residential mortgage-backed market that we would see year-over-year declines.  Gosh, I think I've been saying that for two years.  And even last year, we knew we were going to see year-over-year declines, and it was actually up 1%.  But the numbers are so enormous.  It's still a tremendous market.  It's just going to be -- year-over-year comparisons are going to be more difficult.

137.    Later in the call, the following exchange took place, in which McGraw III touted the

Company's objectivity and ability to monitor the Company's ratings of CDOs:

**Audience Member**:  [inaudible] -- your CDO business? Can you talk a little bit about, institutionally, what kind of structures you have in place to maintain objectivity while managing revenue growth? Obviously, there's a little bit of a contradiction between wanting to -- between revenue growth and making sure that you're entirely accurate in all of your ratings. Can you talk about your internal structure, and how you maintain that objectivity?

**McGraw III:**  Thank you for raising that.  *It's critical. Standard and Poor's*, *on the rating side, is a trusted business.  It's a reputation business.  If you have a propensity to get things wrong, and people lose confidence in your credibility to do that, you can [be] damage[d] severely.*  Your compliance -- it's a process; and your compliance to those kind of things, has got to be extremely, extremely strong.

We have independent compliance officers that are outside management's purview that can go anywhere.  We monitor all of our process.  We're very strong in it.  We've been very strong in terms of the credit rating agency performance.  And as you know -- comments are finished up this week -- we're in that 30-day period for comments, and SEC by Congress has to report back by June with the finished product. In large part, we've very sanguine with that; First Amendment protections and all of those things, are all in that.  *With the size and complexity of some of these instruments, especially CDO, t takes a lot of monitoring activity; it takes a lot of compliance; and we have very, very strong processes in place, and we measure them.*

138.    On March 12, 2007, Bahash participated in the Credit Suisse Group Global Services

Conference on behalf of the Company.  During the conference, Bahash made additional false and

misleading statements, which included the following:

Let's turn now to the Financial Services.  We continue to forecast double digit top and bottom line growth for this segment despite an estimate decline in the U.S. dollar buy and issuance of U.S. Residential Mortgage-Backed Securities, or RMBS, of 10

to 15%. That is a continuation of the slowdown experienced in 2006 when the U.S. RMBS market rose by only 1%. It was also a year in which Financial Services had double digit top and bottom line growth and margin expansion.

Except for U.S. RMBS issuance, we continue to expect increases in all other asset classes. By the way, issuance for U.S. RMBS was off 9.3% in January, the only month for which we have statistics. That fall-off is mostly due to a decline in home equity loan issuance. *We recognize there has been a concern about the sub-prime market*, so I want to review the situation here.

*It is true that delinquencies in the sub-prime market have increased, but the impact on overall credit ratings has not yet been significant. In 2006 we lowered about 1.5% of the almost 10,000 outstanding sub-prime ratings. To date in 2007, there were no downgrades, and only 10 credit watch actions relating to almost 5,000 vintage 2006 sub-prime ratings. That is only 0.2% of the outstanding ratings. S&P has been on top of the situation in the sub-prime market.*

*When lending standards started to deteriorate last year in the sub-prime market, S&P notified the industry in April 2006 that it would be raising in July 2006 the level of credit support for riskier sub-prime deals and tightened surveillance standards for Residential Mortgage-Backed Securities.*

*S&P has a fully integrated surveillance process for RMBS and Collateralized Debt Obligations, or CDOs*. That means S&P will determine what effect, if any, the increase in delinquencies on certain sub-prime mortgages has on both its rated RMBS transactions and those CDO transactions which hold Residential Mortgage-Backed Securities.

We do not expect the problems in the sub-prime market to impact the growth prospects we anticipated in 2007 for structured finance. Generally, RMBS transactions issued during the second half of 2006 are supported by higher loss coverage and are still performing as expected. But as a cautionary note, I would point out that it is very early in the life of these transactions.

So, what's the current outlook? S&P believes that the 2006 vintage RMBS transactions will underperform relative to the 2005 transactions. *But based on our current economic scenarios, S&P does not believe the 2006 transactions will perform as badly as some have suggested.* S&P is anticipating losses in the 5.25% to 7.75% range, which is slightly above vintage year 2000, the previous worst performing year, with average cumulative losses of about 5%.

*Overall, we expect the RMBS market to maintain strong credit quality and returns that continue to attract investors at a time when high-grade corporate issuance is in short supply.* Today, the credit quality of U.S. corporate bonds is averaging BBB-minus.

Between 1978 and 2006, S&P has issued about 47,000 RMBS securities ratings. 85% were initially investment grade, AAA to BBB. Of the 3.6 trillion in par value of S&P

ratings outstanding as of January 1, 2007, 88.1% are rated AAA. In general, then, the vast majority of RMBS ratings have been investment grade and very stable.

*S&P believes its models have captured the deterioration in the credit quality of the 2006 sub-prime mortgages. The sub-prime mortgage originations may decline this year, but the market will not evaporate.* The mortgages are profitable for lenders and represent an opportunity to own a home for many people who would never qualify for a prime mortgage.

139.    The statements referenced in ¶¶135-38 were each materially false and misleading when made for the reasons stated in ¶116.  In addition, the statements were each materially false and misleading when made as they misrepresented and/or omitted adverse facts which then existed and disclosure of which was necessary to make the statements not false and/or misleading.  The true facts, which were then known to each of the Defendants, were:

- Defendants were in no position to comment on the actual impact of delinquencies on the Company's credit ratings because the Company did not conduct surveillance of the transactions it rated on a timely basis.

- Defendants' statements regarding the small number of ratings downgrades taken to date were false and misleading.  If the Company's S&P brand had conducted surveillance on a timely basis, it would have downgraded thousands of subprime and Alt-A structured finance transactions – as ultimately happened – much sooner, which would have revealed the Company's true financial condition to the market.

- Defendants' statements regarding the future performance of the RMBS market's performance over the long term lacked a reasonable basis.

- Although the Company's S&P brand did offer signals to the market that there were problems in the subprime arena, the Company undertook no action to timely conduct surveillance on the transactions it rated.  Thus, Defendants' statements regarding its regular monitoring of credit markets were meaningless.

- The Company's S&P brand was not "on top of the situation in the sub-prime market."  Rather, the Company had no basis for predicting the performance of 2006 transactions.

- The Company's inability to conduct surveillance on the transactions it rated, and its unwillingness to downgrade transactions on a timely basis, especially in light of its conflicts of interests from issues, would cause substantial damage to the Company's reputation and credibility.

- The Company's surveillance process for RMBS and CDOs was not "fully intergrated."  Indeed, the Company failed to look at loan-level data, which meant it did not understand the performance of deals it rated.

140.    On April 24, 2007, the Company issued a press release entitled "The McGraw-Hill Companies Reports First Quarter EPS of $0.40, Including $0.03 Gain on Divestiture[,] Revenue Increases by 13.7%," which stated in relevant part:

*Net income for the first quarter of 2007 was $143.8 million. Revenue for the first quarter increased 13.7% to $1.3 billion.*

"*A strong performance by Financial Services*, and improvement in Education and Information & Media *contributed to our first quarter*," said Harold McGraw III, chairman, president and chief executive officer of The McGraw-Hill Companies. "The operating margin improved in all three segments."

\*       \*       \*

*Financial Services:  "Revenue for this segment in the first quarter increased 21.5% to $728.9 million compared to the same period last year.* Including a pre-tax gain of $17.3 million on the sale of a mutual fund data business, *operating profit grew by 38.3% to $348.0 million*.

"Standard & Poor's had the best first-quarter performance in its history as fixed income and equity information products and services contributed to new records for revenue, operating profit and the operating margin, which was 47.7%, including the gain on the sale of the mutual fund data business. *Structured finance produced 40.8% of the revenue growth.* Corporate and government ratings contributed 34.3% of the revenue increase.

"Both U.S. and international ratings grew at double-digit rates in the first quarter. International credit ratings and services accounted for 36.1% of ratings revenue in the first quarter versus 35.6% for the same period a year ago.

"*Structured finance benefited substantially from a robust U.S. collateralized debt obligations market where concerns about widening spreads resulting from credit quality deterioration in the sub-prime market and an increase in collateralized loan obligations resulting from strength in the corporate loan market led to a strong pick up in activity in the first quarter*.

"*Collateralized debt obligations also grew rapidly in Europe. We had solid results from residential mortgage-backed securities in Europe and steady improvement in the European commercial mortgage-backed securities market*. Auto issuance slumped, but increases in credit card and student loans kept asset-backed securities growing in the U.S.

\*       \*       \*

"New issuance dollar volume increased in the U.S. and European bond markets in the first quarter versus the same period last year, according to reports from Thomson Financial, Harrison Scott Publications and S&P estimates. In the U.S., total new issue dollar volume was up 28.5% in the first quarter as corporates climbed 42.9%.

Public finance was up 46.8%. ***Mortgage-backed securities, reflecting the anticipated decline in U.S. residential mortgage-backed securities issuance, decreased by 4.3%. Asset-backed securities were up 49.7%*** in Europe, new issue dollar volume was up 34.1%.

*    *    *

The Outlook: "We're off to a good start to achieving our goal of producing double-digit earnings growth in 2007. ***There will be more double-digit growth and margin expansion for the balance of the year in Financial Services***, although probably not at the exceptional rate of growth we experienced in the first quarter."

141.    Also on April 24, 2007, McGraw-Hill hosted a conference call to discuss its first quarter 2007 earnings and outlook. The Individual Defendants participated in the call on behalf of the Company. During the call, numerous false and misleading statements were made that were designed to artificially inflate the Company's stock price. For example, McGraw III stated:

> Structured finance produced another strong quarter despite a 10.8% decline in the U.S. residential mortgage back security issuance. As I pointed out earlier, we anticipated a 10 to 15% decline in the U.S. residential mortgage back security issuance this year. A slowing housing sector, rising mortgage rates, lower housing price appreciation and fewer housing starts were factors in shaping our forecast. ***As part of its ongoing ratings and surveillance process for residential mortgage back securities. S&P carefully monitors trends in the housing and mortgage finance markets, consumer credit, and in the economy overall.*** Last Spring, a little over a year ago, S&P foresaw the trend in the quality of mortgage lending that led to the concerns that have arisen in the subprime market today. As a result of the deteriorating credit quality of certain subprime mortgage loans in 2006, ***S&P enhanced the credit support necessary for a rating by 50% compared to transactions from 2005. While there is a lot going on in the sub-prime market, nothing has occurred so far this year to cause us to materially change our expectations on the level of issuance that we originally anticipated for 2007.*** It is also worth pointing out that the U.S. residential mortgage backed securities market has not come to a dead stop in 2007, not with a $254.1 billion in issuance in the first quarter. $254.1 billion in issuance in the first quarter. ***Prime and Alt-A issuance increased 5.6%, particularly offsetting the 24.4% decline in sub-prime issuance in the first quarter.***

142.    During the question and answer portion of the April 24, 2007 conference call, the following exchanges took place, during which the Individual Defendants made additional false and misleading statements:

> ***Lisa Monaco (Morgan Stanley, Analyst):*** Terry [McGraw III] can you comment a little bit -- a bit of a follow-up to Peter's question, just on the debt issuance in the

first quarter. How much of that was related to potential deals being pulled into March from future periods? And then if you could just talk to the strength in the CDO market and what is driving that. And if you can quantify what percent of the CDOs that you rate are related -- are tied to RMBS in the subprime market and given the slow down in RMBS (Inaudible) how is the growth in CDO issuance (Inaudible). Thanks.

**McGraw III:**    Thanks, Lisa. Bob, did you can get that last one. Between us we will get these. A lot of questions there. There always is timing issues, Lisa. The pipeline has been strong in '05, '06, and again, the folks work very hard to get it all completed, but there are carry-over and timing issues on that one, but, again, it is just very, very strong. At this point, there is no let up on that. *The CDOs are very attractive because it is the instrument of choice of so [many] financial institutions because of all of the variability that CDOs have in terms of being able to break up into various attributes and risk reward capabilities and the like, and it just gives portfolio managers more flexibility to do more things in terms of the construction of those portfolios.*

*So the CDO strength that we are seeing now is a continuation of the attractiveness of those investment[s]*. With residential mortgage back, the U.S. market was down 10.8%. And -- and again, the sub-prime market was down 24.4 on that part. *Now, the thing on the sub-prime, it has gotten, in my opinion, an awful lot of spotlight in the general press as-- and I don't think it is as warranted or deserved.* I don't want to understate it. But, when you are talking about an economy that's in its sixth year of expansion, the Fed Reserve worked hard to bring down the growth rate with the 17 rate hikes from last year, the housing sector has been most affected. And, therefore, with the rise in those rates, we have seen some defaults on the sub-prime side. *Yes, there were some lenders that were way too aggressive. And that's why over a year ago, S&P changed some of the lost coverage criteria for those lenders. And put those into effect such that it reflected the fact that some of these lenders were too aggressive*. Of the outstanding mortgage loan volume, sub-prime is about 13%, of that market. And, yes, I think the housing market slump has bottomed on that in terms of sales and new starts, but we will see throughout the year certain defaults on some of the sub-prime loans, but it won't have a material impact in our opinion on our results. So we just think that these are in the housing sector, these excesses we all know get into the markets, and we see that those that are least able to afford certain things, you are going to see some defaults on that. Bob, do you want to add anything?

**Bahash:**    Yes, Lisa, the growth in the CDO area continues in our case to be driven by some of the new structures of the hybrids, the arbitrage opportunities within the class flow and synthetic factors. *And clearly sub-prime issuance is part of some of the CDO packages, but as Terry pointed out it's a small piece relative to the total issuance volume*.

*        *        *

**Michael Meltz (Bear Stearns, Analyst):**    Great, thank you. I think I have three questions on S&P. Terry, I think -- there was a slide where you talked about the

outlook specifically for the CDO area and you mentioned growth should decelerate or might decelerate. Can you talk a little bit though, are you still expecting revenue growth from the CDO business throughout the rest of the year? I know it is a broad -- a general question, but I think it is important. And then, Bob, are you -- on the margin side, can you just talk a little bit about S&P and the accruals. Was there anything -- did you normalize anything this quarter or anything we should be aware of on the margin side? Last question, of the 21% revenue growth of the quarter, ratings versus nonratings, which grew faster? Thank you.

**McGraw III:**     Okay. Michael, on the **collateralized debt obligation market. Again, this has been a very strong market** and multiyear and has been growing as the acceptance of CDOs and variability of CDO usage is taken -- taken hold of the marketplace. **The CDO market was up 154% in Q1**. And -- and that's coming off a pretty good base. So, I mean, **that is pretty stunning growth**. Now I just don't think that we can expect 154% growth in each quarter going forward on that one. So we are just saying that we think there is a slower growth rate in subsequent quarters, but it is going to grow on that one. And we see nothing to hold that back. Bob?

**Bahash:**     Yes. Just to expand upon that point. Our second-quarter estimate at this point in time based on external data calls for **significant growth in the U.S. in the CDO area in terms of par value, up over 60%**. That's in the U.S. and in Europe we are forecasting close to 23% growth in the CDO marketplace. That is the second quarter. **So very, very strong**. On your question with regard to margins and accruals. We are very high in there. What you are seeing is what you are getting. There is a very strong quarter. The margin improvement clearly driven by the higher revenue elements, as well as the containment of costs.

143.     On April 25, 2007, at McGraw-Hill's annual meeting of shareholders, the Individual Defendants made additional false and misleading statements. For example, McGraw III stated, "Just about a year ago S&P alerted investors that underwriting standard in the subprime market had deteriorated and S&P would raise the level of credit support for riskier subprime assets in order to protect investors. Standard and Poor's also tightened surveillance standards for the residential mortgage backed securities. And the leadership Standard and Poor's demonstrated anticipating weakness in this subprime market illustrates why S&P is one of the most respected names in the financial services industry."

144.     On April 27, 2007, the Company filed its interim financial report on Form 10-Q for the quarter ending March 31, 2007. The financial results reported in the 10-Q were substantially similar to those reported in the Company's April 24, 2007 press release. The Form 10-Q was signed

by Bahash, and contained required Sarbanes-Oxley certifications signed by McGraw III and Bahash stating that the Form 10-Q did not include any material misrepresentations. In discussing what drove McGraw-Hill's improved financial performance, the April 27, 2007 10-Q stated, in relevant part:

> *In the first quarter of 2007 the Company achieved growth in revenue and operating profit of 13.7% and 71.0%, respectively. The increase in revenue is primarily attributable to growth in the Financial Services segment*.

> \*       \*       \*

> *Service revenue increased 17.4% in the first quarter of 2007, due primarily to a 21.5% increase in Financial Services. Financial Services increased primarily due to the performance of structured finance ratings* and corporate (industrial and financial services) and government finance ratings. *In the U.S., collateralized debt obligations (CDOs) drove growth in structured finance*. The growth in corporate finance ratings was attributable to increases in industrials, driven by merger and acquisition activity, and public finance issuance, driven by refundings. The service margin increased to 32.3%.

> \*       \*       \*

> *The Financial Services segment's increase in revenue and operating profit was due to the performance of structured finance* and corporate (industrial and financial services) and government ratings, *which represented approximately 40.8%* and 34.3%, respectively, *of the growth in revenue. In the U.S., collateralized debt obligations (CDOs) drove growth in structured finance*. The growth in corporate finance ratings was attributable to industrials, driven primarily by bond and loan issuance related to acquisition financing. Public finance also performed well in the quarter with issuance driven primarily by refundings.

> *Total U.S. structured finance new issue dollar volume increased 17.2% in the first quarter versus prior year. U.S. CDO issuance increased 153.6%*, according to Harrison Scott Publications and Standard & Poor's internal estimates (Harrison Scott Publications/S&P). Growth in the U.S. CDO market continues to be driven by new structures (hybrids) and arbitrage opportunities within the cash flow and synthetic sectors; however, *in the first quarter issuance volumes were also favorably impacted by concerns about widening spreads resulting from credit quality deterioration in the subprime mortgage market*. U.S. commercial mortgage-backed securities (CMBS) issuance increased 34.9% over the prior year due to the historically low interest rate environment and strong commercial real estate fundamentals, which are driving commercial originations and the refinancing of maturing deals as well as rising property values. *U.S. residential mortgage-backed securities (RMBS) issuance decreased 10.8%, driven primarily by declines in the subprime and affordability products and home equity sectors*.

\*     \*     \*

In Europe for the first quarter, structured finance issuance grew 160.9% as all structured finance asset classes experienced growth, with CDOs and RMBS being particularly strong. CDO issuance was driven by a surge in cash CDO deals and a robust market for collateralized loan obligations (CLOs). A stable economic backdrop combined with moderate home price growth in most European countries fueled demand for mortgage credit and RMBS volumes picked up as new and existing issuers took advantage of tight spreads. European corporate issuance was up in the first quarter due primarily to solid growth in the financial services sector.

\*     \*     \*

The Company maintains disclosure controls and procedures that are designed to ensure that information required to be disclosed in the Company's reports filed with the Securities and Exchange Commission (SEC) is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to the Company's management, including its Chief Executive Officer (CEO) and Chief Financial Officer (CFO), as appropriate, to allow timely decisions regarding required disclosure.

As of March 31, 2007, an evaluation was performed under the supervision and with the participation of the Company's management, including the CEO and CFO, of the effectiveness of the design and operation of the Company's disclosure controls and procedures (as defined in Rules 13a-15(e) under the U.S. Securities Exchange Act of 1934). Based on that evaluation, the Company's management, including the CEO and CFO, concluded that the Company's disclosure controls and procedures were effective as of March 31, 2007.

145.    In response to the April 24, 2007 press release and conference call, and the April 27, 2007 Form 10-Q, the Company's stock price reacted favorably. Specifically, on April 23, 2007, the stock closed at $63.54. In response to the press release, conference call, and Form 10-Q, the stock closed at $66.23 on April 24, 2007 and $66.25 on April 27, 2007, as demonstrated in the chart below:



146.    The statements referenced in ¶¶140-44 were each materially false and misleading

when made for the reasons stated in ¶116.  In addition, the statements were each materially false and

misleading when made as they misrepresented and/or omitted adverse facts which then existed and

disclosure of which was necessary to make the statements not false and/or misleading.  The true

facts, which were then known to each of the Defendants, were:

- Defendants misled the market when they told investors that the Company understood
  the credit quality deterioration problems impacting the Company's Structured
  Finance division.  The truth was that although the Company was aware of such
  problems, its models were useless at addressing them, ratings downgrades would
  reach into the thousands (representing billions of dollars), and the Company lacked a
  reasonable basis for predicting its financial performance.

- Although the CDO market was helping drive the Company's Structured Finance
  division, the CDOs were made up of underlying subprime RMBS, and those
  underlying subprime RMBS were failing at an astonishing rate.  The growth
  attributed to the CDO market was unsustainable and the Company would downgrade
  tremendous percentages of its CDOs.

- The Company did not carefully monitor trends and conduct surveillance for RMBS.
  In fact, its surveillance process was lagging more than one year behind schedule.

- Defendants' statements regarding Alt-A issuance were misleading as well, because the Alt-A and subprime markets had converged, making the traditional performance metrics for Alt-A transactions inapplicable to the Alt-A transactions rated by the Company's S&P brand.

147.    On June 19, 2007, McGraw III and other Company executives participated in the NAA Mid-Year Media review on behalf of the Company.  During the conference, Vickie Tillman ("Tillman"), S&P's Executive Vice President, discussed the Company's exposure to RMBS and stated:

> Let me talk a little bit about the residential mortgage-backed market, which has been getting a lot of attention of late. We started this year by forecasting that we were going to be down about 10% to 15% in terms of dollar volume increases in the US residential mortgage-backed market. Issuance [have] been off, primarily due to a slowdown in the subprime area; again, which has been a headliner for a while. But the interesting statistic is that it's up 15% so far in the second quarter.
>
> *As you are aware, the subprime residential mortgage market is attracting considerable attention amid mounting delinquencies and defaults.  Standard and Poor's took decisive action in 2006 by increasing loss expectation and required additional support in the transactions to address issues that we saw in the marketplace.  Subprime that originated in 2006 -- this is a class of transactions that were sold in the year 2006 with mortgages that were originated there -- are having the most difficulty.  Subprime issuance has been a significant and increasing component of the mortgage lending market over the last two years.  Numerous subprime lenders are facing financial difficulties, while larger, more diversified firms have also been experiencing some of the pinch.  Subprime downgrades will continue increasing, especially in the 2006 vintage.*  And again, when we talk about the 2006 vintage, these are the mortgages that were originated in 2006.

148.    On July 24, 2007, the Company issued a press release entitled "The McGraw-Hill Companies Reports Second Quarter EPS of $0.79, a 31.7% Increase," which stated in relevant part:

> *Revenue for the second quarter of 2007 increased by 12.5% to $1.7 billion compared to the same period in 2006*.
>
> *        *        *
>
> *"A very strong performance by Financial Services was a key factor in our second quarter," said Harold McGraw III, chairman, president and chief executive officer of The McGraw-Hill Companies*.  "We also benefited from the McGraw-Hill School Education Group's strong start in this year's state new adoption market and solid performances in higher education, professional and international markets.

\*        \*        \*

*"Revenue for the first half grew to $3.0 billion, a 13.0% increase over the same period in 2006.*

\*        \*        \*

*Financial Services: "Revenue for this segment increased 21.2% in the second quarter to $821.0 million compared to the same period last year.  Operating profit grew by 27.9% to $401.4 million.*

\*        \*        \*

"Strength in fixed income and equity information services in domestic and international markets produced a record second quarter performance for revenue, operating profit and operating margin at Standard & Poor's.  The operating margin for the second quarter was 48.9%.  *Structured finance contributed 42.1% of the revenue growth*.  Corporate and government ratings produced 38.1% of the revenue increase.

\*        \*        \*

*"Structured finance was strong globally.  In the domestic market, Standard & Poor's benefited from robust activity in commercial mortgage-backed securities and collateralized debt obligations.  Despite a contraction in the U.S. subprime market, domestic collateralized debt obligations remained strong in the second quarter as arrangers focused on hybrids, synthetics and collateralized loan obligations.  As a result, the issuance of collateralized debt obligations grew by 58.0% in the second quarter.  In Europe, we saw solid performances in all asset classes.*

\*        \*        \*

"In the U.S., total new issue dollar volume grew by 15.3% in the second quarter.  Corporates increased 34.5%, setting a new record for issuance for the second consecutive quarter. Public finance was up 15.3%.  Mortgage-backed securities dollar volume was off by 5.7%, reflecting a 12.4% decline in residential mortgage-backed securities issuance.  Asset-backed securities were up 8.3%.  In Europe, new issue dollar volume was up 33.4%.

\*        \*        \*

The Outlook: "*We expect to achieve our goal of double-digit earnings growth in 2007* even though the growth rate will probably slow during the second half of the year as compared to our very strong first half performance.  Although we expect low double-digit growth from Financial Services in the second half, tougher comparisons will make the fourth quarter more challenging.  Some operating margin compression

- 74 -

may occur in our segments in the second half, but we still expect improved operating margins in all three segments for the full year."[3]

149.    Also on July 24, 2007, McGraw-Hill hosted a conference call to discuss its second quarter 2007 earnings and outlook.  The Individual Defendants participated in the call on behalf of the Company.  During the call, numerous false and misleading statements were made that were designed to artificially inflate the Company's stock price.  For example, McGraw III attempted to downplay the rapid deterioration of the subprime market, characterizing market concerns as an "obsession":

In the second quarter, ***the obsession with subprime issues obscured some very, very positive trends in the ratings market***.  International markets grew at a double-digit rate and contributed 38.9% of ratings revenue in the second quarter, up from 36.6% for the same period a year ago.  The U.S. corporate market set a new record for issuance for the second quarter in a row, as both U.S. investment grade, which was up 33% and high-yield, which was up 42.6%, grew substantially.  Public finance coming off a slow second quarter last year grew solidly because of new money issuance, but also because of refundings.  ***Structured finance was strong globally, despite a 12.4% decline in the dollar volume issuance of residential mortgage-backed securities in the United States***.

\*        \*        \*

In Europe, the corporate sector is off to a solid start and the current pipeline of business is strong and it's across all sectors.  Dollar volume issuance in the U.S. public finance started the year on an upswing, but even though this may be a record year for issuance, we expect somewhat slower growth for the balance of 2007.  ***Similar volume issuance in the U.S. residential mortgage-backed securities market is off 11.6% in the first half of this year, and we anticipate a further decline in the second half.  We now estimate that dollar volume issuance of U.S. residential mortgage-backed securities will decline by 15% to 20% this year.  Our prior guidance here was 10% to 15% and we think maybe just a little bit more, up to***

---

[3] On July 24, 2007, the Company issued a revised press release, stating: "This amendment pertains to Exhibit 2 of the Registrant's earnings release filed on Form 8-K on July 24, 2007.  In the Operating Results by Segment-Operating Profit, for the three and six month periods presented, the percentage of change for General corporate expense and Interest expense were inadvertently presented as favorable, when they were unfavorable.  In the Operating Results by Segment-Operating Profit, for the six month period presented, the percentage of change for McGraw-Hill Education Operating loss was inadvertently presented as unfavorable when it was favorable.  In all other respects, the earnings release and related exhibits filed on Form 8-K on July 24, 2007 did not require any change."

*about 20% is right. Activity is being driven primarily by Alt-A and net interest margin security deals and the refinancing of adjustable rate mortgages.* Many potential deals are on hold as issuers reprice to the new criteria and gauge the market's appetite for residential mortgage-backed securities.

The U.S. commercial mortgage-backed securities market is up 36.8% in the first half, and of course that's driven by low interest rates and strong commercial real estate fundamentals, but the pipeline for commercial mortgage-backed securities is robust. Dollar volume issuance in the U.S. asset-backed securities market is up 22.5% for the first half, and the pipeline looks very solid. The U.S. collateralized debt obligation market, CDO market, soared last year and is off to a fast start in 2007. We expect more growth in the collateralized debt obligation market in the second half, but at rates well below the blistering pace established in the third and the fourth quarters last year.

150.    As the July 24, 2007 conference call continued, McGraw-Hill executives continued to downplay the problems of the subprime market and made additional false and misleading disclosures. Tillman further attempted to minimize the problems facing the Company:

*There's been a great deal of commentary recently about the deterioration of the subprime market. Not all of it has been particularly insightful or accurate, so we think it's important to share with you Standard & Poor's perspective on our market conditions and our ratings.* In the brief time I have this morning, I would like to make five key points.

First, the current situation did not develop overnight. *For more than a year, Standard & Poor's have been signaling the market about the deterioration in residential mortgage-backed securities backed by subprime loans and their potential affect on credit worthiness.* Second, *S&P continues to alert the market to new problems.* On June 2, for example, we commented to the market about emerging issues with collateral debt obligation. S&P said that covenant-like juggernaut is raising CLO risks and that we were raising the collateralized loan obligation loss criteria to reflect potential expectations of increased loss exposure on covenant light loans. Third, we do not structure or engineer transactions nor do we arbitrate on which deals can or cannot proceed. Our guidelines and criteria are publicly available.

Fourth, criteria is a factor in whether or not Standard & Poor's is selected to do a rating. Tightening criteria may have an adverse impact on our market share, but we will continue to develop and adjust our criteria to reflect how changing conditions impact credit risk. *We are driven to improve our ratings process because it is our excellent track record that makes Standard & Poor's a rating agency of choice. Fifth, the performance of Standard & Poor's structured finance ratings have been exceptionally strong over a long period of time.* Our regularly-published default studies show the clear relationship between the initial ratings signed by Standard & Poor's and the likelihood of default. Since 1978, the average five-year default rate for investment-grade structured securities is 0.87%. The default rate for speculative-

grade securities is 15.42%. We identified heightened credit exposure with so-called affordability products and the layering of multiple risk factors in loan programs over a year ago and adjusted our assumptions going back to April 2006. In any rating decision, we are concerned about the duration and the severity of issues affecting future credit performance. *We need sufficient time and data to show how collateral pools are performing. Our recent actions are a continuation of that view and in applying our adjusted assumptions to the delinquency default and loss trends to make decisions on some of the RMBS transactions*.

Let me quickly sum up our latest actions in July. *S&P downgraded 562 classes of rated RMBS transactions that were backed by first lien subprime loans from the fourth quarter of 2005 through the fourth quarter of 2006.* It's worth noting that the 6.3 -- *$6.3 billion of securities* represented only 1.1% of all first lien subprime RMBS deals rated during this period. *We also downgraded 418 classes of S&P rated RMBS transactions, which were backed by closed-end second liens. That represented $3.8 billion in volume or 6.1% of this class.* As a result of the first lien subprime downgrades, *74 synthetic CDOs were downgrades, 19 classes of cash flow and hybrid CDOs were placed on credit watch negative, 17 classes of cash flow and hybrid CDOs were placed on credit watch negative as a result of the closed end second lien downgrades, and yesterday an additional 33 tranches from eight U.S. cash flow and hybrid CDOs were also placed on credit watch negativ*e. *Again, the result of downgrades of the first lien subprime transactions.* The downgrades we announced on the first lien subprime collateral did not impact any AAA ratings.

*Also note that while eight classes of the AAA second lien RMBS deals were downgraded, none of these fell below investment grade. Of course, we will continue to monitor these issues and will take any further rating actions we deem to be appropriate.* In fact, the actions we have taken in July are part of Standard & Poor's ongoing process of adjusting its assumptions and ratings to reflect current trends in the housing market, the mortgage finance market, consumer credit, and the overall economy as they move over time. We have provided the market with information on our approach for rating new CDOs containing RMBS securities, which are backed by nonprime collateral, and *S&P is currently reviewing RMBS transactions, which are backed by Alt-As and the net interest margin collateral.* That will be completed over the next several weeks. Transactions issued after January 2007 have not had adequate seasoning. We are monitoring these transactions under new assumptions and will take such ratings actions as we deem appropriate and as more loss data becomes available. In our view, loans made prior to January '05 are not at the same level of risk as those made since then.

I'll wrap up with one final observation. *Our role is to provide an independent opinion on credit worthiness based on demonstrable facts*. Sometimes that puts us at odds with the ebb and flow of market sentiment. While the market doesn't always agree with our ratings, we take a longer-term view and do what we believe is right for the market. And I would make one further note. Tomorrow, Standard & Poor's structured finance group will be holding a teleconference discussing the details of the downgrades that I have gone over with you today, as well as some future actions and the changes and assumptions that we have made, and I encourage any of you that are

interested in this detail to please dial in.  The teleconference facts will be made available today.  Thank you.

151.    As the call continued, McGraw III told analysts and the market that 2008 would be a very good year for the Company's Financial Services division:

> **Karl Choi (Merrill Lynch, Analyst):**  Hi. A couple of questions here. First, Terry, your comment about the fourth quarter for S&P being a little bit more challenging in terms of comps.  It's a little bit early, but comps will remain difficult for all of '08 then, given what's going on in the subprime market and if some maybe liquidity growing out of the credit market here, does this change your confidence about S&P's ability to deliver double-digit topline growth next year?

> **McGraw III:**    Well, it's a little early to get into 2008.  I want to get through this year on this one.  I feel very good about our guidance on double-digit growth, top and bottom line for S&P for the remainder of the year.  Albeit, it's going to be at a lower rate and we have to see what the affect in some of the subprime there, but, again, it's going to be a smaller impact because of the strength overall, globally as well as in the corporate market.  But on -- **our planning process that is underway now for 2008, I think 2008 for Standard & Poor's is going to be a very good year. But it's too early to quantify that, and so we'll give guidance come December on what we expect on that one, but I have every reason to believe that it's going to be a very good year**.

152.    Later in the July 24, 2007 conference call, Tillman made additional false statements to the market:

> I'm mentioning that we're going to adjust our criteria as we see fit, and if that requires higher subordination levels and higher support levels, it's then up to an issuer to make that choice in terms of whether they're going to go with S&P or not. To date, we have made moves in adjusting our criteria and in some regards, especially in a collateralized mortgage-backed securities area, as you probably have read, **we saw the changes in the real estate market a while ago, saw that the leveraging and the structuring of the deals and the underwriting was beginning to really begin to deteriorate somewhat and even further in the first quarter of '07, at which point again we called it like it was and just raised our requirements in terms of ratings.  This can in fact have an adverse impact on whether they come to Standard & Poor's or not, but that's not what we're concerned about.  We're concerned about calling it as it is**.

153.    On July 27, 2007, the Company filed its interim financial report on Form 10-Q for the quarter ending June 30, 2007.  The financial results reported in the 10-Q were substantially similar to those reported in the Company's July 24, 2007 press releases.  The Form 10-Q was signed by Bahash, and contained required Sarbanes-Oxley certifications signed by McGraw III and Bahash

stating that the Form 10-Q did not include any material misrepresentations.  In discussing what drove McGraw-Hill's improved financial performance, the July 27, 2007 10-Q stated, in relevant part:

> *In the second quarter of 2007 the Company achieved growth in revenue and operating profit of 12.5% and 25.8%, respectively.  The increase in revenue is primarily attributable to growth in the Financial Services segment.*
>
> \*    \*    \*
>
> *Service revenue increased 16.0% in the second quarter of 2007, due primarily to a 21.2% increase in Financial Services.  Financial Services increased primarily due to the performance of structured finance ratings* and corporate (industrial and financial services) and government finance ratings.  *In the U.S., issuance of collateralized debt obligations (CDOs) and commercial mortgage-backed securities (CMBS) drove growth in structured finance, while in Europe issuance across all asset classes grew at a double-digit pace*.
>
> \*    \*    \*
>
> *Financial Services revenue and operating profit increased substantially over second quarter 2006 results*.  Foreign exchange positively impacted revenue growth by $12.1 million and had an immaterial impact on operating profit growth.
>
> *The Financial Services segment's increase in revenue and operating profit was due to the performance of structured finance* and corporate (industrials and financial services) and government ratings, which represented approximately 42.1% and 38.1%, respectively, of the growth in revenue.  *In the U.S., issuance of collateralized debt obligations (CDOs) and commercial mortgage-backed securities (CMBS) drove growth in structured finance, while in Europe issuance across all asset classes grew at a double-digit pace*.  The growth in corporate ratings issuance was driven primarily by acquisition financing, while public finance also performed well in the quarter with issuance driven by new money issuance and refundings.
>
> *Total U.S. structured finance new issue dollar volume increased 5.5% in the second quarter versus prior year.  U.S. CDO issuance increased 58.0%,* according to Harrison Scott Publications and Standard & Poor's internal estimates (Harrison Scott Publications/S&P).  *Despite weakness in issuance of cash CDOs backed by subprime residential mortgage-backed securities, overall issuance of U.S. CDOs remained strong* due to growth in other sectors such as issuance of hybrids and synthetics as well as issuance of collateralized loan obligations (CLOs) which was fueled by the robust acquisition financing market.  U.S. commercial mortgage-backed securities (CMBS) issuance increased 38.5% over the prior year due to higher mortgage originations driven by the low interest rate environment and strong commercial real estate fundamentals as well as rising property values and refinancing of maturing deals.  *U.S. residential mortgage-backed securities (RMBS) issuance decreased 12.4%, driven primarily by declines in the subprime and home equity*

*sectors*.  According to Thomson Financial, U.S. corporate issuance by dollar volume for the second quarter of 2007 increased 34.5%, with investment grade up 33.0% and high yield issuance up 42.6%, driven by continued robust merger and acquisition activity and opportunistic financing as issuers took advantage of favorable market conditions.

\*       \*       \*

Structured finance will continue to drive global growth in 2007 with increases expected in all regions around the world.  However, financial market concerns regarding the credit quality of subprime mortgages could adversely impact future debt issuance of residential mortgage backed securities and CDOs backed by subprime RMBS in the United States.  ***On July 10, 2007, Standard & Poor's placed 612 classes of residential mortgage-backed securities backed by U.S. subprime collateral on CreditWatch with negative implications. Some of these classes have subsequently been downgraded.  Standard & Poor's also indicated that it would assess the impact of these potential negative movements on related asset classes, such as CDOs.***  Similar actions were taken by other credit ratings agencies as well. Notwithstanding the current market environment in the U.S., the Company had been anticipating a decline in residential mortgage originations as well as a slow down in the rate of growth of CDO issuance versus the significant rates of growth experienced in the past.  U.S. residential mortgage backed securities issuance is expected to decline by approximately 20%-30% in the second half of the year which would result in approximately a 15%-20% decline in issuance for the year.  Slower growth in U.S. CDO issuance is also expected, with growth rates ranging from approximately 15%-20% for the balance of the year.  U.S. CDO growth for the year is expected to range between approximately 40-45% versus 93% in the first half of 2007.  ***The outlook for both asset classes as well as others is dependent upon many factors including the general condition of the economy, interest rates, credit quality and spreads, and the level of liquidity in the financial markets***.

\*       \*       \*

The Company maintains disclosure controls and procedures that are designed to ensure that information required to be disclosed in the Company's reports filed with the Securities and Exchange Commission (SEC) is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to the Company's management, including its Chief Executive Officer (CEO) and Chief Financial Officer (CFO), as appropriate, to allow timely decisions regarding required disclosure.

As of June 30, 2007, an evaluation was performed under the supervision and with the participation of the Company's management, including the CEO and CFO, of the effectiveness of the design and operation of the Company's disclosure controls and procedures (as defined in Rules 13a-15(e) under the U.S. Securities Exchange Act of 1934). Based on that evaluation, the Company's management, including the CEO and CFO, concluded that the Company's disclosure controls and procedures were effective as of June 30, 2007.

154.    In response to the July 24, 2007 press releases and conference call, and the July 27, 2007 Form 10-Q, the Company's stock price declined slightly, falling from a close of $63.37 on July 23, 2007 to closing prices of $59.79 on July 24, 2007 and $60.01 on July 27, 2007.  If not for Defendants' false and misleading statements and omissions, however, the Company's stock price would have declined much further.

155.    The statements referenced in ¶¶147-53 were each materially false and misleading when made for the reasons stated in ¶116.  In addition, the statements were each materially false and misleading when made as they misrepresented and/or omitted adverse facts which then existed and disclosure of which was necessary to make the statements not false and/or misleading.  The true facts, which were then known to each of the Defendants, were:

- The Company's S&P brand had not yet taken "decisive action."  The Company's ongoing inability to conduct timely surveillance meant that any action taken by the Company was materially delayed.

- Although Defendants purported to give insight into the ongoing problems impacting the Company's Financial Services segment, the reality was they were misleading investors.

- The Company's S&P brand would not have an "excellent track record," and Defendants' claims that it would were unsupported.  The Company's models were grossly incapable of rating the performance of subprime and Alt-A RMBS and CDOs.

- Although the Company claimed to be reviewing RMBS transactions for future ratings actions, its surveillance was more than one year behind.

- The Company could not provide independent opinion on credit worthiness based on demonstrable facts because its models did not account for fraud and its surveillance lagged significantly.

- In light of the foregoing, the Company's forecast for earnings lacked a reasonable basis and McGraw III was in no position to comment on the Company's 2008 financial outlook.

156.    On August 16, 2007, investors were shocked when the *Associated Press* published an article entitled "EU to Examine Credit Rating Agencies" reported that "the European Union will

examine why credit rating agencies were slow to react to early signs of U.S. loan defaults that are now worrying investors worldwide." The *Associated Press* article stated in relevant part:

### EU to Examine Credit Rating Agencies

EU to Look at Why Credit Rating Agencies Were Slow to Downgrade Subprime Losses

BRUSSELS, Belgium (AP) – The European Union will examine why credit rating agencies were slow to react to early signs of U.S. loan defaults that are now worrying investors worldwide, EU officials said Thursday.

The inquiry will look specifically at whether there were conflicts of interest, they said.

***Credit rating agencies such as Standard & Poor's Corp., Moody's Investors Service Inc. and Fitch Ratings are paid by the banks that they rate for credit-worthiness***.

A senior EU official, who spoke on a condition he not be quoted by name because of the sensitivity of the issue, said the EU needed to look at possibly strengthening its code of conduct and whether other measures would be appropriate.

He said there was a "very significant delay" between banks reporting a sharp climb in poor returns from U.S. subprime housing loans made to people with poor credit and the agencies putting banks on credit watch.

Agencies continued to support debt trading at a discount after banks' first quarter results this spring showed a growing number of mortgage defaults, he said.

In the United States, Rep. Barney Frank, chairman of the House Financial Services Committee, in a recent interview promised a "serious inquiry" this fall into the ratings agencies, which have been criticized for not properly evaluating the risks of bonds backed by mortgages given to borrowers with weak credit.

EU spokeswoman Antonia Mochan confirmed that the European Commission and its high-level advisory group on financial services, the Committee of European Securities Regulators, would be looking at how credit rating agencies assess structured products, investments that derive their value from real assets and are used to spread risk.

Mochan said the EU's executive arm would look at the governance of these agencies, their management of conflict of interests and their ratings performance.

In addition, CESR will in parallel report on the agencies next April. A code of conduct drawn up by the International Organization of Securities Commissions was also under review, she said.

"We have a general eye on market developments including regulatory supervision and hedge funds," Mochan said. "We are following the situation and will draw any lessons that need to be drawn from what we see over the last weeks and in the coming days and weeks."

Moody's spokesman Anthony Mirenda said the agency, "is committed to continuing the constructive dialogue that we've had with regulators and policymakers to enhance the overall understanding of the structured financial market, the various players in that sector and the role of ratings and rating agencies in the market."

A spokesman for S&P, part of McGraw-Hill Cos., declined to comment other than to say that S&P is participating in the European review. A Fitch spokesman, James Jockle, said that Fitch has not yet been contacted by the EU but "would be happy to answer whatever questions they may have about our business."

The worsening credit situation prompted French President Nicolas Sarkozy to urge the Group of Seven industrial countries to better monitor international financial markets. In a letter to German Chancellor Angela Merkel, he called for an investigation of the role of credit agencies in identifying risks.

Sarkozy has repeatedly sought a greater role for governments in managing the economy – and has sought to wrest some control of monetary policy from European Central Bank regulators.

157.    Investors were shocked by this news, which partially revealed the Company's true financial condition, and reacted negatively, causing the price of McGraw-Hill shares to fall as low as $48 per share – on unusually heavy trading volume – as detailed in the chart below:



158.    The decline in the Company's stock price was described in a *Reuters* article published

on August 16, 2007, which stated:

Rating agency shares fall on report of EU review

New York, Aug 16 (Reuters) – Rating agencies' shares were falling on Thursday after a European Union executive announced a review of the code used by the raters, a probe that could be critical of the industry.

EU Internal Market Commissioner Charlie McCreevy said that the crisis in the U.S. subprime mortgage sector has highlighted apparent failings in the voluntary code now used by the raters.

The three largest U.S. raters are Moody's Corp [], Standard & Poor's, a unit of McGraw-Hill Cos. Inc. [] and Fitch, a unit of France's Fimalac[].

Moody's shares were off 1.7 percent or 84 cents in afternoon trading at $48.26 on the New York Stock Exchange, below their previous year low of $48.28 set last August; they fell as low as $43.70 earlier.

***Shares of McGraw-Hill were off 5.1 percent or $2.60 in NYSE trading, below their year low of $50.59 last August; they fell as low as $48.00 earlier.***

Fimalac shares fell 8 percent in Paris to 54.40 euros.

"There's likely to be a headline risk in this story," said Neil Godsey, and analyst with Friedman, Billings, Ramsey & Co. "And it will stay that way until the subprime turmoil subsides."

After the collapse of energy trader Enron Corp. in 2001, the global market regulators come out with a voluntary code. This was targeted at what they saw as conflicts of interest in the sector, whereby rating agencies are paid by the firms they rate.

"The Commission is going to be looking at the issue of credit ratings agencies, particularly as they relate to rating of structured products," Commission spokeswoman Antonia Mochan told a regular news briefing.

In Brussels, Mochan said the Commission would look at a number of issues – governance of the agencies, their management of conflicts of interest, resourcing and ratings performance.

She said the Commission would focus on "the concerns we have in regard to their apparent slowness in responding to material market evidence of deterioration since 2006."

Mochan said the review would take at least until April 2008, but analysts said scapegoats were being hunted for the subprime fallout.

"THE BLAME GAME"

"The blame game has already started, with a growing criticism of the rating agencies," Citigroup economist Richard Reid said.

McCreevy will meet next month with the chairman of the Committee of European Securities Regulators (CESR), which groups the EU's 27 national market watchdogs, to discuss the issue.

Moody's spokesman Anthony Mirenda said his company would not comment on its stock price butt was "committed to constructive dialogue with regulators and policymakers."

S&P said it was already participating in the CESR's review of hose the industry complied with the code.

James Jockle, a managing director of Fitch, said his company had not been contacted by the EU regarding the review but would be happy to participate. "We talk frequently to world regulators," he said.

159.     On August 30, 2007, the Company announced that it had terminated its relationship with S&P's president, Corbet. On August 31, 2007, the *Wall Street Journal* reported on the Company's shift in leadership:

*McGraw-Hill Cos. replaced the top executive at Standard & Poor's Corp. as criticism of the company's financial-information division mounts for its role in the unfolding subprime-mortgage crisis.*

Kathleen Corbet, S&P's president, is leaving to pursue other opportunities, McGraw-Hill Cos. said yesterday, without elaborating. She will be succeeded by Deven Sharma, 51 years old, a senior McGraw-Hill executive who has been at S&P since late last year.

*S&P's bond-rating arm and several other rating services have downgraded hundreds of mortgage-backed securities tied to subprime loans in recent months. Critics charge S&P and others were too optimistic about the market for too long. Ratings firms say they did the best they could with the information available at the time. The company also compiles stock indexes such as the S&P's Composite Index of 500 stocks, commonly known as the S&P 500.*

McGraw-Hill spokesman Steven Weiss said Ms. Corbet's departure wasn't related to criticism of its subprime-bond ratings.

\*       \*       \*

McGraw-Hill's shares soared during most of [Corbet's] S&P tenure, in part because of booming credit markets. Shares have tumbled 26% since the start of this year. Earlier this month, they hit a 52-week low of $47.15. The shares rose 48 cents to $50.27 yesterday in 4 p.m. New York Stock Exchange composite trading.

\*       \*       \*

The credit-market turmoil has caused a sharp decline in the issuance of mortgage-backed securities and derivatives like collateralized debt obligations. During the past few years, a large chunk of S&P's revenue has come from rating these "structured-finance" products, which bring in more fees than rating corporate and municipal bonds.

For the first six months of 2007, McGraw-Hill reported net income of $421 million, or $1.18 a share, up 49% from a year ago, in part because the previous year included a charge. Revenue was up 13% to $3.01 billion, half of which came from S&P, which chalked up growth of 21%. Analysts expect McGraw-Hill to report earnings of $3.05 a share for the full year, up 22% from 2006, according to Thomson Financial. They are expected to rise 14% in 2008. In addition to worries about a slowing market, investors have been concerned that the rating business will face litigation and more government regulation.

160.    On September 7, 2007, *The Wall Street Journal* reported that the SEC and State Attorneys General of New York and Ohio were investigating and subpoenaing McGraw-Hill. Although the subpoenas attracted media coverage, McGraw-Hill did not disclose their existence to investors for several weeks. The article stated, in part:

### Ratings Firms' Practices Get Rated

### SEC Probes if Conflicts Fueled Subprime Troubles

In the wake of mortgage-market turmoil, regulators plan to probe how the big credit-rating companies are paid and whether they are independent enough of the Wall Street firms that issue bonds.

*The Securities and Exchange Commission and state attorneys general in New York and Ohio have begun to examine how the ratings firms evaluated subprime-mortgage-backed securities that grew into a trillion-dollar market. The ratings firms include McGraw-Hill Cos.' Standard & Poor's*; the Moody's Investors Service unit of Moody's Corp., whose stock has soared in recent years; and Fitch Ratings, a unit of Fimalac SA of Paris.

Wall Street bankers churned out profits in recent years by bundling mortgages into securities and selling them to investors. *Ratings firms played an important role because they gave investment-grade ratings to many of those securities, making it easier for Wall Street firms to sell the bonds*.

*Hundreds of those securities have since been downgraded by the ratings companies*.

*Though that is a small portion of all the securities graded by the ratings firms, the reversal contributed to a rout in credit markets last month* and has sparked criticism of the ratings firms.

\*      \*      \*

In New York state, Attorney General Andrew Cuomo has subpoenaed documents from S&P and Fitch as part of a broader probe into the mortgage market. In Ohio, Attorney General Marc Dann is looking into the ways that rating firms interacted with Wall Street underwriters. "The more we look at it, the more we realize that these firms are important," said Mr. Dann.

161.    On September 10, 2007, *CNBC* reported that more states were joining in the probe of

McGraw-Hill's S&P brand:

Half a dozen states are working together to investigate rating agencies, banks and other players that benefited from the onetime boom in subprime mortgages that has since turned into a meltdown, Ohio Attorney General Marc Dann told Reuters.

Cooperating with Ohio, states including Massachusetts, Illinois and New York, as well as the District of Columbia, are gathering data to determine if agencies are independent enough from Wall Street banks that issue mortgage bonds and other securities, he said.

Dann also stressed that the investigation focuses on all the firms that participated in the booming market for mortgage securities: mortgage brokers, appraisers, wholesale and retail lenders, investment banks, law firms and accounting firms.

"Everybody knows they don't get paid until the transaction gets a triple-A rating," said Dann, who has been looking into rating agencies since July.

"The system clearly is broken, and the poster child for that breakdown is the securitization of fraudulently obtained mortgages now known as subprime bonds," Dann said in a brief interview Friday. "Something has to be done about it."

A spokesman for Massachusetts Secretary of the Commonwealth William Galvin confirmed the office is looking into subprime market issues.

New York Attorney General spokesman Jeffrey Lerner declined to comment on the credit agencies probe. "We have not commented on the ongoing investigation."

### Incentives for Ratings Agencies?

Dann in recent months has been among the most vocal critics of the mortgage securities industry. He argues that agencies such as the Moody's Investors Service unit of Moody's and Standard & Poor's, part of McGraw-Hill, had an incentive to work with underwriters and ultimately grant high ratings to securities packaged by Wall Street banks.

Those ratings in several cases were downgraded after subprime loans went sour, leading to losses in related securities. The rating cuts sparked a wider panic in debt markets that has triggered losses for investors and a credit crunch more broadly.

Thousands of Ohio homeowners now face default and state pension funds suffered losses on mortgage bonds that were supposed to be as safe as Treasuries, Dann said.

On Wednesday, the Securities and Exchange Commission said it had begun a probe into the role of rating agencies in the mortgage market. The review, an SEC official told a Congressional hearing, looks at advisory services provided by agencies to underwriters and to lenders, the potential for conflicts of interest, disclosures and the performance of credit ratings after issuance.

Moody's said it is cooperating with the various probes.

"In light of developments in the market we've received and anticipate receiving various government inquiries and we will assist with each of these inquiries," Moody's spokesman Tony

Mirenda said. S&P officials were not immediately available for comment.

Dann declined to comment on the specifics of his probe. He did say the state plans to hire an outside legal counsel over the next few weeks and has beefed up staff assigned to handle the expanding probe.

Looking ahead, Dann said he expects these actions will lead to industry reforms, including greater transparency surrounding the relationship between banks and agencies. He also hopes the industry can create a different evaluation process for bonds that prevent conflicts of interest.

"We're going to work as hard as we can for consumers and pensioners, to hold accountable all those who created such a perverted version of our capital markets," Dann said.

162.    On September 18, 2007, the Company issued a press release entitled "The McGraw-

Hill Companies Reaffirms Double-Digit Earnings Growth for 2007," which stated in relevant part:

In a presentation today at Goldman Sachs' Communacopia XVI 2007 conference, Harold **McGraw III**, chairman, president and CEO of The McGraw-Hill Companies (NYSE: MHP), ***reaffirmed that the Corporation expects to achieve double-digit earnings growth in 2007***, continuing its long-standing record of growth.

"We expect to achieve our goal of double-digit earnings growth for the year even though the rate of growth is expected to slow during the second half of the year as compared to our very strong first-half performance," said Mr. McGraw. "For the full year, we also still expect to achieve double-digit top- and bottom-line growth in Financial Services, as well as improved operating margins in our McGraw-Hill Education and Financial Services business segments."

\*        \*        \*

***In Financial Services we anticipate top-line growth of nine-to-12 percent and double-digit bottom-line growth in the third quarter***, while our Information & Media businesses will continue to battle the impact of a soft advertising market for the remainder of the year, which may affect our hopes for 2007 margin improvement in this business segment."

Mr. McGraw noted that Standard & Poor's faces the toughest comparisons of the year in the fourth quarter given that its revenue grew by 22.1 percent in the fourth quarter of 2006. ***In reviewing current deceleration in the U.S. structured finance market, Mr. McGraw commented that "assuming it continues, we anticipate flat to declining revenue in the fourth quarter and a reduction in operating profit versus the same period last year" in Financial Services***.

***"We are obviously coming through a challenging period in Financial Services, but we believe the issues are short-term and can be addressed. Furthermore, favorable long-term trends, including the globalization of financial markets, securitization, privatization and the disintermediation of the banks in favor of public markets, will continue to drive our business for some time to come," said Mr. McGraw.***

"We look forward to continuing Standard & Poor's tradition of service to investors around the globe by working with government officials as they review the role our

industry plays in the capital markets and the way credit ratings are set," added Mr. McGraw.

*      *      *

163.    Also on September 18, 2007, McGraw III participated in the Goldman Sachs Communacopia XVI Conference.  During the conference, McGraw III made additional false and misleading statements to the market:

> S&P has always lived in a goldfish bowl.  ***Our business model has always been built on transparency and regulators now require it***.  That is why we publish our ratings and analysis free to investors and to others around the world in real time.  Each day, S&P publicly issues between 500 and 1000 ratings opinions across the globe.  Today, there are more than 1.2 million public and private opinions on debt outstanding, most of which are available for free at standardandpoors.com.  Investors can access up to nine million current and historical ratings on S&P's RatingsDirect.
>
> Because the market wants to scrutinize our ratings, we also host conferences, seminars, teleconferences around the world and we publish articles explaining assumptions, methodologies, criteria guidelines, transition studies and performance data on our ratings opinions.  ***We have institutional safeguards in place to ensure the independence and integrity of those opinions***.
>
> For all that transparency, we still see misunderstanding starting with the basic notion of what a credit rating represents.  A rating is an impartial and independent opinion on the credit quality of bonds and the likelihood that investors will be paid interest and principal in a timely fashion.  At S&P, these ratings are decided by committees, not by individual analysts.  Rating the ultimate credit risk of course is not the same as pricing the bond.
>
> In our view, credit ratings do not and should not fluctuate like bond prices.  Bond prices are anticipatory, while ***bond ratings are based on current and expected credit performance***.  In other words, bond ratings are an assessment of the current credit worthiness of an obligation in accordance with its terms.  We are not operating a buy/sell/hold business.  Ratings in comparison to the ebb and flow of market prices are designed to be stable.  They do change of course, but that is based on new information or fundamental adjustments to risk profiles that drive the assumptions behind our credit opinions.
>
> We do not structure transactions nor do we determine which deals can or cannot proceed.  We are not investment advisors and we are not consultants.  ***There is no distinction between a rating of a corporate bond or a rating of just one tranche of a structured finance transaction.  In both cases, Standard & Poor's is applying its own predetermined, nonnegotiable and publicly available criteria and assumptions to the facts presented.***

- 90 -

So while there may be more dialog between S&P and an issuer in the structured finance transaction, that does not change the reality that at its core, S&P is still just applying its own predetermined, nonnegotiable, publicly available criteria in a factual context.

As part of the ratings process, we do have regular dialog with bond issuers. We think it is necessary and the international regulatory community insists on openness, transparency and dialog. This dialog helps issuers understand our ratings criteria and it *helps S&P understand the structured securities so that it can arrive at better informed opinions on credit worthiness*.

S&P has been criticized by some for moving too fast or too slow, moving too slowly as the charge in the subprime market. The problems in the subprime market did not develop overnight. We are in the 20th month of a housing recession. *By early 2006, S&P was informing the market about increased risk*. Here is a headline from the S&P RatingsDirect in January 2006. US residential mortgage backed securities market still robust, but risks are increasing and growth drivers are softening.

In April of 2006, S&P told the market that it was raising the level of credit support, credit enhancement, collateral required for riskier subprime deals. Here is a headline from S&P RatingsDirect in May 2006. A more stressful test of a housing market decline on US residential mortgage backed securities. By July 2006, S&P was reporting sector report card, the heat is on for subprime mortgage. *The point is that Standard & Poor's was already clearly informing the market in early 2006 about risks that it perceived in the residential mortgage backed securities backed by subprime loans and the potential effect on credit worthiness.*

164.     The statements referenced in ¶¶162-63 were each materially false and misleading when made for the reasons stated in ¶116. In addition, the statements were each materially false and misleading when made as they misrepresented and/or omitted adverse facts which then existed and disclosure of which was necessary to make the statements not false and/or misleading. The true facts, which were then known to each of the Defendants, were:

- Despite touting the Company's supposed understanding of risks facing the RMBS market, Defendants did not tell the market that its surveillance lagged more than one year behind.

- McGraw III had no basis to claim the implosion of the subprime market would be "short-term."

- The Company was not being transparent and, as a result, its reputation would be substantially damaged.

165.    On October 18, 2007, the Company issued a press release entitled "The McGraw-Hill Companies Reports Third Quarter EPS of $1.34, a 26.4% Increase," which stated in relevant part:

The McGraw-Hill Companies (NYSE: MHP) today reported diluted earnings per share increased 26.4% to $1.34 in the third quarter compared to $1.06 for the same period last year.  Diluted earnings per share in 2006 included *a $0.03 charge for restructuring business operations*.

\*        \*        \*

"Double-digit growth and increased share in the elementary-high school market in the most important quarter of the year for education and *solid performances in Financial Services even as the structured finance market deteriorated were key to our results*," said Harold McGraw III, chairman, president and chief executive officer of The McGraw-Hill Companies.  "The operating margin expanded in all three segments.

\*        \*        \*

*Financial Services: "Revenue for this segment increased 12.5% in the third quarter to $759.6 million compared to the same period last year.  Operating profit grew by 17.3% to $346.7 million.*  Foreign exchange rates positively affected revenue growth by $12.6 million and had an immaterial impact on operating profit growth.

"Double-digit growth in Standard & Poor's international fixed income markets, a strong performance by corporate and government ratings, and outstanding results from financial information products and services offset growing weakness in structured finance.  *Although new issuance in the U.S. bond market declined precipitously in September, the segment improved its operating margin to 45.6%, up from 43.8% for the same period in 2006.*

"International credit ratings and services accounted for 41.6% of ratings revenue in the third quarter versus 38.5% for the same period last year.

*"Structured finance revenues declined modestly in the third quarter due to difficult conditions in the credit markets created by the performance of subprime mortgages.*  Solid growth overseas partially offset a decline in the U.S. market.  *The contraction in U.S. residential mortgage-backed securities activity and the related impact on the collateralized debt obligation sector were the biggest contributors to the revenue shortfall in structured finance*.  Revenue increased in the asset-backed securities market.

\*        \*        \*

"For the third quarter, new issue dollar volume declined by 19.7% in the U.S. market and by 23.6% in Europe, according to reports from Thomson Financial and Harrison Scott Publications and Standard & Poor's estimates.

"In the U.S., investment-grade corporate dollar volume issuance increased 9.4% while speculative volume fell 76.8%. As a result, total corporate issuance was flat. Public finance issuance was up 3.8%. *Mortgage-backed securities issuance was off 43.9% as residential mortgage-backed securities fell 59.3%. Asset-backed securities issuance was off 7.6%.*

\*       \*       \*

The Outlook : "We are still on course to produce double-digit earnings per share growth in 2007, as well as improved operating margins in the Financial Services and McGraw-Hill Education segments. For the fourth quarter, revenues and earnings will not match last year's results because of challenging conditions in the structured finance market and some softness in education."

166.    Also on October 18, 2007, McGraw-Hill hosted a conference call to discuss its third quarter 2007 earnings and outlook. The Individual Defendants participated in the call on behalf of the Company. During the call, numerous false and misleading statements were made that were designed to artificially inflate the Company's stock price. For example, McGraw III stated:

*Credit quality issues and the repricing and re-evaluation of risks, due in part to the concerns regarding the performance of subprime mortgages, all contributed to that decline*.

\*       \*       \*

Although new issue volume is an imperfect measure of our performance in any one period, recent issuance does illustrate the trajectory of business in the third quarter. As this chart indicates, after a slow start in July, there was strong acceleration in new dollar issuance in the U.S. industrial market in August and September and obviously for the third quarter. There also was modest improvement in the public finance sector, which was encouraging, *but we saw a sharp decline in new issuance dollar volume in the U.S. structured finance markets as the third quarter progressed*. The following charts illustrate the pattern I have just described. You can see year-over-year volume plunging in September for the U.S. residential mortgage-backed securities, and also somewhat for the U.S. commercial mortgage-backed securities, and U.S. collateralized debt obligations, CDOs.

The activity that we're seeing in the U.S. structured finance so far in October is tracking the level of issuance we saw in September. We already pointed out that the year-to-year comparisons are challenging in the fourth quarter for structured finance. It is a large quarter seasonally for that business, and the revenue model is heavily transaction oriented. *We now expect new issue dollar volume in the U.S. residential mortgage-backed securities market to decline by 70 to 75% in the fourth quarter versus last year, which obviously was robust. Declines of 85% to 90% are possible in the new issuance of U.S. CDOs, collateralized debt obligations, in the fourth quarter versus last year. As these charts illustrate, new issue dollar volume in the*

*fourth quarter of 2006 actually surged in December for U.S. residential mortgage-backed securities, and collateralized debt obligations. The comparisons may not be quite as challenging for asset-backed securities, and possibly U.S. commercial mortgage-backed securities*.

167.    Regarding the problems in the subprime market, McGraw III downplayed the extent

of problems facing the Company:

> Well, we're in to subjective territory, Craig. My opinion is just one. I personally don't think a two-year timeframe for a credit crunch in the structured finance market to return is realistic. We're already seeing signs of things like the commercial mortgage-backed market starting to pick up again, and I think it was just a pause it had taken there because we had seen since early 2005 that market do very well. *But, I think we have to assume that there's going to be some softness, certainly with CDOs and residential mortgage-backed securities going forward here, but I don't think we're going to see an extended credit crunch.* I think that would have implications on the economy overall, and I don't think that would be in the best interest of the major lending institutions either, so I just don't see that taking place. There is enormous liquidity that still exists in the system because of all of the worldwide surpluses and that still has to be employed. *So, I see this as more temporary in nature rather than long-term in nature*.

168.    Later in the conference call, the following exchange took place as one analyst

questioned how McGraw-Hill's S&P brand would be impacted by the extreme problems in the

structured finance market:

> ***David Einhorn (Greenlight Capital, Analyst):*** Oh, thanks for taking my question as well. My question is, as you look at the structured finance market, are there parts of that it you feel, looking back -- it's not a question that they -- there's a temporary issue, but maybe some of this just wasn't such a good idea to begin with? And, second, I'm wondering *how you view Standard & Poor's from a brand, and what might be happening to the brand as a result of what's gone on in the structured finance market?* Thanks so much.
>
> ***McGraw III:*** Yes, David, the market is what the market is, and what we do is provide access to the capital markets, and provide in the structured area, credit ratings that relate to the risk a particular instrument has in terms of defaulting on its interest or on its principal payment. So, the structured finance market is a -- is a market that institutional investors like, and a lot. The reason is, is because with structured product you can -- you can divide them up in to tranches and you can get just the risk reward characteristics or attributes that you are looking for in terms of your own portfolio construction on that one. So, if the market wants those kinds of products, and the institutional investors want those products, then we move with the market and we're going to rate whatever on that part.

Give even the current environment I think what you are going to see is more of a flight to quality, and -- and less to speculative grade on that, and -- and we're reflecting that now.  In terms of Standard & Poor's as a brand, no. I mean, your constantly growing.  You're constantly learning.  You're constantly involved in not only the rating side of the market, but providing the transparency in terms of all of the financial information products.  And we are -- *we take that responsibility very seriously, and the credibility that S&P has as a brand, in terms of serving the markets in a lot of areas here and around the world, is only going to grow with the growth of the capital markets*.

\*    \*    \*

169.    On October 26, 2007, Connecticut Attorney General Richard Blumenthal ("Blumenthal") confirmed that his office issued subpoenas to the three largest debt rating agencies as part of an antitrust investigation into the commercial debt rating industry.  Blumenthal sent the subpoenas October 10, 2007 to S&P, among others.  McGraw-Hill did not disclose the subpoena until October 26, 2007.

170.    Also on October 26, 2007, the Company filed its interim financial report on Form 10-Q for the quarter ending September 30, 2007.  The financial results reported in the 10-Q were substantially similar to those reported in the Company's October 18, 2007 press releases.  The Form 10-Q was signed by Bahash, and contained required Sarbanes-Oxley certifications signed by McGraw III and Bahash stating that the Form 10-Q did not include any material misrepresentations.  In discussing what drove McGraw-Hill's improved financial performance, the October 26, 2007 10-Q stated, in relevant part:

> *In the third quarter of 2007 the Company achieved growth in revenue and operating profit of 9.8% and 17.0%, respectively.  The increase in revenue is primarily attributable to growth in the McGraw-Hill Education and the Financial Services segments.*

\*    \*    \*

Service revenue increased 10.5% in the third quarter of 2007, due primarily to a 12.5% increase in Financial Services.  Financial Services increased primarily due to the performance of corporate (industrial and financial services) and government finance ratings. *Structured finance ratings faced challenging market conditions as a result of the performance in the subprime mortgage sector as well as concerns*

- 95 -

*about credit quality across most debt asset classes*.  The service margin increased to 34.4% from 30.0% in the third quarter of 2006.

*In Financial Services, because of current credit market conditions, issuance levels have deteriorated across all asset classes and regions during the latter half of the third quarter.  The impact on U.S. residential mortgage-backed securities and U.S. collateralized debt obligations has been the greatest.  If current market conditions persist, the Company expects global issuance levels to decline significantly in the fourth quarter of 2007 versus the prior year, primarily in structured finance.  The outlook for both asset classes as well as others is dependent upon many factors including the general condition of the economy, interest rates, credit quality and spreads, and the level of liquidity in the financial markets.*

\*        \*        \*

The performance of corporate (industrials and financial services) and government ratings contributed to the segment's increase in revenue and operating profit.  *Structured finance ratings faced challenging market conditions as a result of the performance in the subprime mortgage sector as well as concerns about credit quality across most debt asset classes*.  In the U.S., issuance declines were experienced in the quarter across all structured asset classes with the exception of commercial mortgage-backed securities (CMBS), while in Europe, issuance increased across all structured asset classes with the exception of CMBS.  A flight to quality led to increases in U.S. corporate investment grade issuance and U.S. public finance as well as a large decline in speculative grade issuance.

Total U.S. structured finance new issue dollar volume declined 33.6% in the third quarter versus prior year.  U.S. commercial mortgage-backed securities issuance increased 52.5% over the prior year, according to Harrison Scott Publications and Standard & Poor's internal estimates (Harrison Scott Publications/S&P), as commercial real estate fundamentals remained strong through the first half of the year, which favorably impacted the third quarter.  *U.S. residential mortgage-backed securities (RMBS) issuance decreased 59.3%, driven primarily by declines in the subprime, Alt-A and home equity sectors and a weak housing market. U.S. collateralized debt obligation (CDO) issuance declined 13.3%. The unfavorable conditions in the credit markets contributed to weakness in CDOs by curtailing issuance of CDOs of asset-backed securities (ABS) and collateralized loan obligations (CLOs)*.  According to Thomson Financial, U.S. corporate issuance by dollar volume for the third quarter of 2007 was flat compared to the same period in 2006, with investment grade issuance up 9.4% but high yield issuance down 76.8%, driven primarily by investor flight to quality.  The U.S. municipal market grew modestly at 3.8%, coming off a slow third quarter 2006, with new money issuance outpacing the decline in refundings.

In Europe for the third quarter, structured finance issuance decreased 4.4% as a result of a large decline in CMBS.  European corporate issuance declined 34.0% in the third quarter with decreases in both financial services and industrials.  High yield and investment grade issuance in Europe were down 8.7% and 34.5%, respectively, for the quarter.

Financial market concerns regarding the credit quality of subprime mortgages have adversely impacted debt issuance of residential mortgage-backed securities and CDOs backed by subprime RMBS in the United States and in Europe. The Company had been anticipating a decline in residential mortgage originations and RMBS issuance as well as a slowdown in the rate of growth of CDO issuance versus the significant growth rates experienced in the past. U.S. residential mortgage-backed securities issuance is expected to decline by approximately 70%-75% in the fourth quarter, as compared to the fourth quarter of 2006, which would result in approximately a 35%-40% decline in issuance for the year. Slower growth in U.S. CDO issuance is also expected; with declines in the range of 85%-90% for the fourth quarter, as compared to the fourth quarter of 2006, and flat to declining for the year. Because of the current credit market conditions, issuance levels have deteriorated across all asset classes and regions during the latter half of the third quarter. The impact on U.S. RMBS and U.S. CDOs has been the greatest. If current market conditions persist, the Company expects global issuance levels to decline significantly in the fourth quarter of 2007 versus the prior year, primarily in structured finance. The outlook for both asset classes as well as others is dependent upon many factors including the general condition of the economy, interest rates, credit quality and spreads, and the level of liquidity in the financial markets.

*        *        *

*In the third quarter of 2007, rating agencies became subject to scrutiny for their ratings on structured finance transactions that involve the packaging of subprime residential mortgages, including residential mortgage-backed securities (RMBS) and collateralized debt obligations (CDOs).*

*On August 29, 2007, Standard & Poor's received a subpoena from the New York Attorney General's Office requesting information and documents relating to Standard & Poor's ratings of securities backed by residential real estate mortgages. Standard & Poor's is responding to this request.*

*On October 16, 2007, Standard & Poor's received a subpoena from the Connecticut Attorney General's Office requesting information and documents relating to the conduct of Standard & Poor's credit ratings business. The subpoena appears to relate to an investigation by the Connecticut Attorney General into whether Standard & Poor's, in the conduct of its credit ratings business, violated the Connecticut Antitrust Act. The Company is responding to the subpoena.*

*In September 2007, the SEC commenced an examination of rating agencies' policies and procedures regarding conflicts of interest and the application of those policies and procedures to ratings on RMBS and related CDOs. Standard & Poor's is cooperating with the SEC staff in connection with this examination.* On September 26, 2007, Standard & Poor's testified before the U.S. Senate Committee on Banking, Housing and Urban Affairs concerning the role of rating agencies in the capital markets and, specifically, the subprime market. On September 27, 2007, Standard & Poor's also testified before the U.S. House of Representatives (Financial Services Committee) Subcommittee on Capital Markets, Insurance and Government

Sponsored Enterprises concerning the role of rating agencies in the structured finance market.

171.    In response to the October 18, 2007 press release and conference call, and the October 26, 2007 Form 10-Q, the Company's stock price declined slightly, trading at closing prices of $51.42 on October 18, 2007 and $49.75 on October 26, 2007.

172.    The statements referenced in ¶¶165-68, 170 were each materially false and misleading when made for the reasons stated in ¶116.  In addition, the statements were each materially false and misleading when made as they misrepresented and/or omitted adverse facts which then existed and disclosure of which was necessary to make the statements not false and/or misleading.  The true facts, which were then known to each of the Defendants, were:

- Despite alerting investors of RMBS and CDO declines, Defendants omitted disclosing that its surveillance was materially lagging.

- Because of the surveillance time lag, Defendants truly did not understand how severally the mortgage crisis would hurt the Company.

- McGraw III lacked a reasonable basis for claiming the problems in the structured finance market were "temporary in nature."

- Defendants knew that when the truth regarding McGraw-Hill's useless models and insufficient surveillance were revealed, the Company's reputation would suffer extensive damage.

173.    On December 3, 2007, McGraw III spoke at the UBS Global Media Conference on behalf of the Company.  During the conference, McGraw III made numerous false and misleading statements designed to minimize the impact of the subprime market meltdown on the Company and to maintain the artificial inflation in the Company's stock price.  For example, McGraw III stated:

> Financial services also faces challenging comparisons in the first half next year and into the third quarter. We will be obviously providing constant updates as the market recovers. But getting some still to be determined level of activity in 2008, we expect to see a reduced appetite for complex structured products, a tightening of credit standards by originators who remain in the marketplace, more issuance by higher quality issuers, and although there will be a pullback in the U.S. structured finance market next year and whereas there is some weakness in Europe, the fundamentals of structured finance remain very positive there.

\*      \*      \*

With that, let's spend a little bit of time on the regulatory and the legal risks that we face. For the record, the U.S. Securities and Exchange Commission on September 24th officially registered at Standard & Poor's as a nationally recognized statistical rating organization under the U.S. Credit Rating Agency Reform Act of 2006, which went into effect in June of this year. The SEC is using its new authority to examine S&P's policies and procedures, and obviously not only are we cooperating fully, it is in our best interest to do everything possible to make sure that we are supporting the SEC and to ensure that the new process works effectively and efficiently. And we are working with the various appropriate entities outside the United States as well.

Because as we all are aware, the SEC isn't the only interested party in rating agencies. In the wake of recent events in the subprime mortgage market, we are also dealing obviously with the Congress, with regulators in Europe, and that would be both CESR, the security regulators as well as IOSCO, the security commissioners, State Attorney Generals, other government agencies, and representatives.

Lawsuits have been filed with federal courts in California and in Washington, but so far none has been served with a complaint in either case. Much has been written about all of this and it is disappointing how much of the commentary is misinformed. We see default on subprime loans confused with defaults on AAA-rated U.S. residential mortgage-backed securities.

\*      \*      \*

S&P is currently studying a range of voluntary actions in four key areas, governance, analytics, education, and information and communication. And in all of these areas, over the next three weeks you'll be hearing a number of pronouncements that we will be making in terms of what we're going to do in terms of voluntary actions to make things even tighter.

174.    As the conference continued, McGraw III continued to tout the strength of the

subprime mortgage market:

What we're seeing now -- by the way, **subprime gets a lot of hard knocks. The subprime market is a fabulous market**. It was established about 20 years ago and the first ten years of it was fairly small in terms of volume. It was used for a lot of debt consolidation, paying credit card bills, things like that. It was about ten years ago when the volume took off and what the subprime market was designed -- at again, the innovation of the capital markets -- was designed to do was to provide access to credit and access to homeownership to the underclass. And in the last ten years, homeownership in America has gone from 64% to 69%.

So it has been a very lucrative market. Where the problem is is in the 2005/2006 vintage loans, and it's more than end of cycle kind of phenomenon. So what we have seen is that there has been a lot of speculation in those loans. After the fact, we now know that about 36% of the 2005/2006 vintage were used for speculative investment.

This is where I would buy your house, fix it up, and flip it in four months. There was a lot of that activity.

        \*       \*       \*

We saw that problem at the end of 2005 and we are working with regulators in terms of being able to strengthen some of these underwriting standards. In April of '06, we came out with an announcement saying the criteria and the assumptions that you need to focus on that are publicly available to make a credit rating have to be strengthened. That is when we did that, but then you need the hard evidence of delinquencies and defaults and so forth before you can actually initiate a downgrade. You can't do it on sentiment.

        \*       \*       \*

So we have to -- we're going to have to see what those activities are on that one. So we got a three-tiered cost structure plan. The first one is where we are right now. You are screwing everything you have. Do we have a hiring freeze? No. Are we hiring? No. We just don't -- you don't want to be going to that for internal purposes and all of those kind of things. But we are watching that.

175.    On January 8, 2008, the Company issued a press release announcing that it had terminated 600 employees. The press release was entitled "The McGraw-Hill Companies Announces Restructuring of Select Business Operations," and stated in part:

> The McGraw-Hill Companies (NYSE: MHP) today announced that it restructured a limited number of business operations in the fourth quarter of 2007 to fortify the Corporation's long-term growth prospects.
>
>       \*     \*     \*
>
> ***In the fourth quarter of 2007, the Corporation incurred a restructuring charge of $43.7 million, pre-tax, consisting mostly of employee severance costs related to a workforce reduction of approximately 600 positions across the Corporation. This reduction represents approximately three percent of the Corporation's global workforce. The total restructuring charge after tax is $27.3 million, or $0.08 per diluted share of fourth quarter 2007 earnings***.
>
> "Reducing staff is never an easy decision, but we believe the steps we have taken will strengthen our organization, enhance our ability to serve our customers and maximize shareholder value," said Mr. McGraw.
>
>       \*     \*     \*
>
> ***The Financial Services segment accounts for $18.8 million, pre-tax, of the restructuring charge***. In this segment, the reduction was driven by the current business environment, as well as the consolidation of several support functions

across Standard & Poor's global operations.  The segment's restructuring actions affected both Standard & Poor's ratings and non-ratings businesses.

176.    On January 24, 2008, the Company issued a press release announcing its financial

results for the fourth quarter and full year 2007 entitled "The McGraw-Hill Companies Reports

22.5% Increase in 2007 EPS," which stated in part:

> The McGraw-Hill Companies (NYSE: MHP) today reported 2007 diluted earnings per share of $2.94, an increase of 22.5% versus $2.40 in 2006.  The 2007 results include a $0.03 diluted per share gain on the divestiture of a mutual fund data business and *an $0.08 restructuring charge mainly for employee severance costs for a reduction of 611 positions*.
>
> *        *        *
>
> Net income for 2007 increased 14.9% to $1.0 billion compared to 2006.  Revenue in 2007 grew by 8.3% to $6.8 billion versus 2006.
>
> *        *        *
>
> Net income for the fourth quarter of 2007 was $140.6 million versus $204.8 million in 2006.  Revenue declined 1.5% to $1.6 billion in the fourth quarter of 2007.
>
> *        *        *
>
> Financial Services : "Revenue for this segment in 2007 increased by 10.9% to $3.0 billion compared to last year.  Operating profit grew by 13.1% to $1.4 billion. Included in the segment's operating profit is a pre-tax gain of $17.3 million on the divestiture of a mutual fund data business in the first quarter and *an $18.8 million pre-tax restructuring charge in the fourth quarter consisting mostly of severance relating to a workforce reduction of 172 positions, driven by the current business environment, as well as the consolidation of business support functions*.
>
> *        *        *
>
> "In the fourth quarter, revenue declined by 7.2% to $736.7 million.  Including the restructuring charge, operating profit in the fourth quarter fell by 22.8% to $263.4 million.
>
> *        *        *
>
> *The Outlook: "We are facing a challenging economic environment in 2008. Nevertheless, we expect revenue growth in 2008 of 6% to 8% at McGraw-Hill Education and Information & Media, and a 2% to 4% increase at Financial Services*.
>
> "The diversity and breadth of our portfolio again will be a significant factor in the performance of Financial Services in 2008.  The negative impact on the segment's

operating margin from the fall-off in structured finance will be partially offset by growth in other ratings markets and by Standard & Poor's Investment Services. As a result, the segment's operating margin may decline between 125 and 225 basis points in 2008.

\*      \*      \*

*"As a result, we now expect to produce another year of growth with earnings per share increasing by 3% to 5% in 2008.* Net income, reflecting increased interest expense for share buybacks, will decline slightly.

177.    Reacting to the Company's press release, analysts responded favorably. For example, on January 21, 2008, analysts from Bear Stearns stated, in part:

The point was well taken – S&P seems to have good diversification, and *management is confident that the credit crunch will not eviscerate revenues/profits in 2008. In fact, S&P guidance for 2008 is better than expected – revenues +2-4% with margin down 125-225 basis points.*

\*      \*      \*

[McGraw-Hill] shares jumped 7% today – short covering likely provided some of the boost. However, *we think management did a good job detailing the expected revenue build-up for S&P in 2008*.

178.    On February 7, 2008, the Company issued a press release entitled "S&P Announces New Actions to Enhance Independence, Strengthen the Ratings Process, and Increase Transparency to Better Serve Global Markets," which stated in part:

Standard & Poor's Ratings Services ("S&P") today announced that *we have begun implementing a broad set of new actions to further strengthen our ratings operations* and better serve capital markets around the world.

"The ongoing transformation of the financial markets requires us to continue to bring more innovative thinking, greater resources, and improved analytics to the ratings process," said Deven Sharma, president of S&P. "By *further enhancing independence, strengthening the ratings process*, and increasing transparency, the actions we are taking will serve the public interest by building greater confidence in credit ratings and supporting the efficient operation of the global credit markets."

The actions, which will be implemented throughout S&P's global organization, include enhancements in the following four areas:

- Governance: S&P is implementing new measures that build on existing governance policies and protections and further strengthen the integrity of the ratings process to ensure its independence, make

- 102 -

the effectiveness of our governance even more transparent and to maintain investor confidence.

- Analytics: S&P is taking steps to ensure that our ratings models, processes, and analytical talent continue to be of the highest quality and that S&P remains fully equipped to rate complex financial structures with increasing transparency regarding assumptions.

- Information: S&P is providing market participants with greater transparency about the ratings process and greater clarity about the risks that could cause a change in ratings assumptions.

- Education: S&P is undertaking an extensive educational outreach program to help market participants better understand what a credit rating is – and is not. The goal is to help them use ratings appropriately.

S&P has already adopted a number of these enhancements and will implement the remainder throughout the year. S&P also is evaluating additional actions and intends to introduce further measures throughout the year.

"This initial set of actions is the product of a comprehensive, formal assessment of our policies and practices conducted in collaboration with an independent third-party expert, as well as active dialogue with market participants, regulators, and legislators. These actions are consistent with our commitment to continuous improvement," said Sharma. "Our goal is not only to enhance specific processes but also to minimize even the potential for perceived conflicts of interest and provide the public a greater understanding of how our ratings are determined, what they mean, and how market trends and events affect them.

"We are committed to playing a leadership role, in collaboration with market participants, regulators, and experts, in addressing the issues currently facing the global credit markets. We will continue to engage with market participants and policymakers on an ongoing basis and consider additional steps in response to the feedback we receive," concluded Sharma.

Highlights of S&P's New Actions

Below are brief descriptions of some of the major new actions that S&P is undertaking. Details of all 27 individual measures that S&P is implementing are available at http://www.spnewactions.com/.

Enhancing Governance

- Establish an Office of the Ombudsman that will address concerns related to potential conflicts of interest and to analytical and governance processes across S&P's businesses that issuers, investors, employees, and other market participants may raise. The Ombudsman will oversee the handling of all issues, with authority to escalate any

unresolved matters, as necessary, to the CEO of The McGraw-Hill Companies and the Audit Committee of the Board of Directors.

- Engage an external firm to periodically conduct an independent review of S&P Ratings' compliance and governance processes. This firm will issue a public opinion that addresses whether S&P is effectively managing potential conflicts of interest and maintaining the independence of our ratings.

- Institute periodic rotations for lead analysts.

- Implement "look back" reviews whenever an analyst leaves to work for an issuer to ensure the integrity of prior ratings.

Strengthening Analytics

- Complement traditional credit ratings analysis by highlighting non-default risk factors such as liquidity, volatility, correlation, and recovery that can influence the valuation and performance of rated securities and portfolios of these securities.

- Add new surveillance capabilities, including tools, models, and data sets, that will enable S&P to better monitor the performance of collateral pools over time.

- Establish a Model Oversight Committee within the Quantitative Analytics Group, which will be separate from and independent of the business unit, to assess and validate the quality of models and tools.

- Increase annual analyst training requirements, enhance training programs, and establish an analyst certification program.

Increasing Transparency of Information

- Develop an identifier that will highlight to the market that the rating is on a securitization or on a new type of instrument.

- Include "what if" scenario analysis in rating reports to explain key rating assumptions and the potential impact on the rating of unexpected events. The goal is to help investors better assess an issue's risk profile.

- Work with issuers and investors to improve disclosure of information on collateral supporting structured securities.

- Request greater minimum portfolio disclosure criteria of issuers of certain structured securities.

- Collect more information about the procedures issuers and originators use to assess the accuracy and integrity of their data and to detect fraud.

Educating the Public

- Create a Credit Ratings User Manual and Investor Guidelines to promote better understanding of our ratings process and the role of ratings in the financial markets.

- Establish an Advisory Council with membership that includes risk managers, academics, and former government officials to provide guidance on addressing complex issues and to establish topics for market education.

- Broaden distribution of analysis and opinions via the Web and other media.

179.    The response to the Company's broad-based reforms of its operations was negative.

For example, on February 7, 2008, *Dow Jones Factiva* and the *Wall Street Journal* reported that the reforms were referred to as "window dressing" and "too little, too late" by the New York Attorney General:

New York Attorney General Andrew Cuomo wants ratings firms to go further in their efforts to fix their processes for rating mortgage bonds.

After McGraw-Hill Cos.' (MHP) Standard & Poor's and Moody's Corp.'s (MCO) Moody's Investors Service this week put out plans to improve their methodologies for rating mortgage-related bonds and other hard-hit structured finance vehicles, Cuomo's office will release a statement Thursday **calling the moves "window dressing" that fall short of the systemic reform needed to restore investor confidence**, according to a person familiar with the matter.

Cuomo's office is investigating the rating firms to ascertain how culpable they are for assigning ratings that were far too high for various bonds backed by subprime mortgages. Many collateralized debt obligations, or CDOs, that heavily invested in mortgage instruments were also highly rated, but many have now been downgraded, forcing billions of dollars in write-offs at financial firms. ***The New York Attorney General's Office has subpoenaed both S&P and Moody's in an effort to find out how much each knew about flaws in the mortgage products that they rated triple-A***. The rating firms have been meeting with representatives of the Attorney General's Office in recent weeks.

While critics of the rating firms say they grew too close to the investment banks that sold billions of dollars in mortgage bonds, others say they simply made bad judgment

calls about the direction of the housing market and relied on incomplete or incorrect data provided by banks and mortgage firms.

Cuomo is meeting with executives of the three major ratings firms this week, the person familiar with the matter said. In addition to Moody's and S&P, Fimalac SA's (3794.FR) Fitch Ratings is a big player in ratings. *"The supposed reforms announced today by Standard & Poor's and by Moody's on Tuesday are too little too late," the attorney general said in his statement.*

*In an interview with CNBC, Standard & Poor's President Deven Charma deflected questions about an investigation*, saying only that "we are very happy to engage with the attorney general on any and every question that he may have as we will cooperate and offer him all of the information that his office may need to come to appropriate conclusions."

\*     \*     \*

180.    On the following day, the Company's stock price fell approximately 5.5%, dropping from a close of $43.01 on February 7, 2008 to a closing price of $40.66 on February 8, 2008.

181.    On February 29, 2008, the Company filed its annual financial report on Form 10-K for the year ending December 31, 2007. The financial results reported in the 10-K were substantially similar to those reported in the Company's January 24, 2008 press release. The Form 10-K was signed by the Individual Defendants, and contained required Sarbanes-Oxley certifications signed by the Individual Defendants stating that the Form 10-K did not include any material misrepresentations. In discussing what drove McGraw-Hill's improved financial performance, the 2007 10-K stated, in relevant part:

\*     \*     \*

TO OUR SHAREHOLDERS:

For The McGraw-Hill Companies, 2007 was filled with significant achievements—and some equally big challenges.

It was a year in which we delivered record results and impressive growth thanks to the outstanding performance of our business portfolio. But it was also a year in which the U.S. housing bubble burst and the market for mortgage-related securities deteriorated, fueling disruption in the capital markets and causing a slowdown in our fourth-quarter results.

It was a year in which phrases like "subprime mortgage" and "credit crunch" made headlines and ratings agencies were thrust into an unfamiliar spotlight—with questions raised about their performance, policies and practices.

As we reflect on the events of the past year and focus on our opportunities for 2008 and beyond, there is one imperative shared by the management team across The McGraw-Hill Companies—to extend our record of growth while generating superior shareholder value.

Our senior leadership team is actively managing through the current environment. We believe that steps we are taking now will strengthen our operations and position us for continued growth. And while it's difficult to make definitive predictions, history tells us that our markets will stabilize and the current turmoil will eventually pass.

*     *     *

Focusing on Another Year of Growth

***Entering 2008, we expect to achieve another year of growth,*** although at a slower pace than in 2007. We anticipate that the economy and conditions in the credit markets will begin to improve later in the year, and we are ready to capitalize on all available opportunities.

To prepare us for the year ahead, we restructured certain business operations in the fourth quarter of 2007, consistent with our efforts to streamline operations and lower costs. The steps we took resulted in a ***3% reduction in our workforce***, and while the decision to reduce staff is never easy, we believe these steps will strengthen our efficiency.

*     *     *

As we look ahead, we remain confident about our prospects in the U.S. corporate and public finance markets in 2008, while expecting a more conservative approach to financing in the structured markets and reduced investor appetite for complex products.

*     *     *

In Financial Services, issuance levels deteriorated across all asset classes and regions during the latter part of the year because of the current credit market conditions. The impact on U.S. residential mortgage-backed securities ("RMBS") and U.S. collateralized debt obligations ("CDOs") had the greatest impact on structured finance ratings. The Company expects the current market conditions and global issuance levels to persist through the first half of 2008 versus the prior year, primarily in structured finance. The outlook for U.S. RMBS and CDOs as well as other asset classes is dependent upon many factors including the general condition of the economy, interest rates, credit quality and spreads, and the level of liquidity in the financial markets.

- 107 -

*     *     *

In 2007, the Financial Services segment incurred restructuring charges totaling $18.8 million pre-tax. The pre-tax charge consists of employee severance costs related to a workforce reduction of approximately 170 positions across the segment. The current business environment and the consolidation of several support functions drove these restructuring activities across the segment's global operations. The segment's restructuring actions affected both its Credit Market Services and Investment Services businesses.

*     *     *

*In the third quarter of 2007, rating agencies became subject to scrutiny for their ratings on structured finance transactions that involve the packaging of subprime residential mortgages, including residential mortgage-backed securities ("RMBS") and collateralized debt obligations ("CDOs").*

*On August 29, 2007, Standard & Poor's received a subpoena from the New York Attorney General's Office requesting information and documents relating to Standard & Poor's ratings of securities backed by residential real estate mortgages.* Standard & Poor's is responding to this request.

*In September 2007, the SEC commenced an examination of rating agencies' policies and procedures regarding conflicts of interest and the application of those policies and procedures to ratings on RMBS and related CDOs.* Standard & Poor's is cooperating with the SEC staff in connection with this examination.

*On October 16, 2007, Standard & Poor's received a subpoena from the Connecticut Attorney General's Office requesting information and documents relating to the conduct of Standard & Poor's credit ratings business.* The subpoena appears to relate to an investigation by the Connecticut Attorney General into whether Standard & Poor's, in the conduct of its credit ratings business, violated the Connecticut Antitrust Act. Subsequently, a second subpoena dated December 6, 2007, seeking information and documents relating to the rating of securities backed by residential real estate mortgages, and a third subpoena dated January 14, 2008, seeking information and documents relating to the rating of municipal and corporate debt, were served. The Company is responding to the subpoenas.

*On November 8, 2007, Standard & Poor's received a civil investigative demand from the Massachusetts Attorney General's Office requesting information and documents relating to Standard & Poor's ratings of securities backed by residential real estate mortgages. Standard & Poor's is responding to this request.*

*     *     *

In 2007, total U.S. structured finance new issue dollar volume decreased 22.2% versus prior year due primarily to a decline of 40.4% in U.S. residential mortgage-backed securities ("RMBS") issuance attributable to reductions in mortgage originations in the subprime and affordability products and home equity sectors. *Although U.S. collateralized debt obligation ("CDO") issuance was strong during*

- 108 -

*the first half of 2007, it slowed significantly during the second half due to deteriorating market conditions* and was up only 1.4% for the full year 2007 as compared with 2006 according to Harrison Scott Publications and Standard & Poor's internal estimates ("Harrison Scott Publications/S&P"). U.S. commercial mortgage-backed securities ("CMBS") issuance increased 6.8% over the prior year due to higher mortgage originations driven by the low interest rate environment and strong commercial real estate fundamentals as well as rising property values and refinancing of maturing deals experienced over the first three quarters of the year offset by sharp declines in issuance in the fourth quarter of 2007.

\*        \*        \*

*Financial market concerns regarding the credit quality of sub-prime mortgages adversely impacted debt issuance of RMBS and CDOs backed by subprime RMBS in the United States*. The Company had been anticipating a decline in residential mortgage originations as well as a slowdown in the rate of growth of CDO issuance versus the significant rates of growth experienced in the past. U.S. RMBS declined by 70.5% in the second half of the year, as compared with the same period in 2006, which resulted in a 40.4% decline in issuance for the year. U.S. CDO issuance declined 48.5% in the second half of the year, as compared to the same period in 2006, and was up a slight 1.4% for the year.

*Because of the current credit market conditions, issuance levels deteriorated across all asset classes and all regions* with the exception of Europe, which was up a slight 1.8% during the second half of the year. The impact on U.S. RMBS and U.S. CDOs has been the greatest. The Company expects the current market conditions and global issuance levels to persist through the first half of 2008, primarily in structured finance. The outlook for U.S. RMBS and U.S. CDOs asset classes as well as other asset classes is dependent upon many factors, including the general condition of the economy, interest rates, credit quality and spreads, and the level of liquidity in the financial markets.

Growth rates in 2008 for Credit Market Services will be unfavorably impacted for at least the first half of the year due to expected lower issuance levels for most U.S. structured finance and challenging comparisons to the same period of the prior year. The Mortgage Bankers Association is forecasting approximately a 16% decline in mortgage originations due to continued weakness in the housing market, which is expected to adversely impact the U.S. RMBS sector. International growth and product diversification may help mitigate the anticipated decline in most U.S. structured finance issuance volumes.

The U.S. CMBS market in 2008 is expected to decline significantly due to lower commercial origination levels and investor aversion to risk. U.S. CDO issuance will be impacted by an anticipated decrease in investor demand for complex securities in favor of those that are less complex as well as a decline in the availability of underlying collateral. Issuance in the U.S. asset-backed securities market is anticipated to grow moderately in 2008 as auto manufacturers continue to rely on securitization as a source of funding. The resiliency of the consumer should also lead to growth in the credit card and student loan sectors.

*        *        *

The Company maintains disclosure controls and procedures that are designed to ensure that information required to be disclosed in the Company's reports filed with the Securities and Exchange Commission ("SEC") is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to the Company's management, including its Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO"), as appropriate, to allow timely decisions regarding required disclosure.

As of December 31, 2007, an evaluation was performed under the supervision and with the participation of the Company's management, including the CEO and CFO, of the effectiveness of the design and operation of the Company's disclosure controls and procedures (as defined in Rules 13a-15(e) under the U.S. Securities Exchange Act of 1934). Based on that evaluation, the Company's management, including the CEO and CFO, concluded that the Company's disclosure controls and procedures were effective as of December 31, 2007.

182.    The statements referenced in ¶¶173-76, 178, and 181 were each materially false and misleading when made for the reasons stated in ¶116.  In addition, the statements were each materially false and misleading when made as they misrepresented and/or omitted adverse facts which then existed and disclosure of which was necessary to make the statements not false and/or misleading.  The truth facts, which were then known to each of the Defendants, were:

- The subprime market was anything but a fabulous market. Defendants' ratings models were useless, as demonstrated by the extreme volume of significant ratings downgrades, and as admitted to by the Company on May 1, 2008, when it announced it would stop rating certain structured finance transactions.

- The elimination of a large number of employees was directly tied to the Company's subprime and Alt-A failures.

- The Company lacked any reasonable basis to predict 2008 revenue growth, and would abruptly withdraw its recently issued guidance at the end of the Class Period.

- Given the substantial surveillance failures and time lag, management could not "be confident" that the credit crunch would not destroy the Company's revenues.

- The actions to "further strengthen" the Company's rating were admissions that the Company's ratings and surveillance failed during the Class Period.

## IX.    THE TRUTH IS PARTIALLY REVEALED

183.    On March 11, 2008, the Company withdrew its financial forecasts for its Financial

Services segment.  In response, analysts from Lehman Brothers cut their target price for the stock, as

the *Associated Press* reported:

### Lehman Cuts Price Target on McGraw-Hill

McGraw-Hill Hits New Low As Lehman Cuts Price Target; Downgrades Moody's
Rating

NEW YORK (AP) -- ***Shares of textbook publisher and Standard & Poor's owner
McGraw-Hill Cos. dipped Tuesday even as the Dow surged 260 points***, as a
Lehman Brothers analyst lowered his price target on the stock to take into account
risk associated with fundamentals, regulatory, and litigation.

Analyst Craig Huber dropped his 12-month target price on the stock to $47 from $63,
but maintained an "Overweight" rating on shares.  He said the stock is attractive for
long-term investors, but warned that S&P ratings revenue comparisons will be very
difficult through August.

McGraw-Hill owns credit ratings agency Standard & Poor's. Huber said he prefers
McGraw-Hill (S&P) shares over those of Moody's Corp., another credit ratings firm,
due to the diversity of its portfolio and the fact that it trades at a discount.

Historically, Moody's and McGraw-Hill`s S&P Ratings business models have been
quite successful with each currently having 40 percent global market share of credit
ratings. However, Huber originally expected a rebound in the fixed income markets
in September, but is now not expecting the market to regain ground until January
2009. Therefore, new issue dollar volume is expected to drop 42.5 percent, much
lower than his prior estimate for a 30 percent drop in 2008.

"If new issuance stays at these low levels, for say 2-3 years, then the fixed income
markets are just not working and would signal significant global financial distress
further hurting Moody's fundamentals," he wrote in a note to clients.

He is modeling a 15 percent rebound in 2009, however, "given expected pent-up
demand and a healthier global credit market."

Huber cut Moody's to "Underweight" from "Overweight" with a 12-month price
target of $29 -- forecasting 18 percent downside to the stock's current $34.60 price.
Since August, Moody`s ratings business has been experiencing pressure from a
significant downturn in new issuance of fixed income products, furthermore, because
of market criticism of the ratings agencies' responsibility for rating troubled
securities linked to the subprime mortgage crisis, there could be changes made to the
business model and/or sector that could alter the nature of the credit ratings business.

"Investor concerns regarding litigation risk are quite widespread in the marketplace," he added. "Moody`s may be sued under various theories such as contract, tort, or a fraud-type claim."

Huber thinks litigation concerns have been quite heavily reflected in the stock price already, but nevertheless discounts the stock's value to account for further uncertainty.

McGraw-Hill shares fell 69 cents, or 1.8 percent, to close at $37.30, having earlier hit a new 52-week low of $36.32. Moody's dropped 31 cents, or less than a percent, to $35.19. Meanwhile, the Dow Jones Industrial average surged 340 points, or nearly 3 percent, to 12,080 in late afternoon trading after the Federal Reserve and other central banks said they will pump $200 billion into the financial markets to help ease the strain from the credit crisis.

184.    Similarly, on March 11, 2008, *Dow Jones Factiva* and *Reuters* reported on the

negative reaction to McGraw-Hill's abrupt withdrawal of its recently issued guidance:

The parent companies of Moody's Investors Service and Standard & Poor's, the largest credit rating agencies, Tuesday cut their 2008 forecasts, saying capital markets turmoil will persist at least through mid-year as the economy slows.

Moody's Corp said profit and revenue will decline more than expected. ***McGraw-Hill Cos said revenue from its financial services unit, which includes S&P, and overall profit should both fall short of its prior forecast***.

"We have just a complete freeze in some market sectors, and we are trying to, frankly, catch up with that reality," Moody's Chief Executive Raymond McDaniel said at a Bear Stearns & Co media conference in Palm Beach, Florida. "We have declining prices, we have liquidity issues, we have confidence issues."

Moody's expects 2008 profit per share of $1.90 to $2.00, with revenue declining by a mid- to high-teens percent-age. On Feb. 7, Moody's had forecast profit per share of $2.17 to $2.25, with a low double-digit drop in revenue.

***McGraw-Hill Chief Executive Harold "Terry" McGraw said his company is unlikely to achieve its Jan. 24 forecast for 2008 profit growth of 3 percent to 5 percent excluding items, compared with $2.99 per share in 2007.***

***He also withdrew his forecast for 2 percent to 4 percent revenue growth in financial services, after demand for ratings fell below expectations in January and February.***

"Uncertainty remains high," McGraw said at the Bear Stearns conference. "Nobody can predict when the credit crunch is going to unwind."

Moody's and S&P have suffered as the housing crisis led to disappearing demand for a wide variety of debt, including "structured products" such as collateralized debt obligations.  This reduced demand for ratings needed to sell such debt.

Analysts on average expected Moody's to post 2008 profit of $2.12 per share on revenue of $2 billion, the latter reflecting an 11 percent drop, according to Reuters Estimates.

McGraw Hill's full-year profit was expected to be $3.01 per share. The company also publishes textbooks and magazines such as BusinessWeek, and owns researcher J.D. Power & Associates.

**On a day of broad market gains**, Moody's shares closed down 31 cents at $35.19, while **McGraw-Hill shares fell 69 cents to $37.30**.

DISTRESS IN CREDIT MARKETS

Lehman Brothers Inc analyst Craig Huber assigned an "underweight" rating and $29 price target to Moody's. He rates McGraw-Hill "overweight," but cut its price target to $47 from $63. Huber expects the dollar volume of fixed-income securities issuance to fall 42.5 percent this year.

"If new issuance stays at these low levels, for say two to three years, then the fixed-income markets are just not working and would signal significant global financial distress further hurting Moody's fundamentals," Huber wrote.

Critics have faulted the rating agencies for long being willing to assign "triple-A" credit ratings to securities backed by risky debt, including subprime mortgages.

But the quantity and speed of downgrades over the last several months have exacerbated the credit crunch.

McDaniel, Moody's chief executive, said it would be "disingenuous" to say his company's reputation hasn't been hurt by the market turmoil.

Moody's has said it might change how it rates structured products, and may drop its usual 21 traditional letter grades -- which range from "Aaa" to "C" -- for numerical ratings.

Meanwhile, S&P last month announced 27 actions it said would help bolster confidence in, and accuracy of, its ratings.

New York Attorney General Andrew Cuomo, who is conducting a broad investigation into lending-related problems and abuses, last month called the proposed changes "too little, too late."

The largest investor in Moody's is Warren Buffett's Berkshire Hathaway Inc, which reported a 19.1 percent stake at year end. (Editing by Derek Caney, Phil Berlowitz)

## X. ADDITIONAL SCIENTER ALLEGATIONS

185.    As alleged herein, Defendants acted with scienter in that they knew or disregarded

with severe recklessness that the public documents and statements, issued or disseminated in the

name of the Company, were materially false and misleading, knew that such statements or documents would be issued or disseminated to the investing public, and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail throughout this complaint, Defendants, by virtue of their receipt of information reflecting the true facts regarding McGraw-Hill, their control over, and/or receipt and/or modification of McGraw-Hill's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning McGraw-Hill, participated in the fraudulent scheme alleged herein.

186.    Defendants knew and/or disregarded with severe recklessness the falsity and misleading nature of the information that they caused to be disseminated to the investing public. The ongoing fraudulent scheme described in this complaint could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of the Company, including each of the Individual Defendants.

187.    In addition to the foregoing and other facts alleged herein, Bahash was motivated to perpetuate the fraudulent scheme and course of conduct described herein so that he could profit from the sale of his own personally held shares of artificially-inflated Company stock. Bahash sold a substantial amount of stock in a very short timeframe, while in possession of adverse non-public information concerning, among other things, the Company's inability to address the failing subprime market. At the time of these reported sales, the Company's stock price was as high as $68.71 per share.

188.    Specifically, in the four-day period between December 19, 2007 and December 22, 2006, Bahash sold more than 202,000 shares, resulting in proceeds totaling almost $14,000,000, as demonstrated in the chart below:

| Date | Number of Shares Sold | Price Per Share | Proceeds |
|---|---|---|---|
| 12/19/2006 | 70,000 | $68.71 | $4,809,700 |
| 12/20/2006 | 20,000 | $68.56 | $1,371,200 |
| 12/21/2006 | 60,000 | $68.36 | $4,101,600 |
| 12/21/2006 | 1,500 | $68.12 | $102,180 |
| 12/22/2006 | 50,654 | $68.17 | $3,453,083 |
| **TOTALS** | **202,154** | | **$13,837,763** |

189.    These sales were unusual and suspicious in amount because of their size, both in terms of the number of shares sold and the dollar amounts of the transactions, and because of the timing and prices of the transaction.

190.    Not by coincidence, on December 18, 2008 – the day before Bahash's selling streak – the Company's stock closed at $69.10, the highest stock price of the year.  Five trading days after Bahash's stock sales, on January 3, 2007, the Company's stock price dropped by $2, closing at $67.09.

## XI.    APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

191.    At all relevant times, the market for McGraw-Hill's publicly-traded securities was an efficient market for the following reasons, among other things:

(a)    McGraw-Hill's securities met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient and automated market;

(b)    As a regulated issuer, McGraw-Hill filed periodic public reports with the SEC; and

(c)    McGraw-Hill regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services.

192.    As a result, the market for McGraw-Hill's publicly-traded securities promptly digested current information regarding McGraw-Hill from all publicly-available sources and reflected such information in McGraw-Hill's securities prices.  Under these circumstances, all purchasers of McGraw-Hill's publicly traded securities during the Class Period suffered similar injury through their purchase of McGraw-Hill's publicly-traded securities at artificially inflated prices and a presumption of reliance applies.

## XII.    LOSS CAUSATION

193.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated McGraw-Hill's stock price and operated as a fraud or deceit on Class Period purchasers of McGraw-Hill stock by misrepresenting the Company's business success and future business prospects, including but not limited to misrepresentations regarding the growth and financial performance of the Financial Services division of Standard and Poor's, which, during the Class Period, was the driver of the Company's revenue growth and income generation.

194.    As a result of Defendants' fraudulent conduct as alleged herein, the prices at which McGraw-Hill securities traded were artificially inflated during the Class Period.  When Plaintiff and other members of the Class purchased their McGraw-Hill securities, the true value of such securities was substantially lower than the prices actually paid by Plaintiff and the other members of the Class.

195.    During the Class Period, Defendants improperly concealed the true reasons behind the increases in McGraw-Hill's financial performance and outlook, and, consequently, the price of its stock was artificially inflated throughout the Class Period.  Defendants also misrepresented the reasons behind McGraw-Hill's reported results and made numerous false and misleading statements regarding many aspects of its business and future prospects.  Later, however, when the truth regarding McGraw-Hill's true financial circumstances leaked out and Defendants' prior

misrepresentations and fraudulent conduct became apparent to the market, McGraw-Hill stock fell precipitously as the prior artificial inflation came out of McGraw-Hill's stock price. As a result of their purchases of McGraw-Hill stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages under federal securities laws.

196. By misrepresenting the success of the Company's business and concealing its improprieties, Defendants presented a misleading picture of McGraw-Hill's business and prospects. These claims of future profitability caused and maintained the artificial inflation in McGraw-Hill's stock price throughout the Class Period until the truth was partially revealed to the market.

197. As a result of Defendants' materially false and misleading statements and documents, as well as the adverse, undisclosed information known to the Defendants, Plaintiff and other members of the Class relied, to their detriment on such statements and documents, and/or the integrity of the market, in purchasing their McGraw-Hill stock at artificially inflated prices during the Class Period. Had Plaintiff and the other members of the Class known the truth, they would not have taken such actions.

198. As explained herein, these false statements directly or proximately caused, or were a substantial contributing cause of the damages and economic loss suffered by Plaintiff and other members of the Class, and maintained the artificial inflation in McGraw-Hill's stock price throughout the Class Period and until the truth leaked into and was partially revealed to the market, at which time the prior inflation came out of the stock.

199. Defendants' false and misleading statements had the intended effect and directly and proximately caused, or were a substantial contributing cause of McGraw-Hill's stock trading at artificially inflated levels, reaching as high as more than $72.00 per share, throughout the Class Period.

200.   On August 16, 2007, the *Associated Press* published a story on McGraw-Hill that disclosed the European Union's commitment to closely examine why McGraw-Hill, among others, was slow to react to early signs of U.S. loan defaults that formed the bedrock of the Company's explosive growth in its Financial Services division.  As investors and the market became aware of McGraw-Hill's prior misstatements and concealments and that McGraw-Hill's actual business prospects were, in fact, driven by static ratings, as opposed to dynamic ratings that reacted to tremendous changes in market characteristics, at least a portion of the prior artificial inflation came out of McGraw-Hill's stock price, damaging investors.

201.   As a direct result of the public revelations regarding the truth about McGraw-Hill's conduct, financial condition, and its actual business prospects going forward, the volume of trading in the Company's stock soared to more than 7.39 million shares and the stock price dropped from $50.74 per share on August 15, 2007 to a low of $47.76 per share on August 16, 2007 – a difference of 6% – before closing at $48.85 later that day – a drop of approximately 4%.  These drops removed at least a portion of the inflation from McGraw-Hill's stock price, causing real economic loss to investors who had purchased the stock during the Class Period, as evidenced by the chart below:



202.    The decline in McGraw-Hill's stock price on August 16, 2007 was a direct result of and proximately caused by the nature and extent of Defendants' fraud partially being revealed to investors and the market.  Similarly, the 5.5% decline in the Company's stock price on February 8, 2008, and the approximately 3% decline to a low of $36.32, on enormous volume of more than 8.75 million shares, on March 11, 2008, were the direct and proximate cause of the partial revelation of Defendants' fraud and the Company's true financial condition.

203.    The timing and magnitude of McGraw-Hill's stock price declines negate any inference that the loss suffered by Plaintiff and other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Defendants' fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by Plaintiff and other members of the Class was a direct result of Defendants' fraudulent scheme to artificially inflate McGraw-Hill's stock price and the subsequent significant declines in the value of McGraw-Hill's

stock when Defendants' prior misrepresentations and other ongoing fraudulent conduct were revealed and the artificial inflation came out of McGraw-Hill's stock.

204.    In addition, the declines in McGraw-Hill's stock price were a natural and probable consequence of Defendants' fraud and should have been foreseen by Defendants in light of the attending circumstances.  The market reaction to the partial disclosure of McGraw-Hill's true financial condition was foreseeable to Defendants and well within the "zone of risk" concealed by Defendants' fraudulent conduct.

205.    In sum, there were no changed economic circumstances, changed investor expectations, new industry-specific facts or McGraw-Hill-specific facts, conditions or other events, which taken separately or together account for the decline in the price of McGraw-Hill stock described therein.

## XIII.  NO SAFE HARBOR

206.    The federal statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint.  Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.   To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of McGraw-Hill who knew that those statements were false when made. Moreover, to the extent that Defendants issued any disclosures designed to "warn" or "caution"

investors of certain "risks," those disclosures were also false and misleading since they did not disclose that Defendants were actually engaging in the very actions about which they purportedly warned and/or had actual knowledge of material adverse facts undermining such disclosures.

## XIV.  COUNT I:  FOR VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 PROMULGATED THEREUNDER AGAINST ALL DEFENDANTS

207.     Plaintiff repeats and realleges the allegations set forth above as though fully set forth herein.  This claim is asserted against all Defendants.

208.     During the Class Period, McGraw-Hill and the Individual Defendants, and each of them, carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did:  (i) deceive the investing public, Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of McGraw-Hill's publicly traded securities; and (iii) cause Plaintiff and other members of the Class to purchase McGraw-Hill's publicly-traded securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, McGraw-Hill and the Individual Defendants, and each of them, took actions set forth herein.

209.     These Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operate as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for McGraw-Hill's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  These Defendants are sued as primary participants in the wrongful and illegal conduct charged herein.  The Individual Defendants are also sued as controlling persons of McGraw-Hill, as alleged below.

210. In addition to the duties of full disclosure imposed on Defendants as a result of their making of affirmative statements and reports, or participating in the making of affirmative statements and reports, or participating in the making of affirmative statements and reports to the investing public, they each had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. § 210.01 *et seq.*) and S-K (17 C.F.R. §229.10 *et seq.*) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, surveillance, financial condition and operational performance, so that the market prices of the Company's publicly traded securities would be based on truthful, complete and accurate information.

211. McGraw-Hill and each of the Individual Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, business practices, performance, operations and future prospects of McGraw-Hill as specified herein.

212. These Defendants each employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of McGraw-Hill's value and performance, financial and operational growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state necessary facts in order to make the statements made about McGraw-Hill and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of McGraw-Hill securities during the Class Period.

213. Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: a) each of the Individual Defendants was a high-level executive and/or director at the Company during the Class Period; b) each of the Individual Defendants, by virtue of his responsibilities and activities as a senior executive officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's financial performance, projections and/or reports; and c) each of the Individual Defendants was aware of the Company's dissemination of information to the investing public which each knew or disregarded with severe recklessness was materially false and misleading.

214. Each of these Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with severely reckless disregard for the truth in that each failed to ascertain and to disclose such facts, even though such facts were available to each of them. Such Defendants' material misrepresentations and/or omissions were done knowingly or with severe recklessness and for the purpose and effect of concealing McGraw-Hill's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' misstatements of the Company's financial condition and performance throughout the Class Period, each of the Individual Defendants, if he did not have actual knowledge of the misrepresentations and omissions alleged, was severely reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false and misleading.

215. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market prices of McGraw-Hill's securities were artificially inflated during the Class Period. In ignorance of the fact that market prices of McGraw-Hill's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the

market in which the securities trade, and/or on the absence of material adverse information that was known to or disregarded with severe recklessness by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired McGraw-Hill securities during the Class Period at artificially high prices and were damaged thereby, as evidenced by, among others, the stock price declines on or about August 16, 2007, February 8, 2008, and March 11, 2008, when the artificial inflation was released from McGraw-Hill stock.

216.     At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known of the true performance, future prospects and intrinsic value of McGraw-Hill, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their McGraw-Hill publicly-traded securities during the Class Period, they would not have done so at artificially inflated prices which they paid.

217.     By virtue of the foregoing, McGraw-Hill and the Individual Defendants have each violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

218.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period, as evidenced by, among others, the stock price declines on or about August 16, 2007, February 8, 2008, and March 11, 2008, when the artificial inflation was released from McGraw-Hill stock.

## XV.    COUNT II:  FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT AGAINST THE INDIVIDUAL DEFENDANTS

219.     Plaintiff repeats and realleges the allegations set forth above as though fully set forth herein.  This claim is asserted against the Individual Defendants.

220.    Each of the Individual Defendants acted as a controlling person of McGraw-Hill within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions with the Company, participation in and/or awareness of the Company's operations and/or intimate knowledge of the Company's fraudulent marketing and promotions and actual performance, each of the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  Each of the Individual Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

221.    In addition, each of the Individual Defendants had direct involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged herein, and exercised the same.

222.    As set forth above, McGraw-Hill and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their controlling positions, each of the Individual Defendants is liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period, as evidenced by, among others, the stock price declines on or about August 16, 2007, February 8, 2008, and March 11, 2008, when the artificial inflation was released from McGraw-Hill stock.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(a)     Determining that this action is a proper class action and designating Lead Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

## XVI.  JURY TRIAL DEMANDED

223.    Plaintiff hereby demands a trial by jury.

DATED:  May 7, 2008

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
DAVID J. GEORGE (*pro hac vice*)
DOUGLAS WILENS (*pro hac vice*)
ROBERT J. ROBBINS (*pro hac vice*)


                               */s/ David J. George*
                                DAVID J. GEORGE

120 E. Palmetto Park Road, Suite 500
Boca Raton, FL  33432-4809
Telephone:  561/750-3000
561/750-3364 (fax)

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
NANCY M. JUDA (DC Bar # 445487)
1100 Connecticut Avenue, N.W., Suite 730
Washington, DC  20036
Telephone:  202/822-6762
202/828-8528 (fax)

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
DAVID A. ROSENFELD
MARIO ALBA, JR.
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

**Lead Counsel for Plaintiff**

SUGARMAN & SUSSKIND
ROBERT SUGARMAN
100 Miracle Mile, Suite 300
Coral Gables, FL  33134
Telephone:  305/529-2801
305/447-8115 (fax)

**Additional Counsel for Plaintiff**

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 7, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system. The electronic case filing system sent a "Notice of Electronic Filing" to the attorneys of record who have consented in writing to accept this notice as service of this document by electronic means.

*/s/ David J. George*
David J. George
